1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3             LAREDO DIVISION

4   UNITED STATES OF AMERICA,        )CRIMINAL NO. 5:08-1244-S2
                                     )
5   vs.                             )January 28, 2010
                                     )
6   ARMANDO GARCIA, A.K.A."CACHETES" )
    TN:GERARDO CASTILLO-CHAVEZ,      )
7                                    )
    Defendant.                       )
8   ═══════════════════════════  ══════

9

10          TRANSCRIPT OF HECTOR GARCIA
        BEFORE THE HONORABLE MICAELA ALVAREZ
11        DISTRICT COURT JUDGE, and a jury

12

13  APPEARANCES:

14  For the Government:   JOSE ANGEL MORENO, AUSA
                          JAMES USTYNOSKI, AUSA
15                        Office of US Attorney
                          P.O. Box 1179
16                        1100 Matamoros
                          Laredo, Texas 78042
17
    For the Defendant:    ROBERTO BALLI, ESQ.
18                        OSCAR VELA, ESQ.
                          Office of Federal Public Defender
19                        801 Matamoros, 3rd Floor
                          Laredo, Texas 78040
20

21  Court Reporter:       LETICIA O. GOMEZ, CSR
                          1300 Victoria #3245
22                        Laredo, Texas 78040
                          (956)726-2341
23

24  Produced by mechanical stenography; computer-aided
25  transcription

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

I-N-D-E-X

|  | DIR | CX |
|---|---|---|
| GOVERNMENT WITNESS: | 3 | 12 |

<u>P-R-O-C-E-E-D-I-N-G-S</u>

HECTOR GARCIA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORENO:

Q    Would you please state your full name?

A    Hector Javier Garcia.

Q    And where do you work, Mr. Garcia?

A    Currently, I'm working for the U.S. Border
Patrol.  And I'm a former investigator for the Webb
County Sheriff's office.

Q    How long have you been with border patrol?

A    Approximately three years.

Q    Okay.  And how long did you work for the Webb
County Sheriff's office?

A    Two years.

Q    Okay.  Can you tell us what period you worked
with the sheriff's office.

A    From 2005 to January 11, 2007.

Q    Okay.  And what duties did you perform for the
Webb County Sheriff's office?

A    My position was Sergeant investigator, and I
investigated crimes such as homicides, aggravated
assaults, engaging, etc.

Q    Okay.  And were you so employed on or about
March 18 of 2006?

1    A    Yes, sir.

2    Q    Okay.  Were you the investigator that was

3    assigned to investigate or follow-up on a shooting

4    involving a victim by the name of Gerardo Ramos?

5    A    Yes, sir.

6    Q    Okay.  In terms of that specific shooting, can

7    you tell us what you did as part of your

8    investigation in that case?

9    A    In the first case, yes, sir.  I followed up and

10   met with a witness -- with the victim, which was

11   Mr. Ramos.  Tried to obtain a voluntary statement as

12   to the facts that what happened that night.

13   Q    Was he cooperative?

14   A    Not really.  I mean he was just giving us vague

15   information as far as the people that were there.

16   Q    Where you did you go meet with him?

17   A    I met -- I do not recall seeing him at the

18   scene because I went out there that night.  I met

19   with him like a couple of days later at the

20   hospital.

21   Q    Okay.  By that time had you determined, you

22   know, what injuries if any he had suffered?

23   A    I believe he had -- I don't remember.  I don't

24   recall how many times he got shot, but he got shot a

25   couple of times.

1    Q    Okay.  And when you saw him at the hospital,

2    you said he just gave you vague information?

3    A    Yes, the first time.

4    Q    Did you interview any of the other witnesses

5    who were at the scene that the night?

6    A    Yes, I interviewed I believe Mariano Resendez.

7    At the scene, we obtained statement from him.  And

8    also he provided vague information.

9    Q    All right.  Did you interview a person by the

10   name of Julio Cesar Resendez?

11   A    I believe he was there at the scene the first

12   time.  We had two -- two aggravated assaults.

13   Q    Okay.  I want to you stay on this one first.

14   A    Yes, sir.

15   Q    And so did you talk to him about this first

16   shooting?

17   A    Yes, sir.

18   Q    Okay.  Now you mention that there was a second

19   shooting involving Mr. Julio Cesar Resendez?

20   A    Yes, sir.

21   Q    When did that happen?

22   A    I want to say a couple -- about a week later or

23   so--

24   Q    Okay.

25   A    -- from that date.

1    Q    Okay.  Let me help you -- would it help you

2    remember the date if I showed you a copy of one of

3    the reports?

4    A    Yes, sir.

5                    MR. MORENO:  May I approach, Your Honor?

6                    THE COURT:  You may.

7                    THE WITNESS:  Yes, sir, March 31, 2006.

8    BY MR. MORENO:

9    Q    Okay.  And on that day were you also assigned

10   to be the investigator on that second shooting?

11   A    No, sir.  I was the agent -- I'm sorry -- Case

12   Agent Investigator Paez.

13   Q    All right.  How was it that you became aware

14   that Mr. Julio Cesar Resendez was involved in the

15   second shooting?

16   A    Because Mr. Paez had advised me about that

17   shooting.

18   Q    Okay.  Did you coordinate your investigation

19   with Investigator Paez?

20   A    Yes, sir.

21   Q    Why was that?

22   A    Because we had basically the same people, the

23   victims.  This time it was Julio Cesar that got

24   shot.

25   Q    Do you know where this second incident took

1    place?

2    A    If I read my report, 1103 Paseo Otiver.

3    Q    So the same address?

4    A    It's the same location.

5    Q    Now you mentioned that at the second instance

6    it was Julio Cesar who was shot?

7    A    Yes, sir.

8    Q    Do you remember how many times he got shot?

9    A    I want to say he got shot twice.

10   Q    Now during the course of investigating this

11   case, did you also respond to the scene on April 2,

12   2006, for the murder of Jesus or Chuy Resendez and

13   Mariano Resendez?

14   A    Actually, I did not respond to the scene, but I

15   did meet with the sister of Gerardo Ramos.

16   Q    Okay.  And by the way was Mariano Resendez that

17   you had spoken to after the shooting of Gerardo

18   Ramos on March 18 is that the same Mariano Ramos

19   that was killed on April 2nd with Jesus Resendez?

20   A    I believe, Mariano Resendez, sir.  That's the

21   same subject.

22   Q    Why did you meet with the sister of Gerardo

23   Ramos?

24   A    Because Ms. Ramos -- Pablo Ramos, the sister,

25   was an associate of mine back in the -- when I was

```
 1   at the university, so she had developed a rapport
 2   with me.  And she wanted to provide more information
 3   on the subjects.
 4   Q    Okay and when you met with her did she turn
 5   anything over to you?
 6   A    I believe not at that -- not that night.  A
 7   week or so later, we met.  She was able to.
 8   Q    Where did you meet?
 9   A    In Cotulla, Texas.
10   Q    Okay.  And what, if anything, did she give you
11   in Cotulla, Texas?
12   A    They gave me a Boost cell phone.
13   Q    Okay.  Where did the boost cell phone come
14   from?
15   A    From one of the -- the day that Jesus -- I'm
16   sorry.  Julio Cesar was shot.  It was dropped at the
17   scene.
18   Q    Okay.  By one of the assailants?
19   A    By the assailants.  Yes, sir.
20   Q    What did do you with that telephone?
21   A    First we looked over the phone to see if it was
22   an abandoned phone at the time, and I wanted to see
23   whose phone it was.  We were able to find, you know,
24   I believe it said something about a house or parents
25   house or something.  And we -- based on our
```

1  investigation, we found out that it was a subject

2  Jose Martinez's phone because we spoke to the

3  mother.

4  Q    Okay.  And do you know if this Jose Martinez is

5  also known as Pepe Martinez?

6  A    Yes, sir.

7  Q    Do you know what that subject looks like?  Did

8  you determine what he looks like from your

9  investigation?

10  A    If you show me a photo, I can probably.

11              MR. MORENO:  Okay.  Can I approach, Your

12  Honor?

13              THE COURT:  You may.

14  BY MR. MORENO:

15  Q    I'm showing you what I've marked as Government

16  Exhibit Number 181.  Do you recognize that?

17  A    Yes, that's Jose Pepe Martinez.

18              MR. MORENO:  We offer Government Exhibit

19  Number 181, Your Honor.

20              THE COURT:  Any objection?

21              MR. BALLI:  No, Your Honor.

22              THE COURT:  It's admitted.

23         (Government Exhibit 181 admitted.)

24  BY MR. MORENO:

25  Q    Okay.  So this is the individual that you

1    traced the Boost phone back to?

2    A    Yes, sir.

3    Q    Okay.  Now you said you spoke to his mother.

4    Where did you go speak to his mother?

5    A    I believe we met at the H-E-B on Zapata

6    Highway.  I do not know the exact address.

7    Q    When you were trying to determine who owned the

8    phone and you discovered that it was Pepe Martinez,

9    did you figure out where he lived or what house was

10    connected him?

11    A    Yes, sir.  I believe it was 902 Musgo -- Santa

12    Rita area.

13    Q    Okay.  Do you know who else lives at 902 Musgo?

14    A    At the time, there was a sister, Diana

15    Martinez.  I want to say.

16    Q    Anybody else?

17    A    The mother.  I don't remember her name -- and

18    David Orlando, which I think he was using the name

19    at the time.

20    Q    Who was using the name?

21    A    Jose Pepe Martinez.

22    Q    Was using Orlando Martinez?

23    A    David Orlando, the brother.

24    Q    Okay. Jose Pepe Martinez was using his

25    brother's name David Orlando Martinez?

1   A    I believe so.

2   Q    Okay.  Now did you ever go to 902 Musgo?

3   A    Yes, sir.

4   Q    Do you remember approximately when you went 902

5   Musgo?

6   A    I'm going to go ahead and see if I can remember

7   the date.  I believe April 7, 2006.

8   Q    So like five days after the murder of Jesus and

9   Mariano Resendez.

10  A    Yes, sir.

11  Q    Okay.  And why did you go to 902 Musgo?

12  A    To further -- for our investigation purposes we

13  went out there to see if they would -- if we would

14  meet up with Jose Martinez and try to interview him

15  on the aggravated assault.

16  Q    Okay.  And did you find anything when you want

17  to the house at Musgo?

18  A    When I stepped out of the vehicle, I observed

19  two spent casings in front of the house.

20  Q    In front of house?

21  A    Yes, sir.

22  Q    Okay.  By the way what kind of house is it?

23  A    I want to say I believe it was a manufactured

24  home.  I'm not sure.

25  Q    Like a trailer?

1    A    A trailer home.

2    Q    A trailer home.  Okay.  And when you say in

3    front of the house where?  Was it in front of the

4    house, the curb?

5    A    Yeah, it was by some -- by the sidewalk, I

6    guess.  It wasn't paved at the time, so there was

7    two spent casings there.

8    Q    Okay.  What did you do with the spent casings?

9    A    The spent casings were processed.  We put them

10   on an evidence tag, and they were placed in the Webb

11   County Sheriff's office evidence room.

12   Q    What type of caliber of casings were they?

13   A    I want to say they were -- I wouldn't remember

14   on the spent casings.  I wouldn't remember.  I

15   didn't write it down.

16   Q    Okay.  I mean do you remember whether they were

17   pistol or rifle?

18   A    They were pistol.  A pistol.  More likely nine.

19   Q    Okay.  So you've recovered this telephone from

20   the sister of Gerardo Ramos, and you said that's how

21   you tracked Pepe Martinez?

22   A    Yes, sir.

23   Q    What else if anything did you do with the

24   telephone?

25   A    I provided Laredo Police Department the phone

1    because we went over the contacts.  And we knew that

2    we had a great piece of evidence for -- to help the

3    double homicide, which they were the same victims,

4    the same people.  So they were the same assailants,

5    so we provided that for Laredo PD to further

6    investigate.

7    Q    Who did you turn the phone over to?

8    A    To Mr. Carlos Adan, Investigator Carlos Adan.

9    Q    Do you remember when you turned over the

10   telephone?

11   A    I want to say maybe a day or two later from the

12   actually obtaining the phone.

13   Q    Okay.  And I'm sorry when did you get the

14   phone?

15   A    April 7, 2006, maybe on the 9th.

16   Q    So after that, did you have any other

17   involvement or first of all in the investigation of

18   the double homicide?

19   A    No, sir.  I just giving them that information

20   that I had obtained.

21   Q    Now let me take you back just for a second

22   then.  You said that-that phone was dropped by one

23   of the assailants on the attempted assault on March

24   31st, is that correct?

25   A    Which is Julio Cesar.

1    Q    Okay.  Now -- but you said it was Investigator

2    Paez who responded to or was the investigator

3    assigned to that case?

4    A    Yes, sir.

5    Q    Okay.  Do you know who Janie Morales or Marisol

6    Morales are?

7    A    I don't recall their names, sir.

8    Q    Okay.

9                    MR. MORENO:  I'll pass the witness.

10                   THE COURT:  Mr. Balli.

11                        CROSS-EXAMINATION

12    BY MR. BALLI:

13    Q    Investigator Garcia?

14    A    Yes, sir.

15    Q    There was a couple of I guess attempts on the

16    Resendez's correct?

17    A    Correct.

18    Q    Before the homicide?

19    A    Correct, sir.

20    Q    And the first of these was on March 18, 2006,

21    correct?

22    A    Correct, sir.

23    Q    And the second was on April -- I'm sorry on

24    March 31, 2006, correct?

25    A    Correct, sir.

1    Q    And on the March 31, 2006, attempt that is the

2    one where a phone was dropped, correct?

3    A    Correct.

4    Q    And that phone led you to Jose Pepe Martinez,

5    correct?

6    A    Correct, sir.

7    Q    And is it your understanding right now that

8    Jose Pepe Martinez was -- is charged by law

9    enforcement that Jose Pepe Martinez was involved in

10   the murder of the Resendez's on April 2, 2006?

11                MR. MORENO:  Excuse me.  Before he

12   answers that, can we approach, Your Honor?

13                THE COURT:  You may.

14           (At sidebar.)

15                MR. MORENO:  I know he's going to ask

16   questions about those people, but they're still sealed.

17                MR. BALLI:  But, Your Honor, it's very

18   important for us on cross examination because the thing

19   is that they had evidence in their hands.  And they

20   shouldn't have evidence in their hands on March 2nd

21   about Jose Pepe Martinez.  And they did not follow-up on

22   that evidence.  And I want to ask him.

23                MR. MORENO:  That's fine.  I don't think

24   we have to include that he's charged in this indictment.

25                MR. BALLI:  I don't wanna do that.

```
 1                    THE COURT:  Okay.

 2                    MR. MORENO:  You already said it.

 3                    MR. BALLI:  Well I didn't say

 4       specifically by law enforcement charges.

 5                    THE COURT:  And he didn't specifically

 6       say in this case.

 7                    MR. BALLI:  And he's charged in state.

 8                    MR. MORENO:  Okay.  Let be careful with

 9       the people.

10                    THE COURT:  Yes.

11                    MR. MORENO:  Okay.  Thank you.

12                    THE COURT:  Thank you.

13               (End of sidebar.)

14       BY MR. BALLI:

15       Q    It's your understanding that Jose Pepe Martinez

16       is charged with being involved in the murders that

17       happened on April 2, 2006?

18                    MR. MORENO:  Your Honor, can he clarify.

19       That's what I thought we didn't want to do.

20                    THE COURT:  Let me have you back at the

21       bench.

22               (At sidebar.)

23                    THE COURT:  Is he actually charged in

24       state court?

25                    MR. MORENO:  Well that's what he just
```

1    said.

2                    THE COURT:  Well but -- I mean believe to

3    be involved, alleged to have been involved, suspected of

4    being involved.  The charge is different because the

5    charge obviously means in any court so.

6                    MR. VELA:  The complaint there can be an

7    indictment.

8                    MR. BALLI:  I'll double check.  But I

9    remember him being on the state indictment.

10                    THE COURT:  Well I don't want you--.

11                    MR. BALLI:  I have the indictment.  I

12    have the indictment.  I'll double check it.

13                    MR. MORENO:  Okay.  And all I'm saying is

14    if you're asking is he charged, there gonna say it's in

15    state.

16                    THE COURT:  Right.

17                    MR. MORENO:  I don't want to leave him

18    hanging.

19                    THE COURT:  Using the term charged, that

20    he is actual charged.  Right.  Otherwise, you can say

21    alleged, suspected, believed, you know.

22                    MR. BALLI:  Okay.

23                    MR. MORENO:  All right.

24            (End of sidebar.)

25    BY MR. BALLI:

1    Q    Is it your understanding that Jose G. Martinez

2    is charged in a state indictment for -- along with

3    Raul Jasso and Gabriel Cardona for the murder of

4    Jesus Resendez?

5    A    I do not recall on that case.

6    Q    Okay.  If I--.

7              MR. BALLI:  Your Honor, permission to

8    approach the witness?

9              THE COURT:  Let me -- if the question is

10   does he have that information, he has already indicated

11   that he doesn't recall.  Let me see you at the bench for

12   a minute.

13              (At sidebar.)

14              THE COURT:  It's one thing if it's a

15   matter to refresh his recollection.

16              MR. BALLI:  Yes, Your Honor.

17              THE COURT:  But if you're basically just

18   wanting to him to look at that and testify from that

19   it's different.

20              MR. MORENO:  And just to clarify, it's my

21   understanding is that it's the police department who

22   charged them.

23              THE COURT:  Well that's why I'm bringing

24   up that point because he was with the Webb County.

25              MR. BALLI:  But he was working with in

```
 1   conjunction with them, so he should have some of that

 2   information, Your Honor.  He was working--.

 3             THE COURT:  Well I think -- I don't know

 4   whether he should or shouldn't, but what I'm saying is

 5   that there's a difference between asking somebody

 6   something to refresh their recollection from a document

 7   and just giving somebody a document and say tell me what

 8   that says.

 9             MR. MORENO:  There will be -- the

10   detective who did all that will be testifying, and he

11   can ask him also.  So--.

12             MR. BALLI:  All right.

13             THE COURT:  Okay.

14         (End of sidebar.)

15   BY MR. BALLI:

16   Q    Do you have from your investigation and from

17   your work with people, the Laredo Police Department,

18   is it your understanding that Jose G. Martinez was

19   one of the people that was suspected of being

20   involved in that double homicide of Jesus and

21   Mariano Resendez?

22   A    I cannot recall, sir.  He was one of my

23   suspects at least to my case.

24   Q    He was one of the suspects of the two

25   shootings?
```

1    A      Exactly.

2    Q      In March?

3    A      Exactly.

4    Q      And at the shooting on March 31st, Jose G.

5    Martinez left behind a phone, correct?

6    A      I'm not sure if it was him that left the phone.

7    It was dropped at the scene.

8    Q      It was dropped at the scene.  And so you don't

9    know whose phone that was?

10   A      Based on the investigation, we found -- we

11   linked it to him.

12   Q      So you linked it to him, so you mean that you

13   don't know if it's his, but you believe that it's at

14   least linked to him?

15   A      At the time.

16   Q      At the time.  So it was linked to him.  And in

17   linking it to him -- how did you link it to him?

18   A      The -- on the contacts it had -- I want to

19   say -- and I don't remember the phone contacts.

20   It's been a while.  It led us to the mother, I

21   believe.  And that's how we found out whose phone it

22   was.

23   Q      Okay.  So did you essentially go to the mother

24   and say, do you recognize this phone number?

25   A      We actually -- I think we spoke to her.

1   Q     You spoke to her.  Did you call her on that

2   phone?  Did you use that phone to call here?

3   A     I think we called her from the sheriff's

4   substation.

5   Q     But using the cell phone?

6   A     The contact number.

7   Q     Using the contact number.  Only the contact

8   number not the actual phone?

9   A     Yes, sir.

10  Q     And she advised you she recognized the number

11  and it was her son's?

12  A     Yes, sir.

13  Q     But that didn't happen until several days after

14  the Resendez murder, correct?

15  A     Correct.

16  Q     And the reason that-that didn't happen was

17  because you didn't get that -- you didn't collect

18  that piece of evidence until six days after the

19  evidence supposedly was left at the scene, correct?

20  A     Correct, sir.

21  Q     So it was left at the scene on March the 31st,

22  but you never -- you didn't collect it, correct?

23  A     No.

24  Q     Someone else picked up that phone?

25  A     I want -- if I can recall, it was Julio Cesar

1  Resendez.

2  Q    Julio Cesar Resendez picked up the phone?

3  A    Yes, sir.

4  Q    And Julio Cesar Resendez didn't give you phone

5  until several -- until like a week later?

6  A    A week later.  Yes, sir.

7  Q    And he actually gave it to you five days after

8  the murder, correct?

9  A    Correct.

10  Q    And that would have been a very useful piece of

11  information, if he had given that to you on March

12  the 31st, correct?

13  A    For our cases, yes.

14  Q    And if he had given it to you on March the

15  31st, that might have led you to Jose G. Martinez on

16  April the 1st, or April the 2nd, correct?

17  A    Correct.

18  Q    And if you had gotten to Jose G. Martinez on

19  April 1st or April 2nd?

20            MR. MORENO:  Excuse me.  I understand

21  where we're going.  But I think now we're getting into

22  speculation as to what might have happened or could have

23  happened.

24            THE COURT:  Sustained.

25  BY MR. BALLI:

1    Q    If you had known that-that phone belonged Jose

2    G. Martinez on March the 31st or April the 1st,

3    would you have attempted to make contact with him?

4    A    Correct.

5    Q    And would you have considered him an important

6    suspect in the case?

7    A    On my case, correct.

8    Q    And if he had been a suspect in your case, you

9    could have gotten -- you could have tried to ID him,

10   correct?

11   A    Correct.

12   Q    And you could have tried to find out through

13   witness if Jose G. Martinez was one of the shooters

14   on March the 31st or on March the 18th?

15                  MR. MORENO:  Objection.  I think we're

16   getting into speculation mode.

17                  THE COURT:  Sustained.

18   BY MR. BALLI:

19   Q    And you would have liked to have had that piece

20   of evidence on March the 31st rather than -- rather

21   than on April the 5th, correct?

22                  MR. MORENO:  Again that would call for

23   speculation.  What this witness would have wanted or

24   wished.

25                  THE COURT:  And relevance.  It's

1    sustained.

2                    MR. BALLI:  Your Honor, it's relevant

3    because--.

4                    THE COURT:  Let me see you at the bench.

5              (At sidebar.)

6                    THE COURT:  I don't like all the

7    arguments in front of the jury.

8                    MR. BALLI:  I understand that.

9                    THE COURT:  What is the relevance of what

10   this witness would have wanted or liked or--?

11                   MR. BALLI:  Well, Your Honor, the reason

12   that it's important is that if he had had that phone he

13   could have solved the murder one.

14                   THE COURT:  Certainly and if he had--.

15                   MR. MORENO:  Not the murder.

16                   MR. BALLI:  He could have prevented the

17   murder.

18                   THE COURT:  Yeah.  It would help.  But he

19   didn't withhold it.  He didn't have a piece of evidence.

20   He didn't.  So--.

21                   MR. BALLI:  Wait, I'm not trying to

22   impeach him.

23                   THE COURT:  How is that relevant?

24                   MR. BALLI:  It's relevant because they're

25   saying that this phone belonged to -- their allegation

1  is that it belonged to Jose G. Martinez.

2              THE COURT:  Okay.  And he has already

3  said that.

4              MR. BALLI:  Well, yes.  But it's evidence

5  that in some way tampered with because they didn't get

6  it for seven days.

7              THE COURT:  That's fine.  That's fine.

8  Then that's already established.  But, again, how does

9  that -- whether he would have liked it earlier or not,

10  how is that relevant to any issue in the case?

11              MR. BALLI:  Your Honor, it's also

12  relevant as to the type of work that the investigator

13  did.  I mean the investigator should have collected that

14  piece of evidence instead of other people are collecting

15  the evidence for the investigator.

16              THE COURT:  But you haven't determined

17  when it was picked up.  You don't know if it was picked

18  up before or whether anybody, you know, withheld that.

19  I mean--.

20              MR. MORENO:  And just to clarify, Your

21  Honor.  He's not the investigator who responded to that

22  second shooting.

23              THE COURT:  Right.  And it would be

24  different if it was there, and they ignored it.  If

25  somebody said I had it and they didn't ask for it, that

```
 1   would be a different situation.  But it hasn't been
 2   shown whether the police were even aware of that before
 3   it was turned over to them.
 4                   MR. BALLI:  All right, Your Honor.
 5                   MR. MORENO:  All right.
 6                   THE COURT:  All right.
 7              (End of sidebar.)
 8                   MR. MORENO:  I'm sorry, Your Honor.
 9                   THE COURT:  The objection is sustained.
10   BY MR. BALLI:
11   Q    On April 7, 2006, you went to the home of Diana
12   Martinez, correct?
13   A    I'm not sure if it's -- I mean she lives there.
14   I don't know if it's her home.  I went to Musgo.
15   Q    To that home that was a place that you
16   suspected that Jose G. Martinez possibly lived at or
17   might be found at, correct?
18   A    Correct.
19   Q    And the reason that you went there was that you
20   were looking for Jose G. Martinez, correct?
21   A    Correct.
22   Q    And you were looking for him because of that
23   cell phone that you had picked up, correct?
24   A    Correct.
25   Q    And you were in the company on that day of
```

1    Investigator Carlos Adan, correct?

2    A    I do not recall that day of him being there.

3    Q    Who was with you?

4    A    Investigator Esteban Paez and U.S. Border

5    Patrol Raul Nava.

6    Q    Was Esteban Paez an investigator?  At that time

7    he was an investigator with Webb County Sheriff's

8    Department?

9    A    Correct, sir.

10   Q    And when you went over there, were you going

11   over there to investigate the -- as part of your

12   investigation or were you already coordinating at

13   that time with the Laredo Police Department?

14   A    Initially, it was part of our investigation.

15   And anything after that, we coordinated with PD --

16   with Laredo PD.

17   Q    When you say anything after that, after what?

18   What day did you start coordinating with the Laredo

19   Police Department?

20   A    I don't recall the day, maybe a day later.

21   That afternoon.

22   Q    Okay.  If you say a day later or that

23   afternoon, you're talking about April 7, 2006?

24   A    Correct.  It could have been.

25   Q    So a day later or that afternoon, sometime

1    April 7th or 8th probably is when you started

2    coordinating with the Laredo Police Department.

3    A    Actually, when we didn't locate Mr. Martinez,

4    we knew because of our course of investigation we

5    knew that this subject was somehow directly involved

6    to that double homicide, and that's why we gave them

7    the information -- I mean the evidence.

8    Q    Okay.  So you knew or you had a very strong

9    suspicion that Jose G. Martinez was involved at that

10   point, right?

11   A    Correct.

12   Q    In the double homicide?

13   A    Correct.

14   Q    And you knew or had a very strong suspicion

15   that Jose G. Martinez was involved in these previous

16   shootings that you-all were investigating, correct?

17   A    Correct.

18   Q    And so on April 7, 2006, you started

19   coordinating or April 7th or April 8th you started

20   coordinating with the Laredo Police Department,

21   correct?

22   A    On or about April 7th.

23   Q    What day did you hear about the shootings, if

24   you recall?  What day did you hear about the double

25   homicide of April 2, 2006 of Jesus and Mariano

```
 1   Resendez?

 2   A     That night.

 3   Q     That night.  And did you hear about it on the

 4   local news or did you hear about it through some

 5   other source?

 6   A     I think at the time I don't remember who was on

 7   call, but they had received information.  And they

 8   called Mr. Doyle Holdrige.  At the time, he was our

 9   Major.

10   Q     Okay.

11   A     And called us all out to assist.

12   Q     To assist PD?

13   A     To find out any more information because of the

14   strong suspicion of the leads in the case.

15   Q     Of the relationship between all three of the

16   cases?

17   A     Exactly.

18   Q     The Laredo Police Department case of April 2nd

19   and your case of March the 31st and your case of

20   March the 8th?

21              MR. MORENO:  18th.

22   BY MR. BALLI:

23   Q     The 18th?

24   A     Exactly.

25   Q     And when you say on April 2nd, the day of the
```

1   homicides that you were called to assist, you don't

2   mean that you were called to assist the Laredo

3   Police Department at the scene of their crime,

4   correct?

5   A     No, correct.

6   Q     Because you weren't coordinating with the

7   Laredo Police Department until April the 7th,

8   correct, or the 8th?

9   A     After obtaining that evidence.

10  Q     And did anybody from the Laredo Police

11  Department between April the 2nd and April the 7th

12  or 8th ever contact you?

13  A     I believe that night on April the 2nd,

14  Mr. Robert Garcia met with us.  It was actually at

15  maybe a 1/2 mile from the scene.

16  Q     So you met with Robert Garcia with the Laredo

17  Police Department on April 2nd?

18  A     Correct.

19  Q     And then you-all began coordinating on April

20  the 7th or April the 8th, correct?

21  A     Correct.  Excuse me.

22              MR. BALLI:  I'll pass the witness.

23              THE COURT:  Mr. Moreno.

24              MR. MORENO:  Nothing further, Your Honor.

25              THE COURT:  All right.  Thank you.  You

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1    may step down.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  The next witness please.

4              (End of testimony.)

5                    CERTIFICATE

6        I, Leticia O. Gomez, Official Court Reporter,

7    certify that the foregoing is a correct transcript from the

8    record of the proceedings in the above-entitled matter.

9        WITNESS MY OFFICIAL HAND, this 16th day of

10   February, 2010.

11

12                         /S/LETICIA GOMEZ
                           Leticia O. Gomez
13                         CSR: 4767

14

15

16

17

18

19

20

21

22

23

24

25