1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3              LAREDO DIVISION

4   UNITED STATES OF AMERICA,    )CRIMINAL NO. 5:08-244-24
                                 )
5   vs.                          )January 28, 2010
                                 )
6   ARMANDO GARCIA, A.K.A."CACHETES"  )
    TN:GERARDO CASTILLO-CHAVEZ,  )
7                                )
    Defendant.                   )
8   ═══════════════════════════  ══════

9


10          TRANSCRIPT OF JURY TRIAL DAY 4
        BEFORE THE HONORABLE MICAELA ALVAREZ
11          DISTRICT COURT JUDGE, and a jury

12


13  APPEARANCES:

14  For the Government:   JOSE ANGEL MORENO, AUSA
                          JAMES USTYNOSKI, AUSA
15                        Office of US Attorney
                          P.O. Box 1179
16                        1100 Matamoros
                          Laredo, Texas 78042
17
    For the Defendant:    ROBERTO BALLI, ESQ.
18                        OSCAR VELA, ESQ.
                          1202 Corpus Christi
19                        Laredo, TX 78040

20


21  Court Reporter:       LETICIA O. GOMEZ, CSR
                          1300 Victoria #3245
22                        Laredo, Texas 78040
                          (956)726-2341
23


24  Produced by mechanical stenography; computer-aided
25  transcription

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

I-N-D-E-X

GOVERNMENT WITNESSES:

| | DIR | CX | REDIR | RECX | FUR-DIR | FUR-CX |
|---|---|---|---|---|---|---|
| RENE GARCIA | | 8 | 23 | 26 | | |
| DAVID MARTINEZ | 28 | 35 | | | | |
| HECTOR GARCIA | 38 | | | | | |
| GERARDO RAMOS | 40 | 47 | | | | |
| FEDERICO CALDERON | 52 | 58 | 61 | | | |
| JULIO C. RESENDEZ | 69 | 86 | 97 | 97 | | |
| JEFFREY BARNES | 102 | 109 | | | | |
| DENISE MORALES | 117 | 125 | 137 | | | |
| GUILLERMO TREJO | 139 | 148 | | | | |
| BLANCA E. LOPEZ | 152 | 157 | | | | |
| RUBEN GARZA | 158 | 168 | | | | |
| CARLOS ADAN | 171 | | | | | |
| ROBERTO GARCIA | 177 | 201 | 204 | 214 | | |
| RAUL JASSO | 218 | | | | | |
| ROSALIO RETA | 221 | | | | | |

E-X-H-I-B-I-T-S

| | | | | |
|---|---|---|---|---|
| GX-24, 25 | 10 | | DX-A | 188 |
| GX-94,95 | 33 | | GX-208 | 217 |
| GX-120 | 55 | | | |
| GX-121, 122 | 163 | | | |
| GX-124, 125 | 164 | | | |
| GX-127, 129 | 166 | | | |

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1              P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Good morning.  You may be

3    seated.  I understand there's an issue before the jury

4    is brought in?

5          MR. BALLI:  Yes, Your Honor.  Your Honor,

6    the issue is that it seems that the prosecution has

7    plans in the case of making continuous references to

8    people's religious beliefs and that is with the Santa

9    Muerte.  And I understand that there's some -- for some

10   people the Santa Muerte is a bad symbol.  They consider

11   it as a bad symbol or bad religion.  I very -- I guess I

12   am relatively unfamiliar with Santa Muerte.  But last

13   night in doing some work I did a little bit of research

14   in the history of the Santa Muerte, and what I found is

15   that this religious beliefs with the Santa Muerte they

16   go back.  They go back hundreds--.

17          THE COURT:  Let's stop.  The merits of it

18   whether really don't matter.  Whether it's a good

19   religious belief or a bad religious belief I guess what

20   is the issue?

21          MR. BALLI:  The issue is that if they

22   continue to try to connect people through this religion,

23   for example, showing photographs of a religious figure

24   in somebody's house and then saying, well, this person

25   is also -- has the same religious figure and this other

1   person has the same religious figure, and eventually

2   they go to my client that way.  And they're trying to

3   connect them and say because they all have the same

4   faith that, therefore, the jury should consider that in

5   saying that somehow they must be connected to one

6   another.

7                    THE COURT:  I don't think -- and let me

8   just stop you.  I don't think, you know, and I haven't

9   heard from Mr. Moreno this morning.  But I think as I

10  have understood this issue in the past, it's not they're

11  saying because all these people believe in the Santa

12  Muerte they must be guilty of some offense.  I think the

13  way it, you know, has been proposed in the past is the

14  Zetas are a gang, an organization that have certain--.

15                   MR. MORENO:  Methods of operation.

16                   THE COURT:  There you go.  Methods of

17  operation.  And within that also certain -- they're made

18  up in a certain manner, and a part of this is the

19  belief in the Santa Muerte, that it is part of the gang

20  mentality so to speak.  And I think what the

21  government and Mr. Moreno will jump in here, that the

22  government intends to show that Mr. Castillo is part of

23  this gang.  And one of the ways they may be able to show

24  that is that, you know, that he has the same religious

25  beliefs of these gang members do.  Mr. Moreno?

1              MR. MORENO:  Exactly, Your Honor.  Also

2      that I can't take out the fact that those items were

3      located in the house, and all I've done so far is ask

4      the officer to explain what that was because there was

5      an altar there.  They have a tendency to create little

6      altars in some of these places.  The house that was saw

7      on Pine in fact is the only location where we were going

8      to talk about that that actually has that.  Although as

9      he says, at the time when his client was arrested, he

10     was wearing one on the outside of his shirt.  But, you

11     know, one, it's a fact that it's at the house.  And he

12     only described the kitchen as well as finding the

13     marijuana there in the wrappings in there together with

14     the fact that those emblems or items were located in the

15     kitchen.  I haven't asked him anything about their

16     religion or their beliefs.  I think there's a world of

17     difference between that being part of their method of

18     operation or their gang organization what you call it

19     and actually saying that we're persecuting somebody

20     because of his religious beliefs.

21              THE COURT:  All right.  And that's all

22     I've seen so far.  If it goes beyond that, if it becomes

23     an issue about the religious beliefs -- and there may

24     be, I assume that there are people out there who have

25     those religious beliefs but are not part of the Zetas,

1  that would be a different issue.  But at this point in

2  time, we haven't gotten there, and I haven't seen it

3  developing in that respect.

4               MR. BALLI:  Well, Your Honor, and that's

5  I guess that's why I'm bringing it to the court's

6  attention now.  Because I don't want -- we may -- I

7  don't want it to go in that direction.  I mean obviously

8  that's not my choice.

9               THE COURT:  I haven't seen it.

10              MR. BALLI:  But we would object to it

11  going in that direction, and we'll address it at the

12  appropriate time, Your Honor.

13              MR. MORENO:  And just so the court is

14  aware.  The only other reference that will come in the

15  rest of the trial will be the fact when he's arrested,

16  and it's on his photograph when he got arrested that I

17  will ask the agent what it is he is wearing.  That will

18  be the only question that comes up in the rest of the

19  trial.

20              MR. BALLI:  And, Your Honor, in addition

21  he was not -- he did not have a chain of Santisima

22  Muerte.  He's not showing it.  The agent in fact took it

23  off and put it on him when he photographed him for

24  purposes of photographing him.

25              MR. MORENO:  And that doesn't change the

```
 1    fact that he was wearing it.

 2                  THE COURT:  All right.  Anything else

 3    before the jury is presented this morning?

 4                  MR. BALLI:  No, Your Honor.

 5                  THE COURT:  All right.  Okay.  Thank you.

 6    I'm going to step out, and I think we're still missing

 7    some.  I don't know if they're all here yet or not.

 8    I'll step out.

 9                  THE CSO:  All rise.

10             (The jury enters the courtroom.)

11                  THE CSO:  Please rise for the jury.  All

12    rise.

13                  THE COURT:  Good morning, ladies and

14    gentlemen.  We are ready to continue.  This is Case

15    Number 08-244, the United States of America versus

16    Gerardo Castillo-Chavez.  Are the parties ready to

17    proceed?

18                  MR. BALLI:  Yes, Your Honor.

19                  THE COURT:  Mr. Moreno?

20                  MR. MORENO:  Your Honor, I think we

21    passed the witness.

22                  THE COURT:  Are you ready to proceed?

23                  MR. MORENO:  Yes, Your Honor.

24                  THE COURT:  Okay.  All right.  We will

25    recall Rene Garcia to the stand, please.  And,
```

1    Mr. Balli, was about to begin his examination.

2    Mr. Garcia, if you will resume the stand where you were

3    yesterday.  Right up here please.  You've already been

4    sworn in.  You're still under oath.  Mr. Balli is going

5    to ask you questions.  You may proceed, Mr. Balli.

6                    MR. BALLI:  Thank you, Your Honor.

7        RENE GARCIA, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8                       CROSS-EXAMINATION

9    BY MR. BALLI:

10   Q     Mr. Garcia, good morning to you, sir.

11   A     Good morning.

12   Q     Sir, when your brother was killed -- after your

13   brother was killed, you involved yourself with the Zeta

14   Organization, correct?

15   A     Yes.  Yes, sir.

16   Q     In fact, you involved yourself.  You started

17   working with Miguel or for Miguel Diaz De Leon,

18   correct?

19   A     Yes, sir, running errands for him.

20   Q     Okay.  And you got as far as even having contact

21   with some of the people that were very high up in the

22   organization, correct?

23   A     No, sir.

24   Q     Well, didn't you testify yesterday that you had

25   contact at one point with Miguel Trevino?

                    LETICIA O. GOMEZ, CSR
                     1300 VICTORIA #3245
                    LAREDO, TEXAS 78040

```
 1   A    Yes, for that moment.  But that I

 2   could communicate with him or like that, no, sir.

 3   Q    And yesterday you said that you were here because

 4   you wanted -- you didn't want anybody to suffer the way

 5   that your family has suffered, correct?

 6   A    Yes, sir.

 7   Q    And yet right after you're brother died you

 8   involved yourself with people that were hitmen,

 9   correct?

10   A    Yes, sir.  I came to find out that they were

11   hitmen.

12   Q    Well, you came to find out.  But when Miguel Diaz

13   De Leon came to you he basically told you that he was a

14   murderer, correct?

15   A    He told me he was a Zeton.  A Zeta member.

16   Q    And to you being a Zeton meant that he is a

17   killer, correct?

18   A    It can mean a lot of things in that organization.

19   Q    Okay.  So your understanding of Zetas is that not

20   all of them are murderers?

21   A    Yes, sir.

22   Q    Okay.  But some of them are, correct?

23   A    Yes, sir.

24   Q    And still you involved yourself with the

25   organization knowing that part of the organization was
```

1    to murder people, correct?

2    A    Yes, sir.

3    Q    And that's -- and you did that because you didn't

4    want anybody else to suffer like your family did?

5    A    I wanted to get to the bottom of what had happened

6    to my brother and find out why he was killed.

7                MR. BALLI:  Your Honor, permission to

8    approach the witness?

9                THE COURT:  You may.

10   BY MR. BALLI:

11   Q    Let me show what has been marked as Defense

12   Exhibits 24 and 25 and ask you if you recognize these,

13   sir?

14   A    Yes, sir.

15   Q    And I showed you 24 and you said you recognized

16   it.  And 25?

17   A    Yes, sir.

18                MR. BALLI:  Your Honor, we move to

19   introduce Defense Exhibits 24 and 25.

20                THE COURT:  Any objection?

21                MR. MORENO:  No, Your Honor.

22                THE COURT:  They will be admitted.

23           (Defendant's Exhibits 24 and 25 admitted.)

24   BY MR. BALLI:

25   Q    And Defense Exhibits 24 and 25 are your plea

---

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1    agreement in this case, correct?

2    A    Yes, sir.

3    Q    And even though yesterday--.

4              MR. BALLI:  Your Honor, permission to

5    approach the elmo?

6              THE COURT:  You may.

7    BY MR. BALLI:

8    Q    Even though yesterday you told this jury that the

9    reason -- that the reason that you are here -- you just

10   told the jury again is so that people won't suffer the

11   way your family did?

12   A    Yes, sir.

13   Q    In your plea agreement, isn't it true that there

14   is a cooperation agreement?

15   A    Yes, sir.

16   Q    And that cooperation agreement they offer you

17   something that is called 5-K?

18   A    Yes, sir.

19   Q    Okay.  And with?

20             MR. MORENO:  He keeps misstating it.

21   It's not an offer.  It's a potential.

22             THE COURT:  If you will just clarify that

23   in your examination, Mr. Balli.

24             MR. BALLI:  Yes.

25   BY MR. BALLI:

1   Q    That you have a potential for getting something

2   that's called 5-K, correct?

3   A    Yes, sir.

4   Q    And in this particular paragraph, do you see where

5   it says 5-K?  You can look at the screen right in front

6   of you.

7   A    Yes, sir.

8   Q    Okay.  Could you -- if you touch that screen

9   that's in front of you, you can circle.  Could you

10  please circle where it says 5-K?

11  A    (Witness complied.)

12  Q    And your understanding -- you had an attorney

13  represent you in this case, correct?

14  A    Yes, sir.

15  Q    And who was your attorney?

16  A    Manuel Flores.

17  Q    Manuel Flores.  And you understand that Manuel

18  Flores is a very experienced attorney, correct?

19  A    Yes, sir.

20  Q    And in fact, you got lucky you got one of the most

21  experienced attorneys to represent you, correct?

22  A    Yes, sir.

23  Q    Appointed by the court for you, correct?

24  A    Yes, sir -- no, sir there were -- he was hired by

25  my family.

1    Q    Okay.  So you were lucky to get a very experienced

2    attorney to help you out, correct?

3    A    Yes, sir.

4    Q    And he explained to you what 5-K was, correct?

5    A    Yes, sir.

6                THE COURT:  Excuse me, I'm going to in

7    that respect, Mr. Flores is not present.  But there is

8    an attorney-client relationship between this witness and

9    Mr. Flores, so, Mr. Balli, make sure that you do not get

10   into any confidential communications between this

11   defendant and his attorney.

12               MR. BALLI:  I understand, Your Honor.

13               THE COURT:  So, in other words,

14   Mr. Garcia, none of the questions Mr. Balli will be

15   asking you are designed to get information from you

16   about communications between you and your lawyer.  Do

17   you understand that?

18               THE WITNESS:  Yes, ma'am.

19               THE COURT:  All right.  Thank you.

20   BY MR. BALLI:

21   Q    And that's exactly what I don't want from you,

22   sir.  I don't want to get into what you and your lawyer

23   talked about.  But I do want to know if your

24   understanding of 5-K is that if you decide to cooperate

25   or help the government of the United States by doing

```
 1    things like testify or providing them with useful

 2    information, that the prosecutor can make a

 3    recommendation to the judge and that the judge can make

 4    a decision on your case where your sentence could be

 5    lowered from the sentence that you might get if you

 6    didn't cooperate?

 7    A    Yes, sir.

 8    Q    And so even though you said that you're doing this

 9    to help other people, you did get this into your plea

10    agreement, correct?

11    A    Yes, sir.

12              MR. BALLI:  Your Honor, permission to

13    approach again?

14              THE COURT:  You may.

15    BY MR. BALLI:

16    Q    And as part of this plea you also testified -- as

17    part of this plea right here in this particular

18    paragraph that you see which is Paragraph One you see

19    in front of you on the screen, you pled to Counts 24

20    and 26, correct?

21    A    Yes, sir.

22    Q    And would you mind circling in the very first line

23    of Paragraph One where it says 24 and 26?

24    A    (Witness complied.)

25    Q    And Counts 24 and 26 -- in 24 you were charged
```

1    with interstate and foreign travel and transportation

2    of a racketeering enterprise, correct?

3    A    Yes, sir.

4    Q    And in Count 26 you were charged with possession

5    of a firearm in furtherance of a crime of violence,

6    correct?

7    A    Yes, sir.

8    Q    And these charges, Counts 24 and 26, stem from

9    your participation that night in the hotel room at El

10   Cortez, correct?

11   A    Yes, sir.

12   Q    And yesterday you told the ladies and gentlemen of

13   the jury about being at the El Cortez motel, correct?

14   A    Yes, sir.

15   Q    And you picked up a bag at the H-E-B, the *mercado*,

16   correct?

17   A    Yes, sir.

18   Q    And you took it over to that hotel?

19   A    Yes, sir.

20   Q    And you were taking items to these gentlemen who

21   had come from Mexico, correct?

22   A    Yes, sir.

23   Q    And these men had come in from Mexico to kill

24   somebody, correct?

25   A    My understanding was that they had come to do

1    something.

2    Q    And when you pled to these charges, you pled to

3    being involved in an attempted basically an attempted

4    hit, correct?

5    A    Yes, sir.

6    Q    And yesterday when you were here you said that you

7    really weren't involved in that?

8    A    Yes, sir.

9    Q    And yet you pled guilty to that?

10   A    Yes, sir.

11   Q    So why did you plead guilty if you were innocent?

12   A    Well, I don't consider myself innocent.

13   Q    So then you were guilty of assisting?

14   A    I was guilty of the charges that were brought

15   against me.

16   Q    Okay.  And as part of this agreement--.

17              MR. BALLI:  Your Honor, permission to

18   approach again?

19              THE COURT:  You may.

20   BY MR. BALLI:

21   Q    And as part of your plea, the United States made

22   certain agreements with you, correct?

23   A    Excuse me?

24   Q    As part of your plea, you made certain agreements,

25   and the government of the United States made certain

```
 1   agreements with you, correct?

 2   A    Yes, sir.

 3   Q    And as part of your plea, the United States made

 4   these agreements that are here right in front of you on

 5   that screen, correct?  Including in Paragraph 2a, if

 6   you read 2a, it says that the government of the United

 7   States, if you accept the plea agreement, the United

 8   States will move to dismiss any remaining counts in the

 9   indictment at the time of sentencing, correct?

10   A    Yes, sir.

11   Q    And do you see where it says that?

12               MR. MORENO:  Just to clarify, there's no

13   2a.

14               THE COURT:  I was going to say I don't

15   see 2a.

16               MR. MORENO:  I know what he's

17   making reference to it's just--.

18               MR. BALLI:  I'm sorry, 12a.  12a.

19               THE COURT:  There you go.

20   BY MR. BALLI:

21   Q    Do you see that in Paragraph A right there right

22   in front of you?

23               THE COURT:  I see you shaking your head.

24   Can you just make sure that you answer with words.

25               THE WITNESS:  Yes, ma'am.
```

```
 1   BY MR. BALLI:

 2   Q    Would you circle the word "dismissed" where you

 3   see it in Paragraph 2a -- 12a, excuse me.

 4   A    I can't.  It looks blurry here.

 5   Q    It looks blurry to you?  Okay.  Can you see it

 6   better on the screen or you cannot see it?

 7   A    I can see it better there, sir.

 8   Q    Can you see it better up there?

 9   A    Yes, sir.

10   Q    Okay.  And do you see it right there the word

11   "dismissed."  You do see it?  Okay.

12                   THE COURT:  Is that a yes?

13                   THE WITNESS:  Yes, sir.  Yes.

14   BY MR. BALLI:

15   Q    Okay.  So the United States was going to move any

16   remaining counts at the time of sentencing?

17   A    Yes, sir.

18   Q    Okay.  And when they dismissed the other counts,

19   you would agree with me that the other counts include

20   Count 1 of the indictment, which was a big drug

21   conspiracy charge, correct?

22   A    Yes, sir.

23   Q    And you were on that drug conspiracy actually

24   charged with the same people that killed your brother,

25   correct?
```

```
1     A     Yes, sir.

2     Q     You're a co-defendant with your brother's

3     murderers, correct?

4     A     Yes, sir.

5     Q     And that would include Gabriel Cardona, correct?

6     A     Yes, sir.

7     Q     And Rosalio Reta?

8     A     Yes, sir.

9                MR. MORENO:  Excuse me, Mr. Reta is not

10    part of this indictment.

11               THE COURT:  That is correct.

12               MR. BALLI:  That's correct, Your Honor.

13    BY MR. BALLI:

14    Q     Gabriel Cardona, correct?

15    A     Yes, sir.

16    Q     Does that include any other people who were

17    involved in your brother's murder?

18    A     Not that I know, sir.

19    Q     So you're on Count 1 with Gabriel Cardona.  And on

20    that count, the government would be moving to dismiss

21    that, correct?

22    A     Yes, sir.

23    Q     And in that count, you were looking at a possible

24    life sentence, correct?

25    A     Yes, sir.
```

1  Q    And so it's good that that count would be dropped,

2  correct?

3  A    It's good that it would be dropped.  Yes.

4  Q    And then in addition, the government would be

5  dropping Count 2, correct?

6  A    Yes, sir.

7  Q    And that carried a possible 20-year sentence,

8  correct?

9  A    Yes, sir.

10  Q    And in addition, Count 25 would be dropped?

11  A    Yes, sir.

12  Q    Do many of the people that you're familiar with in

13  the Zeta Organization, do they consume drugs?

14  A    I don't know, sir.  I couldn't tell you.

15  Q    Okay.  The individuals there at the hotel that you

16  were at El Cortez were consuming drugs, correct?

17  A    Yes, sir.

18  Q    And they were smoking crack cocaine?

19  A    Yes, sir.

20  Q    And have you ever seen people using crack cocaine

21  before?

22             MR. MORENO:  Objection.  I'm not sure

23  what the relevance of that one would be.

24             THE COURT:  The objection.  Your

25  response.

```
 1                    MR. BALLI:  Yes, Your Honor.  It goes--.
 2                    THE COURT:  Let me see you here at the
 3      bench.
 4              (At sidebar.)
 5                    MR. MORENO:  I don't mind him asking him
 6      about people that he saw that were with him, but just
 7      anybody.  Have you ever seen people use cocaine.
 8                    THE COURT:  In general.
 9                    MR. BALLI:  Okay.
10                    MR. MORENO:  If he specifies who, then
11      that's fine.
12                    THE COURT:  All right.
13                    MR. BALLI:  That's fine.
14              (End of sidebar.)
15                    MR. MORENO:  Just for the record, I renew
16      my objection.
17                    THE COURT:  The objection is sustained.
18      BY MR. BALLI:
19      Q    The individuals that you were with were smoking
20      crack cocaine, correct?
21      A    Yes, sir.
22                    THE COURT:  In asking the questions, make
23      sure you identify at what time and on what occasion.
24      BY MR. BALLI:
25      Q    At the El Cortez motel.
```

```
 1   A     Yes, sir.
 2   Q     And did the crack cocaine change their behavior,
 3   their demeanor?
 4   A     No.  I wasn't present there to see how they would
 5   react.  I just left.
 6   Q     Were you using any drugs at that time?
 7   A     I had used drugs, yes, but not at the present
 8   moment.
 9   Q     Not at that moment.  You used drugs in the past?
10   A     Yes, sir.
11   Q     But not at that moment.  Were you using drugs
12   during that time period?
13   A     Yes, sir.
14   Q     What type of drugs?
15   A     I'd say crack cocaine and marijuana.
16   Q     Did you ever use heroin?
17   A     No, sir.
18   Q     Did you ever inject cocaine?
19   A     No, sir.
20                 MR. BALLI:  I'll pass the witness.
21                 THE COURT:  Mr. Moreno.
22                 MR. MORENO:  If I may approach, Your
23   Honor?
24                 THE COURT:  You may.
25
```

```
 1                    REDIRECT EXAMINATION

 2   BY MR. MORENO:

 3   Q    On Government Exhibit -- I'm sorry, Defense

 4   Exhibit Number 24, Mr. Balli asked you whether Count 1,

 5   whether the government was going to ask the court to

 6   dismiss Count 1.  And you said that that was a good

 7   thing because that charge carried a potential life

 8   sentence, correct?

 9   A    Yes, sir.

10   Q    Okay.  Now if you look at Paragraph Number 1 that

11   he was showing you before, you pled guilty to Count 24

12   for the ITAR and then Count 26 for the possession of

13   the firearm, correct?

14   A    Yes, sir.

15   Q    And if you look at Paragraph 2 for Count 24, the

16   ITAR you're still looking at a potential 20-year

17   sentence for that charge, correct?

18   A    Yes, sir.

19   Q    And for the firearms charge, you're still looking

20   at a potential life sentence for that charge, correct?

21   A    Yes, sir.

22   Q    So whether or not Count 1 got dismissed, you're

23   still look at a potential life sentence?

24   A    Yes, sir, that's correct.

25   Q    In your cooperation agreement -- it says there's a
```

1    potential -- in other words, there's no guarantee that

2    the government will ask the court to reduce your

3    sentence, correct?

4    A    Yes, sir.

5    Q    It also says that the United States is the only --

6    party that will determine whether or not we recommend

7    something to the court, right?

8    A    Yes, sir.

9    Q    Go to Paragraph 8, Letter F.  It also says that if

10   we don't recommend a reduction of the sentence or you

11   don't like the recommendation that we give the court

12   about your sentence, you're still bound by the

13   agreement.  In other words, you cannot for that reason

14   alone withdraw your plea of guilty?

15   A    Yes, sir.

16   Q    Okay.  There's also a provision in the agreement

17   about what happens if you break the agreement, if you

18   breach the agreement, right?

19   A    Yes, sir.

20   Q    It says that if you don't fulfill completely all

21   of the obligations, then we can still use anything you

22   say anything you have told us, your plea, your

23   admissions to the court, your testimony here,

24   everything against you?

25   A    Yes, sir.

```
 1    Q     In fact, we can reinstate those things that we

 2    were going to recommend to dismiss back in and

 3    prosecute you for those?

 4    A     Yes, sir.

 5    Q     One other question:  At the time when your brother

 6    was murdered, at that time, not now.  At that time, did

 7    you know who had murdered your brother?

 8    A     No, sir.

 9    Q     Did you know at that time whether or not the Zetas

10    were responsible for your brother's death?

11    A     Out of my knowledge is that--?

12    Q     Did you know that they had done it?

13    A     Excuse me?

14    Q     Did know that the Zetas--?

15                    MR. BALLI:  Objection, leading.

16                    THE COURT:  Objection is overruled.

17                    THE WITNESS:  That the Zetas what, sir?

18    BY MR. MORENO:

19    Q     At the time when they killed your brother, did you

20    know that it was the Zetas who had killed him at that

21    time?

22    A     No, sir.

23                    MR. MORENO:  That's all I have, Your

24    Honor.

25                    THE COURT:  Anything further, Mr. Balli?
```

```
 1              MR. BALLI:  Yes, Your Honor.
 2                  RECROSS-EXAMINATION
 3    BY MR. BALLI:
 4    Q    So it's your understanding that if you score out
 5    at life in the sentencing guidelines, the easiest way
 6    or the best way for you to get a sentence that is below
 7    life is if the government recommends that you get 5-K?
 8    A    What about -- I don't understand what you're
 9    saying.
10    Q    You don't understand the question, okay.  Let me
11    ask it in a different way because I want you to
12    understand this.  Is it your understanding that you
13    could possibly score out in the federal sentencing
14    guidelines at a life sentence?
15    A    Yes, sir.
16    Q    Okay.  And if that happens, you're understanding
17    that if the government recommends that you get 5-K,
18    that you could get a sentence -- you could possibly get
19    a sentence that's less than life?
20    A    Yes, sir.
21    Q    And that that recommendation will be very helpful
22    in your sentence in getting a lower sentence, lower
23    than life, correct?
24    A    Not really, sir.
25    Q    What do you mean by not really?
```

1    A    Well 20 years would be a lot of time to me

2    anyways.  Ten years would be a lot of time to me

3    anyways.

4    Q    But would you rather be in prison for ten years or

5    for life?

6    A    I'd rather be with my family to be honest.

7    Q    I -- I understand that you would rather not be in

8    prison at all, correct?

9    A    Yes, sir.

10   Q    But if you had a choice between 10 years and life

11   in prison, which would you take?

12   A    Less time, sir.

13                   MR. BALLI:  Pass the witness.

14                   THE COURT:  Nothing further?

15                   MR. MORENO:  No, Your Honor.

16                   THE COURT:  All right.  Thank you.  You

17   may step down.  Thank you.  The next witness,

18   Mr. Moreno.

19                   MR. MORENO:  Deputy David Martinez.

20                   THE COURT:  David Martinez, please.

21           (The witness enters the courtroom.)

22                   THE COURT:  Please raise your right hand

23   to be sworn in.

24           (Witness sworn.)

25                   THE WITNESS:  I do.

```
 1              THE COURT:  Thank you.  You may be
 2   seated.  You may proceed, Mr. Moreno.
 3           DAVID MARTINEZ, GOVERNMENT WITNESS, SWORN
 4                    DIRECT EXAMINATION
 5   BY MR. MORENO:
 6   Q    Would you please state your name?
 7   A    David Martinez.
 8   Q    And, Mr. Martinez, where do you work?
 9   A    With the Webb County Sheriff's Office.
10   Q    And how long have you been employed with the Webb
11   County Sheriff's Office?
12   A    Approximately 21 years.
13   Q    And what do you do for the Sheriff's Office?
14   A    Currently, I work with the warrants division.
15   Q    Okay.  Let me ask you this:  In those 21 years
16   that you have been with the Sheriff's Office, how many
17   different jobs have you had within the Sheriff's
18   Office?
19   A    Quite a few.
20   Q    Can you tell us?
21   A    Different divisions.
22   Q    Can you tell us some of the things that you have
23   been assigned to?
24   A    Yes, sir.
25   Q    Can you tell us some of the things you have been
```

1    assigned to?

2    A    I've been at the jail division.  I was an SRO for

3    seven-and-a-half years.

4    Q    What's an SRO?

5    A    A school resource officer.  I had a grant through

6    the sheriff's office.  I've been on patrol, warrants,

7    civil.

8    Q    Okay.  And is it true that you were an

9    investigator at one point also?

10   A    Just a patrolman.

11   Q    Just a patrolman, okay.  And in what capacity were

12   you working back on March 18th of 2006?

13   A    Deputy.

14   Q    As a deputy, okay.  And that day or at that time

15   was there a particular part of county that you were

16   assigned to?

17   A    On that day, I was assigned to the -- for south

18   area.

19   Q    And would that include the Rio Bravo area?

20   A    Yes, sir, Rio Brazo and El Cenizo.

21   Q    On March 18th of 2006, did you have occasion to

22   respond or were you requested to respond to a shooting

23   at 1103 Paseo in Rio Bravo, Texas?

24   A    Yes, sir.

25   Q    Can you tell us whether or not you responded to

1    that call?

2    A    We did respond to the call.

3    Q    And what did you see when you arrived?

4    A    We saw the RQ that was already there.

5    Q    What's an RQ?

6    A    The ambulance.

7    Q    Okay.

8    A    Attending the -- an injured person there.

9    Q    Okay.  Did you determine who the injured person

10    was?

11    A    We identified him as one Gerardo Ramos, I believe.

12    Q    Okay.  Did you identify what his injuries were?

13    A    At the time we -- the EMT personnel were doing

14    their, whatever they do.  So we just identified him and

15    then--.

16    Q    You didn't know what was injured?  How he was

17    injured?

18    A    He -- I believe he had -- the EMT had stated he

19    had injuries to his abdomen and his lower leg.

20    Q    Not where, with what?  Did he break a leg?  Did he

21    fall?  Did he get shot?

22    A    He had been shot.

23    Q    He had been shot?

24    A    Yes, sir.

25    Q    Okay.  When you arrived were there any witnesses

```
 1    present in the area?

 2    A    There was two witnesses.

 3    Q    Okay.  Do you remember what their names were?

 4    A    I believe there was one Julio Resendez.

 5    Q    Okay.

 6    A    And a nephew.

 7    Q    What's the nephews name?

 8    A    Mariano Resendez.

 9    Q    Do you know what the relationship between Julio

10    and Mariano was?

11    A    It's an uncle and nephew.

12    Q    Who is the uncle of who?

13    A    Julio is the uncle to Mariano.

14    Q    Okay.  And do you know if there was any

15    relationship between Julio and Mariano and Gerardo

16    Ramos, the victim?

17    A    I believe they were.  Mariano and Gerardo are

18    cousins.

19    Q    Okay.  And can you describe for the ladies and

20    gentlemen of the jury what the scene was like when you

21    got there.  What was the crime scene like?

22    A    We -- see if I can remember this, it was almost

23    four years ago.  There was a Ford Excursion that was

24    there riddled with bullet holes.

25    Q    With what?  I'm sorry.
```

1    A    Bullet holes.

2    Q    It was riddled with bullet holes.  Okay.  Do you

3    have a recollection approximately how many shots were

4    on the--?

5    A    Approximately, we picked up 11 casings.

6    Q    Eleven casings, okay.  And do you remember what

7    caliber they were?

8    A    I believe 9-millimeter.

9    Q    Okay.  As part of your investigation, did you

10    determine who actually lives at that address?

11    A    At the time, I believe it was Julio Resendez.

12    Q    That's his house?

13    A    It was his house.  I don't know if he was renting

14    or he owned it or.

15    Q    Let me show you what I've got marked as Government

16    Exhibit Number 94 and 95?

17                    MR. MORENO:  If I may approach, Your

18    Honor?

19                    THE COURT:  You may.

20    BY MR. MORENO:

21    Q    Okay.  See Government Exhibit Number 94 and 95.

22    Do you recognize those?

23    A    Yes, sir.

24    Q    And do they fairly and accurately depict the scene

25    as you saw it that night?

```
 1   A     Yes, it does.

 2               MR. MORENO:  Your Honor, we would offer

 3   Government Exhibit Number 94 and 95.

 4               THE COURT:  Any objection?

 5               MR. BALLI:  Without objection, Your

 6   Honor.

 7               THE COURT:  They're admitted.

 8          (Government Exhibits 94 and 95 admitted.)

 9   BY MR. MORENO:

10   Q    Keep your eye on that screen there, please.  Okay.

11   Okay.  On Government Exhibit Number 94, can you

12   describe what we're looking at here, on the top let's

13   say.

14   A    On the top one it's -- I think it's the front part

15   of the Excursion.

16   Q    Okay.  Let me hand it to you in a second and maybe

17   you can see them better there.  And on Government

18   Exhibit Number 95, what is pictured on Government

19   Exhibit Number 95?

20   A    That's the gray Excursion that was--.

21   Q    Can you tell from there what's on the bottom

22   photograph?

23   A    I believe, it's the casings.

24   Q    Let me give it back to you.

25               MR. MORENO:  May I approach, Your Honor?
```

```
 1                    THE COURT:  You may.

 2    BY MR. MORENO:

 3    Q    So 94, you said on the top part what is it that we

 4    were looking at?

 5    A    It's the same vehicle, the Excursion.

 6    Q    And there's a photograph of a tire with part of a

 7    vehicle.  What is it that's depicted on that part?

 8    A    It's the bullet holes there.

 9    Q    On the Excursion.  And then on the right-bottom

10    picture, what is it that's photographed?

11    A    It's blood stains.

12    Q    And is there any damage to the window?

13    A    The window was damaged through the--.

14    Q    Deputy, while you were at the scene you said there

15    were two witnesses present, Julio Resendez and Mariano

16    Resendez.  Did you-all interview Julio and Mariano?

17    A    At the time, yes, sir, but they were

18    uncooperative.

19    Q    And then did you yourself or was that somebody

20    else who went to interview the victim later?

21    A    I believe the investigator in charge.

22    Q    Do you remember who the investigator in charge

23    was?

24    A    It was Hector Garcia.

25    Q    Okay.
```

```
 1              MR. MORENO:  I'll pass the witness, Your
 2   Honor.
 3              THE COURT:  Mr. Balli.
 4                    CROSS-EXAMINATION
 5   BY MR. BALLI:
 6   Q    You were not in charge of this investigation,
 7   correct?
 8   A    No, sir.
 9   Q    You were there as a patrol officer?
10   A    As a primary officer.
11   Q    As a primary officer, meaning that you were the
12   first one at the scene?
13   A    Yes, sir.
14   Q    First officer at the scene.  And you assisted
15   Investigator Garcia in his investigation, correct?
16   A    I did my preliminary investigation, and then he
17   took over.
18   Q    As far as anything that you did or information
19   that you collected or anything that you know about, was
20   Gerardo Castillo in any way that you know of any
21   information that you have had, was involved in that
22   homicide?
23   A    No, sir.
24              MR. BALLI:  I'll pass the witness.
25              THE COURT:  Okay.  Mr. Moreno, anything
```

```
 1   further?

 2                   MR. MORENO:  Nothing further from this

 3   witness, Your Honor.

 4                   THE COURT:  Thank you.  You may step

 5   down.  Thank you.  Next witness.

 6                   MR. MORENO:  Can we approach, Your Honor?

 7                   THE COURT:  You may.

 8            (At sidebar.)

 9                   MR. MORENO:  I was going to call

10   Mr. Ramos next and then followed by Julio Cesar

11   Resendez, the witness.  I spoke to him yesterday, and I

12   read all the statements that they gave the police.

13                   THE COURT:  Spoke to Ramos?

14                   MR. MORENO:  And Julio both.

15                   THE COURT:  Okay.

16                   MR. MORENO:  And I read all the reports

17   that they said and the statements that they gave to the

18   police.  And they never mentioned this, but the agents

19   are telling me right now that when he came in this

20   morning that he says that he -- one of then -- I need to

21   go figure out.

22                   THE COURT:  Which one.

23                   MR. MORENO:  That they know the

24   defendant.  And I never heard this.  They never said

25   this, so I would like to go inquire about what that is
```

```
 1    before I stick him on the stand.
 2                 THE COURT:  Okay.  I don't want to send
 3    the jury out.  Can we do that real quick you think.
 4                 MR. MORENO:  Yes, I just want to know --
 5    I need to figure out which one and why he thinks he
 6    knows this guy -- as I said there are several Cachetes.
 7    I just want to make sure he's not going to come in here
 8    and tell you, yeah, that guy I saw him because that's
 9    not anywhere.
10                 THE COURT:  Not anywhere.  Okay.  All
11    right.
12                 MR. MORENO:  Like I said, just to make
13    sure.
14            (End of sidebar.)
15                 THE COURT:  We need just a minute here,
16    ladies and gentlemen.  Since we have not been here very
17    long this morning, I'm not going to give you break yet.
18    We'll take a minute if anybody needs to step out for
19    just a moment, I'll let you do that, but, otherwise,
20    we'll just sit here and wait.  It shouldn't take very
21    long.
22            (Pause.)
23                 THE COURT:  Where do we stand,
24    Mr. Moreno?
25                 MR. MORENO:  Your Honor, we're going to a
```

```
1    different witness at the mean time.

2                    THE COURT:  Very well.

3                    MR. MORENO:  We're going to move on to a

4    different witness at the time.

5                    THE COURT:  I said very well.

6                    MR. MORENO:  Oh, I'm sorry.  Hector

7    Garcia.

8                    THE COURT:  Hector Garcia, please.

9            (The witness enters the courtroom.)

10                    THE COURT:  Please stop and raise your

11   right hand to be sworn in.

12           (Witness sworn.)

13                    THE WITNESS:  I do.

14                    THE COURT:  You may be seated.  You may

15   proceed, Mr. Moreno.

16           (Hector Garcia's testimony previously

17   transcribed.)

18                    MR. BALLI:  I'll pass the witness.

19                    THE COURT:  Mr. Moreno.

20                    MR. MORENO:  Nothing further, Your Honor.

21                    THE COURT:  Thank you.  You may step

22   down.  The next witness, please.

23                    MR. MORENO:  Gerardo Ramos.

24                    THE COURT:  Gerardo Ramos, please.

25                    MR. MORENO:  May we approach?
```

```
 1                THE COURT:  You may approach.

 2           (At sidebar.)

 3                MR. MORENO:  They tell me that there's no

 4      identification issue with either Ramos or Resendez.

 5                THE COURT:  Is that a misunderstanding

 6      or--?

 7                MR. MORENO:  They tell us that when they

 8      went to go serve him -- I'm talking about in San Antonio

 9      where they served him.  That one of the agents thinks

10      that the agent who served that he him he felt that he

11      told him something about he thought this guy was the

12      bother of another nickname.  Was this guy.  But he's

13      wrong, and it's completely different people, and they

14      asked him, and he doesn't know anything about this guy.

15                THE COURT:  Okay.

16                MR. BALLI:  And, Your Honor, one of the

17      reasons I guess -- a reason related to that we're

18      approaching is that Mr. Vela prepared a motion late last

19      night and early this morning that we're going to file or

20      reurge the identification issues.  The previous motion

21      that I filed--.

22                THE COURT:  That's not before the court

23      right now, so let's move on with this witness.

24           (End of sidebar.)

25                THE COURT:  Mr. Ramos, please raise your
```

1    right hand to be sworn in.

2              (Witness sworn.)

3              THE WITNESS:  I swear.

4              THE COURT:  You may be seated.  You may

5    proceed, Mr. Moreno.

6              MR. MORENO:  Thank you, Your Honor.

7         GERARDO RAMOS, GOVERNMENT WITNESS, SWORN

8                   DIRECT EXAMINATION

9    BY MR. MORENO:

10   Q    Would you please tell us your full name?

11   A    Gerardo Ramos.

12   Q    Mr. Ramos, where are you from?

13   A    Laredo, Texas, born here.

14   Q    Are you still living here in Laredo?

15   A    No, I'm not.

16   Q    Why are you no longer living here?

17              MR. BALLI:  Objection as to relevancy,

18   Your Honor.

19              MR. MORENO:  I'll rephrase.

20   BY MR. MORENO:

21   Q    Were you living in Laredo back on March 18th of

22   2006?

23   A    Yes, sir, I was.

24   Q    Where were you that evening?

25   A    I was getting to my uncle's house when a car

1    pulled up.

2              THE COURT:  Just a second, I'm going to

3    ask you to get a little bit closer to the mike, so that

4    we can hear you clearly yet, please.

5    BY MR. MORENO:

6    Q    You were getting to your uncle's house?

7    A    Yes.

8    Q    Who is your uncle?

9    A    Jesus Maria Resendez.

10   Q    Jesus Maria Resendez?

11   A    Yes, sir.

12   Q    Was he also known as Chuy Resendez?

13   A    Yes, sir.

14   Q    Okay.  And where is this house that you were

15   getting to?

16   A    I don't know the number.  But it's Paseo del Tebir

17   in Rio Bravo.

18   Q    And this your uncle, Chuy Resendez's house?

19   A    Yes, sir.

20   Q    And you said you were getting.  Where were you

21   coming from?

22   A    From South Padre.

23   Q    Okay.  And so did you arrive at your uncle's

24   house?

25   A    Yes.

1    Q    What happened when you arrived at the house?

2    A    As soon as we got there I just had a chance to get

3    off the truck we were on and a car pulled up.

4    Q    Okay.  Hold on.  When you said as soon as we got

5    there.  Who was with you?

6    A    My uncle Julio Cesar Resendez; my cousin, Mariano

7    Resendez; my other cousin Rodolfo Resendez; and my

8    uncle Chuy's little boy, Jesus Maria Resendez Jr.

9    Q    And all of you were coming from South Padre

10   Island?

11   A    Yes, sir.

12   Q    And you said as soon as you got there in the truck

13   you were in -- what vehicle were you all in?

14   A    It was an Excursion.

15   Q    Do you recall what color it was or what model it

16   was?

17   A    Blue.  I want to say like a 2002.

18              MR. MORENO:  If I may, Your Honor?

19              THE COURT:  You may.

20   BY MR. MORENO:

21   Q    Let me show you what was introduced earlier as

22   Government Exhibit 94 and 95.  If you look at the top

23   picture of Government Exhibit Number 94, is this the

24   Excursion you're referring to?

25   A    Yes, sir.

1    Q    And all these other photos here, 94 and 95,

2    they're the same vehicle?

3    A    Yes, sir.

4    Q    Okay.  That was your car or?

5    A    It belonged to my uncle as well.

6    Q    Which one of your uncles?

7    A    Jesus.

8    Q    Jesus.  Okay.  So you said as soon as you arrived,

9    what was the first thing you saw or did?

10   A    I got off the truck and a Mazda pulled up and just

11   started shooting.

12   Q    Okay.  Let me stop you there.  A Mazda.  Can you

13   tell us what kind of Mazda?  Was it a car or a truck?

14   A    It was a car.  It was a 626.

15   Q    I sorry?

16   A    A 626.

17   Q    A 626 Mazda?

18   A    Uh-hum.

19   Q    Do you remember the color?

20   A    The color was maybe burgundy.

21   Q    Okay.  So you saw it.  Did it stop?  Did it drive

22   by?

23   A    It started creeping, and it just stopped in front

24   of me.

25   Q    Okay.  Then what did they do?

1    A    They started shooting.

2    Q    At that point or when you saw them, could you tell

3    how many people were in the car?

4    A    They were three.

5    Q    They were three?

6    A    Uh-hum.

7    Q    And if you recall, when you say they started

8    shooting, can you tell which one of three people you

9    could see was shooting?

10   A    As I recall, three of them.

11   Q    All three of them were shooting?

12   A    Yes.

13   Q    Can you tell us whether or not they were shooting

14   from inside the car?  Did they get out of the car?

15   A    No, no, no, from inside.

16   Q    Where were you standing when the shooting began?

17   A    I was on the right side of the Excursion.  I was

18   just outside.

19   Q    Actually, if I -- let me get back to this picture

20   here on Government Exhibit Number 94.  Okay.  If you

21   look at that picture on the screen you have in front of

22   it, is a touch screen if you touch it.

23   A    Okay.

24   Q    Can you tell me where you were standing?

25   A    Right here.

1    Q    Okay.  And so you said that the Mazda pulled up

2    right in front of you?

3    A    Uh-hum.

4    Q    And what happened when they opened fire?

5    A    Well I got shot at, and they kept shooting when I

6    was on the floor, and they left.

7    Q    Okay.  How many times were you shot?

8    A    Me?

9    Q    Yes.

10   A    I was shot five times and 11 grazes.

11   Q    Shot five times and 11 grazes?

12   A    Uh-hum.

13   Q    When you said they took off, in what direction did

14   they take off?

15   A    That way.

16   Q    Is that going out of Rio Bravo or coming into Rio

17   Bravo?

18   A    Yes.  Going out.

19   Q    Going out of Rio Bravo.  Were you able to see any

20   of the three men who shot you?  Did you recognize any

21   of the three men who shot you?

22   A    No.

23   Q    What happened after the men left?  What do you

24   recall?

25   A    I was on the floor.  Ambulance came and picked me

1    up, and I went to the hospital.

2    Q    Do you recall if you talked to any of the officers

3    when you were at the hospital?  Do you remember?

4    A    I did.  I talked to Hector Garcia and some other

5    two officers.  I don't recall their names.

6    Q    Do you have a sister by the name of Denise Ramos?

7    A    Yes, sir.

8    Q    Do you remember she helped you write a statement

9    for them?

10    A    Yes, sir.

11    Q    And was that done that night?

12    A    No.

13    Q    Or was that done later?

14    A    No, that was later.

15    Q    Do you remember approximately how much later?

16    A    About five days maybe.

17    Q    Okay.  When you were shot on the 18th, you have

18    told us where you were at.  Do you recall where your

19    other uncle Julio Cesar, where he was?

20    A    We were getting off the truck.  As soon as they

21    pulled up they started shooting.  I guess he ran.  I

22    don't know where he went.  I just got off; they started

23    shooting and I fell.

24    Q    Do you remember where your cousin Mariano Resendez

25    was?

```
1    A    Pretty sure he ran inside.

2    Q    Inside the car or inside the house?

3    A    No, inside the house.

4    Q    Is that Mariano Resendez, your cousin, is that the

5    same Mariano Resendez who was killed a couple of weeks

6    later?

7    A    Yes, sir.  Yes, sir.

8                   MR. MORENO:  I'll pass the witness.

9                   THE COURT:  Mr. Balli.

10                      CROSS-EXAMINATION

11   BY MR. BALLI:

12   Q    How serious were the injuries that you sustained?

13   A    I got twice -- I got shot twice in an artery.  I

14   got one in the stomach that went in and out.  I got one

15   in the leg that had to be surgically removed, the

16   bullet, and the other one hit my shin.

17   Q    Which one was the most serious of those?

18   A    The artery.

19   Q    And where was that artery?

20   A    This one right here.  The artery.  But it was in

21   the leg.

22   Q    It was in the leg but that big artery that comes

23   up from the leg?

24   A    Uh-hum.

25   Q    And it was the most serious because I guess there
```

```
 1   was a lot of bleeding.

 2   A    Yeah, it bleed out.

 3   Q    And I imagine you had surgery that night.

 4   A    Excuse me?

 5   Q    I imagine you had surgery that night?

 6   A    Yes.  Well, I had surgery on that one and the

 7   other one that to be surgically removed.

 8   Q    And when did you have -- the first surgery was on

 9   I imagine on the night of March 18th or March 19th.

10   A    Yes.

11   Q    It was immediate.  And then the next surgery was

12   how many days, weeks, or months later?

13   A    The next day.

14   Q    The next day.  So you had surgery on back to back

15   days?

16   A    Yes, I remember because they didn't let me eat

17   anything, and I was hungry.

18   Q    Okay.  And they probably gave you some heavy

19   drugs, aside from, you know, the anesthesia drugs for

20   pain such as maybe morphine or something like that?

21   A    Morphine.

22   Q    How many days was it before you were okay to talk

23   to the police about what had happened on March the

24   18th?

25   A    When I went in to surgery the first time, they
```

1    dislocated my jaw, so I couldn't talk for the next day

2    or until I had surgery again because the -- on the -- I

3    got shot on the 18th.  The 19th around maybe

4    5:00 o'clock a doctor went to see me to locate my jaw

5    again and I could talk cause I couldn't because my

6    mouth was open.

7    Q    Okay.  But were you -- on the 19th, were you under

8    the influence still of morphine or were you already

9    like, you know, in all of your senses?  Were you

10   already okay?

11   A    I was already on my senses.

12   Q    On the 19th?

13   A    Yes.

14   Q    So once you had your jaw back, you were okay to

15   talk?

16   A    Yeah, I was hungry as well.

17   Q    And very hungry.  And when did the police actually

18   come and talk to you or the sheriff's deputy?

19   A    I don't recall the exact date.  But I was still in

20   the hospital.  I was in intensive care.  I was in

21   intensive care for a week, and there was from the

22   18th -- maybe about five days because after that week

23   they had sent me to a regular room.  When they talked

24   to me, I was in intensive care, so it was anywhere

25   between the 18th and a week.  I mean I know it wasn't

1    like on the 19 or the 20th.  It might have been on the

2    23rd, 24th.

3    Q    So you think about the 23rd or 24th was when you

4    finally talked to the investigator?

5    A    Yeah.

6    Q    Did you have any, any useful information anything

7    that you thought that was useful that you could tell

8    the police about the shooting?

9    A    Just the car.

10   Q    The car.  And right now that Mr. Moreno asked you

11   two questions in one so I just want to clarify.  He

12   asked you if you had seen the people was one of the

13   questions.  And were you able to see anybody?

14   A    I saw them.  I just don't remember.

15   Q    Okay.  So you didn't have I guess any information

16   that would be useful in identifying the shooters?

17   A    No.

18   Q    Other than a description of the vehicle?

19   A    Yeah.

20   Q    And you provided that information to the police I

21   imagine or to Investigator Hector Garcia, correct?

22   A    No.  They didn't ask me about the car.

23   Q    What did they ask you about?

24   A    They just asked me basically if I was okay and if

25   I could identify the driver or the people who shot me.

1    Q    And when they asked you if you could identify the

2    people who shot you, were they asking you for a

3    description or did they tell you that they already had

4    some suspect?

5    A    I don't recall, but I gave them like a brief

6    description of what I saw.

7    Q    Now do you have a description of the people or not

8    really?

9    A    Not really.

10    Q    And they didn't tell you about any suspects that

11    they had at that time, correct?  Nobody mentioned to

12    you, specifically an investigator, we have a suspect

13    being detained or questioned or there's somebody that

14    we're looking at?

15    A    I don't recall.

16                    MR. BALLI:  I'll pass the witness.

17                    THE COURT:  Mr. Moreno?

18                    MR. MORENO:  Nothing further.

19                    THE COURT:  Thank you.  You may step

20    down.  Next witness please.

21                    MR. MORENO:  Felipe Calderon.

22                    THE COURT:  Felipe Calderon, please.

23    Federico did you say?  Federico?

24                    MR. MORENO:  I'm sorry, Yes, Your Honor.

25    Federico.

```
 1              THE COURT:  Please come forward.  And
 2    please stop and raise your right hand to be sworn in.
 3              (Witness sworn.)
 4              THE WITNESS:  I do.
 5              THE COURT:  Thank you.  You may be
 6    seated.  You may proceed, Mr. Moreno.
 7         FEDERICO CALDERON, GOVERNMENT WITNESS, SWORN
 8                     DIRECT EXAMINATION
 9    BY MR. BALLI:
10    Q    Would you please tell us your full name?
11    A    Federico Calderon.
12    Q    And where do you work, Mr. Calderon?
13    A    Webb County Sheriff's Office.
14    Q    How long have you worked with the Webb County
15    Sheriff's Office?
16    A    Since 2005.
17    Q    And in those years, in what capacity have you
18    worked?
19    A    I started working in the patrol division of the
20    Sheriff's Office, and I now work in the criminal
21    investigation division.
22    Q    Back on March 31, 2006, in what capacity were you
23    working?
24    A    A patrol officer, sir.
25    Q    Okay.  And on that day did you have occasion to
```

```
 1   respond to a call involving a -- excuse me, a drive-by
 2   shooting over at Rio Bravo?
 3   A     Correct, sir.  Yes, I did.
 4   Q     Do you remember the address that you went to?
 5   A     1103 Paseo Del Tebir.
 6   Q     Do you know who lives there?
 7   A     At the time it was a Mr. Resendez.
 8   Q     Okay.  Do you remember which Resendez?
 9   A     Julio Cesar is what I have in my report.
10   Q     Okay.  And did you respond to that address as a
11   result of the call?
12   A     Yes, sir, I did.
13   Q     Okay.  What did you find when you first arrived?
14   A     When I arrived, there was a green car parked out
15   front.  Broken glass, several bullet holes in the car.
16   There were casings on the street in front of the car,
17   and when I got there, there were two young ladies
18   inside of the vehicle, and they were coming out from
19   where the foot well was, and they were explaining to me
20   what had happened.  And at that time, Mr. Resendez was
21   coming out from where he was inside the house.
22   Q     And just so we're all clear about what we're
23   talking about, what do you refer to as the foot well?
24   A     Well where the steering wheel is under the
25   steering wheel, under the dashboard the space between
```

1   like where the gas pedals are on the passenger

2   compartment under the dashboard.

3   Q    So immediately under the seats.

4   A    Immediately in front under the seat.

5   Q    Below the dash?

6   A    Yes, sir.

7   Q    And do you recall who the two young ladies were?

8   A    Not by memory, but I have them in my report here.

9   Give me a second.  I have them as Marisol Morales and a

10  Denise Morales.

11  Q    And then you said Julio Resendez emerged from the

12  house?

13  A    I was calling out to see if anybody was injured or

14  if anybody was there, and he called out from behind the

15  fence that he was there.

16  Q    And who, if anybody, was injured?

17  A    Mr. Resendez was injured, sir.  He received a

18  gunshot wound to the -- give me a second.  Right or

19  left foot.  It's going to be the left foot.

20  Q    Okay.  And so a gunshot to the foot.  You

21  mentioned that when you arrived you saw several shell

22  casings?

23  A    Correct.

24  Q    Okay.  Do you actually--.

25               MR. BALLI:  May I approach?

```
 1                    THE COURT:  You may.

 2   BY MR. MORENO:

 3   Q    Let me show you what I've marked as Government

 4   Exhibit Number 120?

 5   A    Uh-hum.

 6   Q    Do you recognize these photographs?

 7   A    Yes, I do.

 8   Q    Okay.  And are these photographs of that crime

 9   scene that you have described for us?

10   A    Correct.

11   Q    We would offer Government Exhibit Number 120?

12                    THE COURT:  Any objection?

13                    MR. BALLI:  No, objection, Your Honor.

14                    THE COURT:  It is admitted.

15               (Government Exhibit 120 admitted.)

16   BY MR. MORENO:

17   Q    Okay.  All right.  Is Government Exhibit Number

18   120 a set of four photographs?

19   A    Correct.

20   Q    And I guess more importantly, the bottom left

21   corner is that a picture of the injury to the foot that

22   Mr. Resendez received?

23   A    That's correct.

24   Q    And I am sorry, Julio Cesar Resendez received.

25   A    Correct.  Julio Cesar Resendez, yes.
```

1   Q    And the other three are pictures of what?

2   A    They're not very good detail, but there are some

3   of the shell casings that were recovered from the

4   scene.

5   Q    Let me see if we can get this close enough to

6   where you can actually see them.  Can you -- all right.

7   I don't know if you can see that clearly on your

8   screen.  Can you make out where the casing is?

9   A    No, sir, I can't.  I didn't photograph the scene,

10  sir.

11  Q    And over here on the right-hand picture, can you

12  tell where the casing is?

13  A    Yes, sir, I can.

14  Q    That's the touch screen you have there.  Can you

15  circle that?

16  A    (The witness complied.)

17  Q    And how about on the bottom -- well, all right.

18  Can you spot the casing in there?

19  A    To me it looks like right there.

20  Q    All right.  Now you mentioned that -- thank you.

21  You mentioned that you saw multiple casings.  Do you

22  recall the number and caliber of casing that were

23  recovered at the scene?

24  A    I documented what I counted.  I did not recover

25  them.  That was the evidence technician, but I counted

```
 1   14 casings.

 2   Q    Okay.  What type of casings?

 3   A    It was one 762 by 39 which is like an AKA 47 or

 4   SKS type weapon.

 5   Q    Okay.  One?

 6   A    Just one.

 7   Q    Okay.

 8   A    Four 9-millimeter casings and nine 40 Smith &

 9   Wesson casings.

10   Q    Okay.  Do you recall how many times -- or let me

11   go back.  You said there was a -- I'm sorry what color

12   was the car that is there?

13   A    Green.

14   Q    Green.  Did you determine whose car that is?

15   A    The registered owner of the vehicle is Rene

16   Bernardini.  But the person operating it was Denise

17   Morales.

18   Q    Okay.  Do you remember how many times that car was

19   shot?

20   A    No, I don't, sir.

21   Q    Okay.  Do you remember if it was multiple?

22   A    That was the evidence technician who did the

23   processing.  I didn't actually count the bullet holes

24   in the car, sir.

25   Q    Do you remember where the bullet holes were
```

```
 1   located?

 2   A    Drivers seat, passenger seat, windshield.  Pretty

 3   much passenger compartment of the vehicle.

 4   Q    Okay.

 5                   MR. MORENO:  Pass the witness, Your

 6   Honor.

 7                   THE COURT:  Mr. Balli.

 8                   CROSS-EXAMINATION

 9   BY MR. BALLI:

10   Q    When you arrived at the scene, Mr. -- I'm sorry --

11   Investigator Calderon.  When you arrived at the scene,

12   Investigator Calderon, you met with Julio Cesar

13   Resendez, correct?

14   A    Correct, sir.

15   Q    And Mr. Resendez had just been shot, correct?

16   A    Correct.

17   Q    And was he still under the under the excitement of

18   the event at the time of the shooting?

19   A    He was pretty upset.  Yes.

20   Q    Okay.  And did he tell you -- isn't it true that

21   he told you who at least who one of the shooters was.

22   A    He said he was able to name one by name, and the

23   other three he did not recognize at the time.

24   Q    All right.  And, in fact, he gave you the name of

25   a person by the name of Carrizales, did he not?
```

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

```
 1   A     That is correct, sir.  Yes.

 2   Q     In fact, he gave you a full name.  He said Jose

 3   Luis Carrizales, correct?

 4   A     That's correct, yes.

 5   Q     And he even told you generally where the person

 6   resided, in what area of town, correct?

 7   A     Correct.

 8   Q     And isn't it true that because you had this

 9   description you were able to radio dispatch and provide

10   that information to other officers on patrol, correct?

11   A     Correct.  That's what I called over the radio.

12   Q     And the reason for that was to attempt to find

13   Jose Luis Carrizales?

14   A     Correct.

15   Q     Because he was a suspect in the shooting?

16   A     Mr. Carrizales or the vehicle they were operating.

17   Q     And based on what you did, were you able to find

18   Mr. Carrizales?

19   A     No, sir.  My role there in that capacity ended

20   when the investigator on-scene arrived.  The on-call

21   investigator and he took over the further investigation

22   of the scene.

23   Q     And did you pass on that information to that

24   investigator?

25   A     Correct.  Yes.
```

1    Q    And who was the investigator?

2    A    That's Sergeant Paez.  Esteban Paez.

3    Q    And at the time you found out that Jose Luis

4    Carrizales was a fugitive, correct?

5    A    Correct.  There was an entry for a Jose Luis

6    Carrizales who was wanted at the time.  Yes.

7    Q    Were you at that time a patrol office in the Rio

8    Bravo and El Cenizo area?

9    A    We rotate daily, so -- but, yes, I was commonly in

10    Rio Bravo and El Cenizo.

11    Q    As a matter of fact, a large part of the Webb

12    County Sheriff's patrols the largest part of the

13    population aside from the city of Laredo is patrolling

14    Rio Bravo and El Cenizo, correct?

15    A    In some manner, yes.

16    Q    And the Sheriff's Department doesn't dedicate

17    patrol much to the city of Laredo because the city of

18    Laredo has its own police department, correct?

19    A    That's correct.

20    Q    And so the Sheriff's Department needs to be out in

21    Rio Bravo and El Cenizo frequently because there's a

22    large population out there?

23    A    Correct.

24    Q    And the rest of county is relatively, relatively

25    isolated?

```
1    A    Correct.

2    Q    And in Rio Bravo and El Cenizo also there tend to

3    be a bit of criminal activity sometimes?

4    A    Correct.

5    Q    And were you, when you arrived at the scene

6    already familiar with the Resendez family?

7    A    At the time, no, sir.

8              MR. BALLI:  I'll pass the witness.

9              THE COURT:  Mr. Moreno?

10                  REDIRECT EXAMINATION

11   BY MR. MORENO:

12   Q    In working on this investigation with Investigator

13   Paez, did you later discover that Mr. Resendez was

14   wrong about who he thought shot him?

15   A    Sergeant Paez had commented to me that the

16   information that was given to him, it was flawed

17   somewhere.  But he didn't go into detail.  He didn't

18   tell me exactly what or where.

19              MR. MORENO:  That's all I have.

20              THE COURT:  Anything further?

21              MR. BALLI:  Yes, Your Honor.

22   BY MR. BALLI:

23   Q    So you are really not sure what Investigator Paez

24   meant by that?

25   A    He told me that Jose Luis Carrizales, that I had
```

```
 1   put on the report was not the right person who was --
 2   he was looking for.  But other than that, he didn't --
 3   this was a few week after I turned in my report so
 4   there was not anything I could change.
 5   Q    So he didn't discuss with you the fact that
 6   possibly there could have been two Jose Luis
 7   Carrizales?
 8   A    No, at the time I was on shift work.  He was 8-5.
 9   We didn't really converse more than a few minutes in
10   and out of the office.
11   Q    Okay.  So you don't know what he meant by the
12   wrong Jose Luis Carrizales?
13   A    No, sir, I don't.
14   Q    So it wasn't be possibly that Jose Luis Carrizales
15   with the warrant -- but it may have been someone with a
16   different -- with the same name but it was a different
17   person?
18   A    It's a possibility.
19                    MR. BALLI:  Okay.  I'll pass the witness.
20                    MR. MORENO:  That's all.
21                    THE COURT:  All right.  Thank you.  You
22   may step down.
23                    MR. MORENO:  Julio Cesar Resendez.
24                    THE COURT:  Julio Cesar Resendez, please.
25   Actually, you know what, let's go ahead take a morning
```

1    break at this time, ladies and gentlemen.  We'll take a
2    morning break at this time, about 15 to 20 minutes.
3    We'll resume thereafter, and I remind you of the court's
4    instructions.  You may step out.
5                    THE CSO:  Please rise for the jury.
6              (The jury leaves the courtroom.)
7                    THE COURT:  Anything from counsel at this
8    time?
9                    MR. BALLI:  We're filing that motion that
10   we discussed, Your Honor.
11                   THE COURT:  Very well then.  If you will
12   hand that to Ms. Trevino.
13                   MR. VELA:  Your Honor, for the record,
14   this motion is almost 75 percent identical to the one
15   that was filed before with some case law regarding out
16   of court identification and in court identification and
17   the taint that will happen throughout the court
18   identification.
19                   THE COURT:  The court will review it, and
20   then we'll address it maybe this afternoon.  All right.
21   Anything else?
22                   MR. BALLI:  No, Your Honor.
23                   MR. MORENO:  No, Your Honor.
24                   THE COURT:  All right.  Thank you.
25                   THE CSO:  All rise.

```
 1                    (Break.)
 2                    THE CSO:  All rise.
 3                    THE COURT:  You may be seated.  The jury
 4     apparently got tamales this morning, so they wanted a
 5     little bit more time.  But there is one issue that we
 6     need to address.  One of our alternate jurors, Juror
 7     Number 15, has now indicated that he knows or knows
 8     of -- I'm not sure exactly what, but Investigator Hector
 9     Garcia.  I believe he was our third.  He wasn't our
10     third witness.  Oh, today.  Oh, okay.  When you said
11     third witness, I was thinking as of Tuesday or Monday or
12     whenever we started.  Okay.  All right.  So let me see
13     bring him in and see he is an alternate, but we'll see
14     what he says, and then we will go from there.
15                    MR. MORENO:  I think we already released
16     the -- do we need him back?
17                    THE COURT:  No, no, we're going to have
18     the juror come in to find out what.
19                    (Juror number 15 enters the courtroom.)
20                    THE COURT:  It has been brought to my
21     attention that after listening to the testimony of
22     Investigator Hector Garcia, you realized that you know
23     him or know of him; is that correct?
24                    JUROR:  That's correct, Your Honor.
25                    THE COURT:  How is that you know him?
```

```
 1                    JUROR:  We grew up in the Guadalupe
 2   neighborhood from I want to say from about two years old
 3   to ten years old something like that.
 4                    THE COURT:  Okay.  And without putting
 5   you on the spot, you are about how old now?
 6                    JUROR:  35.
 7                    THE COURT:  Okay.  So some 20 years ago
 8   is when you knew him.  Have you had any contact with him
 9   at all during the past 20 years?
10                    JUROR:  I have gotten in contact with
11   him.  I just saw him at TAMIU when he was I think a
12   patrol officer there.
13                    THE COURT:  So you on occasion would run
14   into him there?
15                    JUROR:  Right.
16                    THE COURT:  When you ran into him, did
17   you talk to him or say hello to him?
18                    JUROR:  Just said hello.
19                    THE COURT:  And that would be it.  Okay.
20   Do you have any involvement with him whatsoever now?
21                    JUROR:  No, I don't.
22                    THE COURT:  And the last time you would
23   have had any real involvement would have been some 20
24   years ago?
25                    JUROR:  Correct.
```

1    THE COURT:  All right.  Is there anything

2    about the fact that you at least when you were a young

3    boy growing up in the same neighborhood, is there

4    anything about that that would make you in any way,

5    shape, or form either biased in favor of the government

6    or in favor of the defendant?

7                THE JUROR:  Of course not, Your Honor.

8                THE COURT:  Okay.  Do you feel that you

9    can continue to sit as a fair and impartial juror in

10   this case?

11               JUROR:  Can I say something else?

12               THE COURT:  Yes, sir.

13               JUROR:  I was city commissioner for the

14   city of Rio Bravo from 1997 to 2001.

15               THE COURT:  Okay.

16               JUROR:  I was also -- I used to work at a

17   paramedic or EMT during for the city of Rio Bravo during

18   those years.

19               THE COURT:  Okay.

20               JUROR:  And I don't recognize any of the

21   names from the list.  And I noticed a lot of testimony

22   of the city of Rio Bravo.

23               THE COURT:  Okay.

24               JUROR:  I just wanted to let you know.

25               THE COURT:  I appreciate that very much.

1    But as of right now, there's is anybody that you would

2    say that, oh, I know that person because of my position

3    back then?

4                    JUROR:  Right.  Right.

5                    THE COURT:  Okay.  Thank you very much

6    then.  You may step back outside.  Thank you.

7              (Juror leaves the courtroom.)

8                    THE COURT:  Anything either counsel?

9                    MR. MORENO:  No, Your Honor.

10                   THE COURT:  Mr. Balli.

11                   MR. BALLI:  No, Your Honor.

12                   THE COURT:  I do not believe that there's

13   any issue for him to continue especially in light of the

14   fact that he is an alternate.  He may not ultimately

15   serve as a juror, so.  We'll go forward then.  Are we

16   ready to proceed in other respects?

17                   MR. MORENO:  Yes.

18                   MR. BALLI:  Yes, Your Honor.

19                   THE COURT:  Let's bring the jury in.

20                   THE CSO:  Please rise for the jury.

21             (The jury enters the courtroom.)

22                   THE COURT:  The jury is permitted -- if I

23   am here sitting then you are permitted to come in and

24   sit down.  Everybody else stands up for you because you

25   are judges as I told you before.  You stand up for me

1    because ultimately I am the ultimate judge in this

2    courtroom.  But if I'm here sitting down, you can come

3    in and sit as well.  And everybody else, you may be

4    seated.  Mr. Moreno, you may be seated as well.  But you

5    are about to call your next witness I think.

6                    MR. MORENO:  Yes, Your Honor.

7                    THE COURT:  And that was?

8                    MR. MORENO:  Julio Cesar Resendez.

9                    THE COURT:  Thank you.

10                    MR. MORENO:  And I don't recall, but he

11    may be one of those that needs an interpreter or--.

12                    THE COURT:  Okay.  We'll check.

13    Mr. Resendez, please come all the way forward.  Do you

14    speak English?

15                    THE WITNESS:  Spanish.

16                    THE COURT:  Please raise your right hand

17    to be sworn in.

18            (Witness sworn.)

19                    THE WITNESS:  Yes.

20                    THE COURT:  Okay.  Thank you.  You may be

21    seated right here.

22            (Judge speaking in Spanish.)

23                    THE COURT:  All right, Mr. Moreno.  You

24    may proceed.

25                    MR. MORENO:  Thank you, Your Honor.

```
1              JULIO CESAR RESENDEZ, GOVERNMENT WITNESS, SWORN

2                          DIRECT EXAMINATION

3    BY MR. MORENO:

4    Q     Would you tell us your full name?

5    A     Julio Cesar Resendez.

6    Q     Mr. Resendez, where are you from?

7    A     From Laredo, Texas.

8    Q     Do you still live in Laredo?

9    A     No, in San Antonio.

10   Q     Okay.  And when you lived here in Laredo, Texas,

11   where did you live?

12   A     1103 Paseo Del Tebir in Rio Bravo.

13   Q     So actually in the city of Rio Bravo?

14   A     Yes.

15   Q     Can you tell us what your relationship is to

16   Gerardo Ramos?

17   A     He is my nephew.

18                    THE COURT:  Let me interrupt you for just

19   a second.  Mr. Resendez, let me -- thank you.

20   BY MR. MORENO:

21   Q    Okay.  And what is your relationship, if any, to

22   the late Jesus Maria Resendez or Chuy Resendez?

23   A     My brother.  Yes.

24   Q     Okay.  And what is your relationship, if any that

25   you had with the deceased, Mariano Resendez?
```

```
 1    A      He was my nephew.

 2    Q      Okay.  I want you to think back to the evening of

 3    March 18, 2006.  This is the night that your nephew,

 4    Gerardo Ramos was shot.  Do you recall that night?

 5    A      Yes.

 6    Q      Okay.  And where were you that night?

 7    A      I was parking the truck with the trailer, and we

 8    had -- we were bringing some motorcycles.

 9    Q      Where were you parking the truck?  Mr. Resendez,

10    you need to wait, if you are going to testify in

11    Spanish, you have to wait for her to translate it, then

12    answer the question even if you think you understand

13    it.  Where were you parking the truck?

14    A      Outside of the house.

15    Q      Okay.  And who was with you when you arrived?

16    A      Rudy, my nephew, and Jesus, the son of my brother

17    Jerry.

18    Q      Jerry -- Jerry who?

19    A      Jerry and Mariano the one that also died.

20    Q      Is Jerry Gerardo Ramos?

21    A      Yes.

22                 THE COURT:  And I think Mariano is Jesus

23    Mariano.

24                 THE WITNESS:  Jesus was the one that was

25    shot at that was killed with Mariano.  Both of them.
```

```
 1   BY MR. MORENO:

 2   Q    Now where were all of you coming from?

 3   A    From Padre Island.

 4   Q    Okay.  And what happened when you arrived at the

 5   house?

 6   A    Have -- well all of a sudden this maroon car

 7   passed by, and he started shooting.

 8   Q    Do you remember the type of maroon car?

 9   A    It was like a Mazda.

10   Q    Okay.  And do you recall whether -- do you

11   remember seeing if -- how many people were in the

12   Mazda?

13   A    Yeah, three persons people with caps or hats.

14   Q    And you said that they pulled up and they started

15   shooting?

16   A    Yes.

17   Q    Okay.  Could you tell or did you see whether all

18   three people were shooting?

19   A    The three persons were shooting because we all

20   started to run right away, the three of us, my nephews.

21   Q    Okay.  Do you remember if anybody from your group

22   was injured?

23   A    Just Gerardo.

24   Q    Okay.  And what happened to Gerardo?

25   A    Well they shot at him.  He received a lot of
```

```
 1   bullet shots, like 16.

 2   Q    Now were you were you still there at the house

 3   when the Sheriff's Office arrived?

 4   A    Yes.

 5   Q    Okay.  And were you able to provide the Sheriff's

 6   Office a description of the car?

 7   A    Yes.  Yes, of course.

 8   Q    Okay.  And did you also give him a description of

 9   what the three people looked like?

10   A    One was a blond one.  The other one was -- one is

11   Aperlado, like that, dark-skinned, and the other one

12   was fat.

13   Q    So the one that was driving was the heavy-set one?

14   A    Yeah.  Yes.

15   Q    Now were you also present when -- were you also

16   present at that same house on March 31st of 2006?  Yes

17   or no.  Were you there first?

18   A    Yes.

19   Q    And who were you there with?

20   A    I was talking to Marisol and Denise.

21   Q    And who are Marisol and Denise?

22   A    She was my brother's girlfriend.

23   Q    Okay.  Let me back up a second.  Do you know what

24   the last name for Marisol and Denise are?

25   A    Morales.
```

1  Q    They're both Morales?

2  A    The both of them.

3            THE COURT:  Let me stop you for a second.

4  I know you understand Spanish, Mr. Moreno.

5            MR. MORENO:  I'm sorry.

6            THE COURT:  Sometimes you're jumping in

7  before the interpreter has interpreted the question.

8  And, Mr. Resendez, you're doing the same thing.  I know

9  you understand a lot of English -- you are doing the

10  same thing.  But because we have to have a clear record

11  here, it's very important that only one person talk at a

12  time.  So if he's asking a question, you wait until it's

13  translating, and then if she's translating you wait

14  until she finishes before you talk again, okay?

15            THE WITNESS:  I know English.

16            THE COURT:  I know.  Yes, I can tell.  So

17  it's natural to want to respond, but you need to wait.

18            THE INTERPRETER:  Well, Your Honor, if he

19  wants to answer and just turn to me if he--.

20            THE COURT:  Well, I think we would rather

21  have it translated here.

22  BY MR. MORENO:

23  Q    Let me go back.  So it's Denise and Marisol

24  Morales.

25  A    Yes.

```
 1    Q     Both of them are Morales and another last name?

 2    A     Morales-Martinez.  Yes.

 3    Q     Okay.  And which one, Marisol or Denise, was your

 4    brother's girlfriend?

 5    A     Denise.

 6    Q     Denise?

 7    A     Yes.

 8    Q     And when you say "your brother" you are talking

 9    about Jesus Resendez?

10    A     Yes.

11    Q     So you said you were talking to the two of them.

12    Where was this conversation taking place?

13    A     I was outside talking to them.

14    Q     Were you-all outside, standing outside?

15    A     No, they were inside of the car, and I was

16    outside.

17    Q     Okay.  Do you remember what car they were in?

18    A     It was a green Cougar about '89 -- like '99.  '99.

19    Q     So the two ladies are in the car and where are

20    you?

21    A     Outside.  Over there, outside.

22    Q     Do you remember which side of the car you were on,

23    driver's or passenger's?

24    A     The passenger.

25    Q     Okay.  And who was closest to you?  Who was on the
```

1    passenger's side?

2    A    It was Marisol and driving was Denise.

3    Q    Okay.  So the three of you were talking, and what

4    was the first thing you noticed after that?

5    A    When a black truck passed by.

6    Q    Now did the truck just -- when you say "passed

7    by," do you mean it drove by you, or it came and

8    stopped?

9    A    No, it got there and it stopped, and then the

10   dudes got off the car and they started shooting.

11   Q    Okay.  Let me ask you this:  So it was a black

12   truck?  What else can you tell us about the black

13   truck?

14   A    The truck, the black truck it had a sticker in the

15   back that said bendees.  That's all.

16   Q    Do you remember the make or model of the truck?

17   A    It was a GMC, but it was new.  That's all.  It was

18   at night, so I couldn't see.

19   Q    Okay.  Do you remember -- when you say truck, are

20   we talking like a pickup truck or are we talking like

21   an Excursion or something like that?

22   A    Pickup, four doors.  The four doors.  Four doors.

23   Q    And you said that the people got down or -- and

24   started to shoot.  Do you remember how many people got

25   down?

```
 1   A     They were three.  Three.

 2   Q     Okay.  Do you remember what the three people

 3   looked like?

 4   A     No.

 5   Q     Okay.  Do you remember anything about them?  Were

 6   they tall, short, fat, skinny?

 7   A     What I remember -- the ones that got off on the

 8   side of the passenger door were two skinny ones, and

 9   the other one, the one that was driving, he was the fat

10   one.

11   Q     Okay.  And so the three get off, and they start

12   shooting at who?

13   A     They started shooting at me -- and they started

14   shooting at me, and then I started running.  I took off

15   running, and then they hit me on the foot.

16   Q     Which foot were you shot in, Mr. Resendez?

17   A     On the right one right here.  Down here.

18   Q     Was that your only injury, one gunshot?

19   A     Only one.

20   Q     Okay.  And so what happened after you got shot?

21   A     I took off running, and I get in the back of the

22   house.

23   Q     Okay.  Did you see what happened to the truck and

24   the three men?

25   A     No.  I just felt that -- they just left, and I
```

1    didn't see anything else.

2    Q    Okay.  And did you come back out?

3    A    No, I got through the back of the house -- to the

4    house, and then my sister started taking care of my

5    foot.

6    Q    Did anyone call the police or the Sheriff's

7    Office?

8    A    Yes, my sister.

9    Q    And did someone arrive from the Sheriff's Office?

10   A    Yes, after a half an hour then the sheriffs got

11   in -- arrived.

12   Q    Did you come back out to talk to the Sheriff's

13   Office?

14   A    Yes, because they escorted me.  They accompanied

15   me to the hospital in the ambulance.

16   Q    What happened to Marisol and Denise?

17   A    Nothing.  Nothing happened to them.

18   Q    They were okay?

19   A    Yes.

20   Q    When you spoke to the Sheriff's Office, did you

21   tell the Sheriff's Office who you thought had shot at

22   you?

23   A    No.

24   Q    Do you know a person by the name of Jose Luis

25   Carrizales?

1    A    Well first they were passing by, but they did not

2    shoot at me.  They went by first.

3    Q    Who is they?

4    A    Tiofo Parral, something like that or Jose Luis

5    Carrizales.  They were passing by first.

6    Q    Okay.  Where do you know Jose Luis Carrizales and

7    Tiofo from?  Tiofo is that what he said?

8    A    Because I used to work at a car lot and they used

9    to come and buy cars over there.

10    Q    So you actually know them?  You know who they are?

11    A    When they used to come, yes.  But I didn't have

12    any business with them or anything.

13    Q    Okay.  And you said that they went by before?

14    A    First they passed by, but they did not shoot.

15    Q    Okay.  When you say before like minutes before,

16    half an hour before?  How long before?

17    A    About half an hour.

18    Q    Like half an hour before the black truck got

19    there?

20    A    Yes.

21    Q    Okay.  Do you remember giving a statement to the

22    Sheriff's Office?

23    A    Yes.  But I don't remember because my sister is

24    the one that has all the statements.

25    Q    Okay.  But do you remember actually you gave them

1    two statements, one when Gerardo Ramos got shot and one

2    when you got shot?

3    A    Yes, yes.

4    Q    Okay.

5                   MR. MORENO:  May I approach, Your Honor?

6                   THE COURT:  You may.

7    BY MR. MORENO:

8    Q    Let me show you the statement that you gave to the

9    Sheriff's Office when you were shot.  Can you read that

10   to yourself not out loud?

11                  MR. BALLI:  Your Honor.

12                  THE COURT:  Let her finish the

13   translation first.  All right.

14                  MR. BALLI:  May I approach?

15                  THE COURT:  You may.

16          (At sidebar.)

17                  MR. BALLI:  I just want to inquire why

18   he's showing him a statement that he wrote.  Is he going

19   to impeach him or is he going to refresh his memory?

20                  MR. MORENO:  Yes, both, actually.  I am

21   going to refresh him and impeach him.

22                  MR. BALLI:  Okay.  Your Honor, I would

23   object to the refreshing of the memory.  He hasn't

24   testified to not having the knowledge of something or he

25   hasn't testified that it would be helpful to him in

```
1    refreshing his memory.

2              MR. MORENO:  And I am going to impeach

3    him because he stated something different than what he

4    testified to.

5              MR. BALLI:  Okay.  No objection.

6         (End of sidebar.)

7              THE COURT:  You may proceed.

8              MR. MORENO:  May I have a ruling on the

9    objection?

10             THE COURT:  The objection is overruled.

11   BY MR. MORENO:

12   Q    And can I get you to read this to yourself first

13   and then tell me when you're done.

14   A    Yes.

15   Q    First of all, is that your statement?

16   A    Yes.

17   Q    Is that your handwriting?

18   A    My sister wrote it, but I was dictating it to her.

19   Q    So the part about the statement was written by

20   your sister.  Is that your signature?

21   A    Yes.

22   Q    Or initials?

23   A    My sister's initials.  And over here, it's my

24   signature in the back.

25   Q    So did you read that before you signed it?
```

1    A    Yes.

2    Q    Okay.  Now you said that the paragraph on the

3    description, that was written by your sister?

4    A    Yes.

5                 THE COURT:  Mr. Resendez, I think you

6    understand a lot of English.  If you're comfortable

7    answering the questions in English that's okay.  But if

8    you want them translated, then you're going to need to

9    wait until it's translated.  Do you want to answer them

10   in English?

11                THE WITNESS:  No, I prefer Spanish.

12                THE COURT:  Then wait, please.

13   BY MR. MORENO:

14   Q    In the statement that you and your sister provided

15   to the Sheriff's Office--.

16                THE COURT:  And to be clear, he did say I

17   dictated it.  So there's no question it's his statement.

18   BY MR. MORENO:

19   Q    Did you say that it was Jose Luis Carrizales that

20   had fired?

21   A    No, because it was at night.  How would I know

22   that it was them.

23   Q    Okay.  Let me show you the statement again.

24   A    Yes, but I made a mistake.

25   Q    Okay.  But did you say that to the Sheriff's

1    Office?  Did you tell me them that you had seen that it

2    was Jose Luis Carrizales that shot you?

3    A    Yes.

4    Q    Okay.  And you're telling us now that that was

5    wrong?

6    A    Yes, it was wrong.

7    Q    Okay.  Why did you say it was him?

8    A    Because they passed by first and they were

9    looking.  They passed by.

10    Q    And so you were saying that they too had to be

11    involved?

12    A    Well most likely because they were going around

13    with the same shit like that.

14    Q    After you were shot, you said that your sister was

15    putting medicine on your foot?

16    A    Yes.

17    Q    When you came back outside, at some point, did you

18    find anything there at the scene after the police left?

19    A    Yes, I found a radio communication from the Zetas.

20    Q    And just to be clear, when did you find it?  After

21    they left or before they came or--?

22    A    When they left skidding, I found it on the floor,

23    and I picked it up, and I gave it to the sheriff.

24    Q    When you say when they left skidding, when who

25    left skidding?

```
1   A    The one from the black truck when they shot at me.

2   Q    Okay.  So before the Sheriff's Office got there?

3   A    No, the sheriffs came over already late.

4   Q    Just to be clear, you -- they shot at you, yes?

5   A    The ones from the black truck.  Yes.

6   Q    Then they left?

7   A    Yes.

8   Q    Then you found the phone?

9   A    Yes.

10  Q    Then the Sheriff's Office came?

11  A    After.

12  Q    Now did you give the telephone to the Sheriff's

13  Office that night when they came?

14  A    Yes.

15  Q    That same night?

16  A    Yes, but when we arrived at the hospital.

17  Q    When you got to the hospital that's when you gave

18  it to them?

19  A    Yes.

20  Q    Do you remember who you gave that to?

21  A    I think that his name is like Calderon, or I don't

22  know how.  I don't know how.  I don't know because I

23  forgot the papers in San Antonio.

24  Q    Mr. Resendez, didn't you meet the investigator in

25  Cotulla like five days later?
```

```
 1    A    Yes, they went to talk to me over there in the
 2    middle part of the road.
 3    Q    Okay.  Between here and San Antonio?
 4    A    Yes.
 5    Q    Isn't that when you gave them the phone?
 6                 MR. BALLI:  Objection, leading.
 7                 THE COURT:  Overruled.
 8                 THE WITNESS:  Yes.
 9    BY MR. MORENO:
10    Q    So not the night that you were shot at the
11    hospital?
12    A    No.  That's why they went over there to pick up
13    the phone.
14    Q    Okay.  Why did you keep the phone?
15    A    So they give them whatever they deserve those
16    asshole Zetas.
17                 THE COURT:  And, Mr. Resendez, I
18    understand that you may have a lot of emotion here, but
19    I am going to ask you to refrain from using foul
20    language, unless it is in presenting something that was
21    said at the time where it is necessary to repeat it.
22    BY MR. MORENO:
23    Q    Let me ask this:  What were you going to do with
24    the phone?
25    A    No, I just wanted to deliver it to the officers
```

```
 1    and to get the information in there.  That's all.

 2    Q    This was before your brother was murdered?

 3    A    Yes, it was about the end of March when I was shot

 4    at.  And it was April 2nd when they killed my brother.

 5    Q    So it was after your brother was murdered that you

 6    decided to give it to the police?

 7    A    Yes.

 8    Q    Were you going to give that phone to your brother

 9    before?

10    A    Not at no moment was I going to give it to him.

11    Q    When -- you already told us your relationship to

12    Mariano?

13    A    Yes, yes.

14              MR. MORENO:  I'll pass the witness, Your

15    Honor.

16              THE COURT:  Mr. Balli.

17              MR. BALLI:  Your Honor, permission to

18    approach?

19              THE COURT:  You may.

20              MR. BALLI:  Your Honor, I'm going move to

21    introduce Defendant's Exhibit Number 26, which is the

22    document that Mr. Moreno impeached the witness with.

23              THE COURT:  And the basis?

24              MR. BALLI:  Your Honor, on the basis

25    that--.
```

```
 1                    THE COURT:  Let me see you at the bench.

 2            (At sidebar.)

 3                    MR. BALLI:  On the basis that it was used

 4    to impeach him with, Your Honor.  And it contains a

 5    statement different from what he's testified to in

 6    court, so we're going to be using it for impeachment as

 7    well.  It's a previous statement by this witness

 8    different from the statement he has made here in court,

 9    Your Honor.

10                    MR. MORENO:  Our objection would be that

11    it would be hearsay, and he's already been impeached by

12    an incorrect statement.

13                    THE COURT:  The objection is sustained.

14                    MR. BALLI:  Okay.

15            (End of sidebar.)

16                    CROSS-EXAMINATION

17    BY MR. BALLI:

18    Q    Mr. Resendez, isn't it true that you both told

19    Deputy Calderon on March 31st, 2006 and you wrote a

20    statement with the assistance of Ana Elsa Robles?

21    A    Yes.

22    Q    Where you said specifically the person that shot

23    at me was Jose Luis Carrizales?

24    A    No.

25                    MR. BALLI:  Your Honor, permission to
```

```
1    introduce Defendant's Exhibit Number 26?
2                   THE COURT:  Mr. Moreno?
3                   MR. MORENO:  Again, objection to that.
4    It's hearsay.  He can show it to him -- and, again, so
5    he can look at what he wrote or what his sister wrote.
6                   THE COURT:  The objection is sustained at
7    this time.
8                   MR. BALLI:  Permission to approach the
9    witness?
10                  THE COURT:  You may.
11   BY MR. BALLI:
12   Q    Is Defendant's Exhibit Number 26, is this the same
13   item that was shown to you right now by Mr. Moreno?
14   A    Yes.
15   Q    And it was said that this item was your -- the
16   statement that you gave Deputy Calderon on March 31,
17   2006?
18   A    Yes.
19   Q    Is that your statement?
20   A    Yes.
21   Q    I'm going to ask you right now or I'm asking you
22   to read that statement in its entirety.
23                  THE COURT:  He's reading it to himself,
24   so we're okay.
25                  THE WITNESS:  Yes.
```

```
1   BY MR. BALLI:

2   Q    Are you finished reading the statement?

3   A    Yes.

4   Q    Isn't it true that you said:  "The person that

5   shot at me was Jose Luis Carrizales."?

6   A    I said -- but since really it was at night, I

7   couldn't see who it was.  But since they were first

8   driving by the house.

9   Q    Well, isn't it true that you said that there were

10  two thin individuals and a chubby individual that was

11  driving?

12  A    But those were the ones in the black truck.

13  Q    The truck that shot at you or the first vehicle?

14  A    It was the second because first Tiofo and

15  Carrizales drive by looking.

16  Q    In what vehicle?

17  A    It was a dark truck.  I don't remember the color.

18  It was night.

19  Q    Now when they passed by the first time, about what

20  time at night was it?

21  A    What the hell, you could hardly see.  It was

22  already dark.

23  Q    Do you have an estimate more or less about what

24  time it was?

25  A    Gee, well, it says here that it was two in the
```

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1    morning.

2    Q    Well, was two in the morning the time that you

3    made the statement or is two in the morning when it

4    happened?

5    A    I believe, no.  This is the time when I gave the

6    statement to the Sheriff's Office, so that happened

7    between maybe 9:00, 9:30.

8    Q    And 9:00 and 9:30 is the time that Jose Luis

9    Carrizales passed by with another individual?

10   A    Yes, with that Tiofo.

11   Q    With Tiofo.  Did Jose Luis Carrizales and Tiofo

12   pass by at any other time?

13   A    No.  First they drove by, then comes the black

14   truck, and then they shot at me the same -- the ones

15   that shot at me were the ones in the black truck.

16   Q    And my question to you is:  Did Mr. Carrizales,

17   Jose Luis Carrizales and Tiofo, pass on more than one

18   occasion, or did they only pass by on one occasion?

19   A    Only one time, looking.

20   Q    And when you say, "looking," what do you mean?

21   Looking at what or looking in what way?

22   A    Looking at me, yes, because they said yes, yes,

23   yes.  This is the guy, and then the guys start shooting

24   when the truck went by.  It was that Jose Luis

25   Carrizales and Tiofo the ones -- letting know the ones

1    in the black truck so they would shoot at me.

2    Q    So are you saying you overheard them talking on a

3    phone or radio saying that it was you?

4    A    Yes.  When they opened the doors and said yes,

5    yes, yes, it's the guy.

6    Q    So are you saying that Tiofo and Mr. Carrizales,

7    Jose Luis Carrizales, got off the vehicle?

8    A    No.  The ones that got off are the ones in the

9    black truck, but they let them know because I saw that.

10    I saw them.  They had clear windows.  The glass was

11    clear and the other ones, the ones in the black truck,

12    it was dark glass.

13    Q    Now when Jose Luis Carrizales and Tiofo passed by,

14    did they pass by did they stop or did they continue

15    driving?

16    A    They kept on going.

17    Q    And when you heard -- who did you hear Tiofo or

18    Jose Luis Carrizales talking on the radio?

19    A    I believe this asshole Jose Luis -- Jose Luis

20    Carrizales.

21    Q    And if you heard Jose Luis Carrizales telling him,

22    telling somebody on the radio, warning someone that you

23    were there, why didn't you leave or call the Sheriff's

24    Office?

25    A    What's the point?  The Sheriffs takes a long time.

```
1    Q    Well, why didn't you leave?

2    A    Well to see.  I'm not going to be afraid of those

3    assholes.  I'm not afraid.

4                    THE COURT:  Mr. Resendez, I'm going to

5    remind you again as far as the language that you're

6    using.

7                    THE WITNESS:  They killed my brother.

8                    THE COURT:  I do understand that,

9    Mr. Resendez, but I do caution you as far as the

10   language.

11                   THE WITNESS:  All right.

12   BY MR. BALLI:

13   Q    So when you told the deputies that Jose Luis

14   Carrizales shot at you, that was not true?

15                   MR. MORENO:  Been asked and answered,

16   Your Honor.

17                   THE COURT:  Sustained.  You don't need to

18   answer the question.

19   BY MR. BALLI:

20   Q    In fact, you said that right after the individuals

21   who shot at you drove away, you picked up a radio?

22   A    Yes.

23   Q    And you kept that radio because you wanted to get

24   the Zetas?

25   A    No, it was just to give it to the Zetas.  They're
```

```
 1    just making a fuss out of nothing.  They're always

 2    killing themselves.  They're killing amongst

 3    themselves.

 4    Q    Well, you wanted to give the police the radio so

 5    they could get the Zetas, correct?

 6    A    Yes.

 7    Q    And right now when I said that you wanted to get

 8    them that you had said that, I was mistaken.  I meant

 9    to say that you wanted to give it to the police, right?

10    A    Yes, to cooperate with the police.

11    Q    How did you know that the radio belonged to the

12    Zetas?

13    A    Because I checked it and it said Miguel Trevino,

14    you know, the boss, and Cachetes, 40, 42, and 150, all

15    of it.

16    Q    And how do you know what those things are?

17    A    Because I checked it and when I was working at the

18    car lot they would just come, you know, to steal the

19    cars.  That's what they do.  They steal cars and all of

20    that.

21    Q    So you're saying that Miguel Trevino would come to

22    your car lot?

23    A    Yes, that's why I knew them.

24    Q    And you're saying that all these individuals would

25    come to the car lot?
```

```
 1    A    Yeah.

 2    Q    All these individuals that were in the phone would

 3    come to your car lot?

 4    A    Yes.

 5    Q    So you worked at a car lot where Zetas would go,

 6    correct?

 7    A    Yes.  Because supposedly they would bring the cars

 8    to be washed, but I didn't know what they were doing or

 9    anything.

10    Q    Well, if you didn't know what they were doing, how

11    did you know they were Zetas?

12    A    It had to be them.  I knew it was the Zetas

13    because when I saw them and when I saw the mess they

14    were doing around, there's no one else.

15    Q    Were you involved with the Zetas other than

16    washing their cars?

17    A    No.

18    Q    And if you had such a valuable piece of

19    information with all these phone numbers, why did you

20    wait so long to give it to the deputies?

21    A    I'm telling you, if they could take so long to

22    come over, the sheriffs, you know, maybe to come and

23    get the radio they took about a week.

24    Q    But you were with them at 2:00 a.m.?

25    A    Yes.  But that happened when I was at the
```

1    hospital.

2    Q    And was the phone with you or was the phone

3    somewhere else?

4    A    Yes, I didn't give it to them.  I gave it to them

5    mid road.

6    Q    And 30 minutes after you were shot, Deputy

7    Calderon arrived at the scene, didn't he?

8    A    Yes.

9    Q    And you didn't give him the phone then?

10   A    I didn't give it, but I gave it on the road.

11   Q    Did -- you didn't call the police the day after

12   the hospital?

13   A    No.

14   Q    And when you wrote this statement, you didn't

15   mention recovering a phone, did you?

16   A    No.

17              MR. BALLI:  Your Honor, permission to

18   approach the witness?

19              THE COURT:  You may.

20   BY MR. BALLI:

21   Q    I'm going to show you what's been marked as

22   Government Exhibits 170, 166, and 165.

23   A    This is Reta.

24   Q    Which one?

25   A    This one, isn't he.  I think that's the one.

```
 1    Q    Okay.  And do you know him from the car lot?

 2    A    Not him.  I knew him.  Not him.

 3    Q    How do you know him?

 4    A    Because the officers are just showing it right

 5    now.

 6    Q    The officers were showing you what, this picture?

 7    A    Yes.  Yes.

 8    Q    Okay.  And so you don't know him, but the officers

 9    told you that this was Rosalio Reta?

10    A    Yes.

11    Q    Did the officers show you pictures of any other

12    people -- which officers?

13    A    They only showed me that one.  No.  They didn't

14    show me others.  I didn't even want to see the ones

15    about my brother.

16    Q    So they only showed you one picture?

17    A    Yes.

18    Q    Only that one picture?

19    A    Yes.

20    Q    I'm going to show you photographs, Exhibit Number

21    181, 182, 174, 175, 186, 183, 167, 113, 12, 11, 161,

22    10, 173, 172, 180, and 179, and 206.

23    A    I only know this one.  He's Pantera.  He's the one

24    who put my brother -- that's Denise's brother-in-law.

25    Q    And how do you know Pantera?
```

1    A    Oh, he built the house -- a room at the rear to my

2    sister.

3    Q    Of all those other pictures, do you know anybody

4    else?

5    A    Let me see.

6    Q    There's a bunch of pictures of Zetas there, sir.

7            THE COURT:  Give him an opportunity.

8    You've asked him to review them.

9            THE WITNESS:  What can I say.

10            MR. BALLI:  Sir?

11            MR. MORENO:  What's the question?

12            MR. BALLI:  Well, I have a question.

13            THE COURT:  I think the question was:  Do

14    you know anybody else?  And I don't think he has

15    answered that question.

16            THE WITNESS:  No, I don't know any of

17    them.  No.

18    BY MR. BALLI:

19    Q    So isn't it true that you were lying earlier when

20    you said that you knew all of those Zetas?

21    A    I knew them, but I knew them when they would come

22    to the car lot for the cars to be washed, so you can

23    understand.

24    Q    But if you were shown a picture of them, you might

25    not be able to identify that, correct?

```
 1    A      No.

 2                    MR. BALLI:  Pass the witness.

 3                    THE COURT:  Mr. Moreno.

 4                    REDIRECT EXAMINATION

 5    BY MR. MORENO:

 6    Q      Mr. Resendez, so what did the officers ask you

 7    about Reta?

 8    A      Oh, they only told me that he was real dangerous.

 9    Q      Did they ask you if you knew him?

10    A      That if I knew him.  I said I don't know him.

11                    MR. MORENO:  That's all, Your Honor.

12                    THE COURT:  Nothing further, Mr. Balli?

13                    RECROSS-EXAMINATION

14    BY MR. BALLI:

15    Q      Do you know why the officers gave you the name?

16                    MR. MORENO:  Now I'm going to object

17    because now that would be speculation.

18                    THE COURT:  Sustained.

19    BY MR. BALLI:

20    Q      Did they give you both the name and show you the

21    picture?

22    A      It said right here on top something about Reta.

23    That's it.  That was all.

24    Q      So when they showed you the picture, it has the

25    name of the individual?
```

```
1    A     That's why I knew him by the name.  But I do not

2    know him.

3    Q     And was it in a binder with other photographs?

4    A     No, it was just that photograph.  That was it.

5    Q     Could you tell us who the official was that showed

6    that to you?  If the person is in the courtroom, can

7    you point to that individual?

8    A     No.  No.

9    Q     The individual is not here?

10   A     No.

11   Q     Was he wearing a uniform?

12   A     He was wearing a suit.

13   Q     And was it right outside this courtroom?

14   A     Yes.

15              MR. BALLI:  Your Honor, I'm going to ask

16   for permission to see if the witness could step out and

17   see if he sees him in the hallway.

18              THE COURT:  Denied.

19              MR. MORENO:  He could just ask him if he

20   knows his name, Your Honor.

21   BY MR. BALLI:

22   Q     Do you know his name?

23   A     No.  The one who showed it to me was Robert

24   Garcia.  The one with homicide.  But that's all he

25   showed me.  I didn't want to look at the pictures from
```

1    my brother.

2    Q    Now was the picture in a group of six pictures or

3    was it by itself?

4              MR. MORENO:  You Honor, I am going to

5    object to that.  He said several -- he repeated several

6    times he saw one photo.

7              THE COURT:  The objection is sustained,

8    and may I see counsel at the bench, please.

9              (At sidebar.)

10             THE COURT:  I've given you some leeway.

11   You're going way beyond the scope of the redirect.  And

12   how is this relevant?  He is not identifying Reta for

13   any purpose so how is it relevant to any issue?

14             MR. BALLI:  The reason that it's relevant

15   is that he went -- first of all, he said that had picked

16   up that phone and there was a bunch of names--.

17             THE COURT:  Okay.  We're talking about

18   the picture right here.  We are talking about the

19   picture.  The examination we're conducting right now.

20             MR. BALLI:  Yes, Your Honor, but it

21   extends to that because he said the phone number of

22   Cachetes was there.  He's starting to identify a bunch

23   of -- he said he knew Miguel Trevino.  He knew all these

24   different people that went to the car lot.

25             THE COURT:  But right now you're asking

1    questions about the process for showing the photographs.

2    How is that line of questioning relevant to any issue in

3    this case?

4                  MR. BALLI:  If he can properly

5    identify -- identify Reta.  Reta.

6                  MR. MORENO:  He said no.

7                  THE COURT:  He's already said -- we've

8    already covered that, so move on.

9                  MR. BALLI:  Yes, Your Honor, it goes to

10    the method of how they've been showing photographs.

11                  THE COURT:  Right now the only issue we

12    have on that is as to Jasso.  The court will address

13    that as to Jasso.  So there's no issue as to this

14    witness with identification.  So let's move on.

15                  (End of sidebar.)

16                  MR. BALLI:  I'll pass the witness.

17                  THE COURT:  Anything further, Mr. Moreno?

18                  MR. MORENO:  No, Your Honor.

19                  THE COURT:  All right.  Thank you.  You

20    may step down.  We'll break for lunch, unless -- do you

21    have a short witness.

22                  MR. MORENO:  I believe he'll be short.

23    And he's here in plain view.

24                  THE COURT:  Okay.  All right.  Well,

25    ladies and gentlemen, especially since I know you had a

101

```
 1   nice break not to long ago.  We're going to go a little
 2   bit longer then.  Okay.  The next witness, please.
 3                 MR. MORENO:  Jeffrey Barnes.
 4                 THE COURT:  Jeffrey Barnes, please.  Just
 5   a second, please.  Mr. Moreno.
 6                 MR. MORENO:  Yes, Your Honor.
 7                 THE COURT:  Counsel.
 8            (At sidebar.)
 9                 THE COURT:  Is he on the list?
10                 MR. MORENO:  He should be at the end of
11   the list.
12                 THE COURT:  Oh, okay.
13                 MR. MORENO:  Actually what it was,
14   there's a stipulation.  There was a stipulation that was
15   going to be introduced of him, and then yesterday
16   Mr. Balli told me that he wouldn't stipulate, so we
17   brought him down.
18                 THE COURT:  Okay.  So he is probably not
19   listed then?
20                 MR. VELA:  We don't have an objection to
21   it.
22                 THE COURT:  Okay.  So there's no
23   objection as far as calling him; is that correct?
24                 MR. VELA:  No.
25                 THE COURT:  All right.  Okay.
```

```
 1                    MR. MORENO:  I just have him on the

 2     exhibit list.

 3                    THE COURT:  Okay.  All right.

 4               (End of sidebar.)

 5                    THE COURT:  Okay.  Mr. Barnes, please

 6     raise your right hand to be sworn in.

 7               (Witness sworn.)

 8                    THE WITNESS:  I do.

 9                    THE COURT:  Thank you.  You may be

10     seated.  Just a second, Mr. Moreno.  It's my

11     understanding that the name of this witness was also not

12     identified in voir dire.  Does anybody know or recognize

13     this witness?  All right.  I see no hands up.  Thank

14     you.  You may proceed, Mr. Moreno.

15          JEFFREY BARNES, GOVERNMENT WITNESS, SWORN

16                    DIRECT EXAMINATION

17     BY MR. MORENO:

18     Q    Would you please tell us your full name?

19     A    Jeffrey G. Barnes, B-A-R-N-E-S.

20     Q    And who do you work for, Mr. Barnes?

21     A    The Federal Bureau of Investigation.

22     Q    And what do you do for the FBI?

23     A    I'm a physical scientist, forensic examiner

24     assigned to the latent print operations unit.  I

25     receive inventory, examine it, and process items for
```

```
 1    the development of latent prints.  I then compare those

 2    prints to known prints.  Prepare reports of my results

 3    and then testify to those results when requested to do

 4    so.

 5    Q    So you do this at the FBI laboratory?

 6    A    Yes, sir.

 7    Q    Which is located where?

 8    A    Quantico, Virginia.

 9    Q    Is that where you live?

10    A    Yes, sir.

11    Q    Okay.  And can you tell us a little bit about your

12    educational background.

13    A    I have a Bachelor's of Arts Degree in chemistry

14    and philosophy from Virginia Westland College located

15    in Norfolk, Virginia.  And I have a Masters of Science

16    degree in chemistry from Virginia Polytechnic Institute

17    and state University located in Blacksburg, Virginia.

18    Q    And how long have you worked for the FBI

19    laboratory?

20    A    Approximately eight-and-a-half years.

21    Q    And in those eight-and-a-half years,

22    approximately, if you have any ballpark figure, how

23    many times have you identified fingerprints?

24    A    Well, I've compared more than 200,000 prints, and

25    I have testified as an expert witness more than a dozen
```

1    times.  And I've identified at least a thousand prints

2    I suppose or more.

3                    MR. MORENO:  Your Honor, we would tender

4    Mr. Barnes as an expert witness.

5                    MR. VELA:  No objection, Your Honor.

6                    THE COURT:  He may so testify.

7    BY MR. MORENO:

8    Q    In your job as a print examiner, did you receive

9    a -- as an item of evidence to examine a pack of

10   cigarettes from the Laredo Police Department?

11   A    Yes, sir.

12   Q    Okay.  And did you have opportunity to process

13   that particular exhibit?

14   A    Yes, sir.

15   Q    Okay.  And what was it that you were asked to do?

16   A    I was actually asked to process it with a

17   particular process that is somewhat exclusive to the

18   FBI called a vacuum metal deposition.  In this case, I

19   had a very short period of time.  I asked the Laredo

20   detectives if it would be okay to process our entire

21   sequence of processes not just that step.  During that

22   process of sequence, I was actually able to develop

23   prints on the cigarette pack and did not actually do a

24   vacuum metal deposition.  So I was able to develop

25   prints, which was enough for the detectives.

1    Q    Okay.  But now that you have mentioned it, what is

2    vacuum metal deposition?

3    A    It's a process to develop latent prints using two

4    metals in a vacuum chamber.

5    Q    Okay.  So without it you were able to develop

6    latent prints on the cigarette pack?

7    A    Yes, sir.

8    Q    Okay.  And what did do you with the latent prints

9    that you found on the cigarette pack?

10   A    I compared them with a fingerprint card bearing

11   the name Rosalio Reta.

12   Q    Okay.  And just briefly, could you explain how

13   that process is done, what is it you're looking for?

14   What do you compare?

15   A    I used a standard methodology known as ACEV which

16   is an acronym standing for analysis, comparison,

17   evaluation, and verification.  During the analysis

18   phase, I'm looking at three levels of detail.  Level

19   one being the pattern type, the overall ridge flow, the

20   structure of the print.

21              Level two being specific ridge

22   characteristics such as an ending ridge, a dividing

23   ridge, or a dot.

24              During the level three details, more

25   minute details such as a pore size, the actual

1    shapes of the ridges, and the minute details as well

2    as the ridge thickness.  I look at these details and

3    once I'm satisfied with understanding those details

4    in the latent print, I then compare that to the

5    known print.  The latent print on the underside of

6    your hand is raised skin called friction ridges.

7    These friction ridges, exude perspiration.  This

8    perspiration will coat the ridges.  And when your

9    hand comes in contact with an object sometimes that

10   impression is left behind, and you'll get an

11   impression of the friction ridges that are on the

12   end of your fingers.

13            I compared those to known prints, and

14   known prints are generally inked prints in which you

15   take an ink, you roll it on your finger, and then

16   you roll onto a contrasting background such as a

17   white fingerprint card, and that's a known print

18   that can be used to compare to the latent print

19   developed on a piece of evidence.

20            I'm looking, when I compare the two

21   together, I'm looking to make sure that the

22   characteristics they share are of the same type, the

23   same general location in the print.  They have the

24   same directionality, so an ending ridge pointing up

25   versus an ending ridge pointing down.  And that they

1    have the same relationship with one another within

2    the prints.  When this information, whether in

3    agreement or not, I can then make a decision.

4              And those conclusions that I can

5    reach would be inconclusive, which would mean that

6    they do not share information that I could compare

7    together.  One, they don't have the same type of

8    information.  One is of a palm, one is of a finger,

9    for example, would be an inconclusive result.

10             Another one would be a exclusion

11   where the information in the latent does not match

12   the information in the known, and they're not from

13   the same source.

14             The last one would be an

15   identification where the information in the latent

16   does in fact match the information in the known and

17   they came from the same source.  That would happen

18   in the evaluation phase.  Once an identification is

19   made, it is then verified by another independent

20   examiner completing a completely -- the same exam

21   independently of mine to make sure that I came to

22   the correct result.

23   Q    Okay.  Now in this particular case, the exhibit

24   and I think you-all labeled it as Q1 for the pack of

25   cigarettes.  How many -- is there a certain number of

1    points of comparison that you have to arrive at before

2    you can say, yes, it's the same print?

3    A    No, we do not have a point standard in the United

4    States.

5    Q    Okay.  And how do you determine that you have got

6    the same print, I guess from between the latent print

7    and the ink print?

8    A    We examine all the information in the latent print

9    and all the information in the known print.  And when

10   the information matches or is in agreement so that all

11   the characteristics are of the same type, the same

12   direction, the same relative position, we then -- we'll

13   conclude that there's an identification in the case.

14   Q    Okay.  And in this case when you examined and

15   analyzed the pack of cigarettes, were you able to

16   identify whether or not the latent print you developed

17   actually matched the known print of someone?

18   A    Yes, sir.

19   Q    And who was the person whose prints they belonged

20   to?

21   A    One of the latent prints developed on the

22   cigarette pack and the number six finger or the right

23   thumb block of the fingerprint card which in this case

24   beared the name Rosalio Reta were made by the same

25   person.  It could not have been made by any other.

1    Q    Were there -- was it only one print that was

2    developed and matched or were there multiple prints?

3    A    There was a second print on the cigarette pack

4    which was an impression.  It could be either be a

5    finger print or a palm print.  We were unable determine

6    that.  And it was compared with Rosalio Reta

7    inconclusively because I did not have his palms or

8    lower joints to compare.

9    Q    Okay.

10                   MR. MORENO:  Pass the witness.

11                   THE COURT:  Mr. Vela.

12                   CROSS-EXAMINATION

13   BY MR. VELA:

14   Q    Mr. Barnes, how long have you been employed

15   with the -- is it the FBI you said?

16   A    Yes, I have been employed with the FBI for

17   approximately eight-and-a-half years.

18   Q    Tell the ladies and gentlemen of the jury, I think

19   you testified that you have done about 3,000

20   examinations?

21   A    No, I've compared more than probably 250,000

22   prints.

23   Q    Tell the ladies and gentlemen of the jury what

24   type of items do you normally compare?

25   A    We compare latent prints, known prints to either

1  latent prints to latent prints or known to known.  I

2  process items of evidence.  I process any type of item

3  of evidence that could have any potential of having a

4  latent print whether that be paper, cigarette pack,

5  trash bags.  Almost anything.

6  Q    That was my next question:  What type of materials

7  do you normally look for fingerprints from?

8  A    Fingerprints can be found on almost any material.

9  Generally it's easier to list them as what they cannot

10 which would be something like a cloth or a high weave,

11 like a canvas bag, maybe a carpet.  Almost anything

12 else you can find prints.  We can even find prints

13 using chemical processes on wood, paper, cardboard.

14 The list is fairly extensive.

15 Q    Can you tell me, can you find prints off of

16 aluminum?

17 A    Yes, sir.

18 Q    Metals?

19 A    Yes, sir.

20 Q    Plastics?

21 A    Yes, sir.

22 Q    Glass?

23 A    Yes.

24 Q    Paper?

25 A    Yes.

```
1    Q    Cardboard?

2    A    Yes.

3    Q    And you said there's many more than what I just

4    mentioned?

5    A    Yes.

6    Q    Can you give me some examples?

7    A    Monitor screens, these cabinets here, the jury

8    boxes, the leather on the chairs, their watches,

9    jewelry, name badges.

10   Q    How common is it for you to run a fingerprint

11   analysis off of shell casings?

12   A    Shell casings, we do process shell casings.  I

13   can't give you the actual numbers.  The FBI seems to

14   think that between 30 to 50 percent of all cases you

15   will not find prints.  It's -- shell casings in

16   particular are more difficult, but prints have been

17   found in the past.

18   Q    So 30 to 40 percent but the other 60 you can?

19   A    It's a ballpark figure.  We don't really know.

20   We get a lot of evidence.  We process it.  The majority

21   of evidence usually will develop something, but there's

22   no way to know.

23   Q    Have you personally found fingerprints or tested

24   shell casings for fingerprints?

25   A    Yes, sir.
```

1    Q    Have you ever been able to positively identify

2    somebody off a shell casing?

3    A    Yes, sir.

4    Q    Okay.  How many times in your career?

5    A    I distinctly remember testifying in one case where

6    that happened.  I don't remember how many other times.

7    Q    And other people in your office have also done the

8    same thing?

9    A    Yes, sir.

10    Q    Okay.  And with regards to the latent prints, what

11    is a latent print?

12    A    As I explained earlier, the friction ridges on the

13    underside of your hand, a raised portions of skin.

14    When you get something trapped on those ridges and you

15    touch an object, that impression can be left behind.

16    Q    And when you compare that impression, do you run

17    it off a database or only on a specific card that they

18    ask you to identify?

19    A    It depends on the case in question.  If we're

20    given a card to compare, we compare the card first, and

21    if asked, we will then run it in the database.

22    Q    Do you have a fingerprint database?

23    A    The FBI does, yes.

24    Q    How large is that fingerprint database?

25    A    We currently have up to 60-million individuals in

1    the criminal database with the FBI.

2    Q    And if you input a specific fingerprint analysis

3    into your database, how responsive is your system to

4    getting either a link -- getting a link to somebody?

5    A    I don't know the exact numbers.  I was told that

6    the protocol is that if you have 15 or more

7    characteristics present in the print, there's a 65

8    percent chance of finding the print it belongs to or

9    the individual that made that print.

10   Q    Now with regards to your specific tests conducted

11   on the pack of cigarettes, the only fingerprint that

12   you found was that of one Rosalio Reta?

13   A    One impression was developed, and one fingerprint

14   was developed, and the fingerprint was identified to

15   Rosalio Reta.

16                MR. BALLI:  I have no further questions.

17                THE COURT:  Anything further?

18                MR. MORENO:  No, Your Honor.

19                THE COURT:  All right.  Thank you.  You

20   may step down.  Thank you.  And I take it, can he be

21   excused?

22                MR. MORENO:  I believe so.

23                THE COURT:  You have no further need for

24   him, Mr. Vela?

25                MR. BALLI:  No, Your Honor.

1          THE COURT:  All right.  He can be

2     excused.  Thank you.  Okay.  Ladies and gentlemen, at

3     this time, then we'll go ahead and break for lunch.  I

4     will ask that you return and be ready to resume at 1:30.

5     Thank you.  You may step down.

6          THE CSO:  Please rise for the jury.

7          (The jury leaves the courtroom.)

8          THE COURT:  Juror Number 15, I need one

9     moment with you, please.  I'm sure you have been

10    following my instructions not to discuss the case with

11    anyone but as an added word of precaution I will tell

12    you that as far as your knowledge of Detective Garcia,

13    not to share that with any of the other members of the

14    jury.  And, ultimately, if you end up deliberating with

15    them not to share that information. Do you understand

16    that?

17          JUROR:  I think they asked me, Your

18    Honor, and I mentioned I knew one of the detectives.

19    And I believe when I told the bailiff there--.

20          THE COURT:  Somebody heard that.

21    Somebody heard that.  Okay.  Well, have no further

22    discussions about him whatsoever.  Okay?

23          JUROR:  Okay.

24          THE COURT:  All right.  Thank you.

25          (Juror leaves the courtroom.)

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

```
 1                    CASE MANAGER:  What time did you say for
 2   them to return?
 3                    THE COURT:  1:30.  Anything from counsel
 4   at this time?
 5                    MR. BALLI:  No, Your Honor.
 6                    THE COURT:  All right.  1:30 then.  Thank
 7   you.
 8                    THE CSO:  All rise.
 9                    THE COURT:  Very quickly, when do we
10   expect Mr. Jasso to testify, Mr. Moreno?
11                    MR. MORENO:  We've got four more
12   witnesses I think before we get to him.
13                    THE COURT:  Okay.
14                    MR. MORENO:  One of the ladies that was
15   there with Mr. Resendez who will be relatively short
16   except on the cross.  And then two eye witnesses that
17   saw the actual shooting of Mr. Resendez, and the first
18   officer on the scene there followed by Mr. Jasso.
19                    THE COURT:  Okay.  So we may -- there's a
20   possibility that this afternoon, depending on where we
21   go, either we'll do it during a break or possibly break
22   a little bit early to have that hearing before he
23   testifies this afternoon.  Likely, we'll need both
24   Mr. Resendez -- excuse me, Mr. Jasso on that issue, and
25   whatever officer showed them the--.
```

```
 1                    MR. MORENO:  Yes, Your Honor.

 2                    THE COURT:  Okay.

 3                    MR. BALLI:  Your Honor, and I think we're

 4      going to have the same issue as to Rosalio Reta as well,

 5      Your Honor.

 6                    THE COURT:  Okay.  Was he also shown in

 7      the same manner?

 8                    MR. BALLI:  That's what we believe, Your

 9      Honor.

10                    THE COURT:  You believe, okay.

11                    MR. MORENO:  I don't know.

12                    THE COURT:  I don't know if Mr. Reta is

13      in the courthouse today or not.

14                    MR. MORENO:  I don't think they've

15      brought him down.  I asked them.  They were trying to

16      see if they could get him down here this afternoon.

17                    THE COURT:  Okay.  All right.  Thank you.

18      1:30.

19               (Lunch break.)

20                    THE CSO:  Please rise for the jury.

21               (The jury enters the courtroom.)

22                    THE CSO:  All rise.

23                    THE COURT:  Good afternoon everybody.

24      You may be seated.  Mr. Moreno, you may call your next

25      witness.
```

```
 1              MR. MORENO:  Denise Morales.

 2              THE COURT:  Denise Morales, please.

 3          (The witness enters the courtroom.)

 4              THE COURT:  Ms. Morales, come forward

 5   please.  Please raise your right hand to be sworn in.

 6          (Witness sworn.)

 7              THE WITNESS:  Yes.

 8              THE COURT:  You may be seated.  When you

 9   speak, speak into the mike so that we can all hear you.

10   You may proceed, Mr. Moreno.

11              MR. MORENO:  Thank you, Your Honor.

12        DENISE MORALES, GOVERNMENT WITNESS, SWORN

13                  DIRECT EXAMINATION

14   BY MR. MORENO:

15   Q    Would you please tell us your full name?

16   A    Denise Morales.

17   Q    Ms. Morales, where are you from?

18   A    Houston, Texas.

19   Q    Have you ever lived in Laredo or this area?

20   A    Yes.

21   Q    How long have you lived here?

22   A    Eleven years.

23   Q    Okay.  And are you still living here in Laredo?

24   A    Yes.

25   Q    Okay.  And were you living here in Laredo back on
```

```
 1   March 31, 2006.

 2   A    Yes, sir.

 3   Q    Okay.  Do you remember where you were that day?

 4   A    Yes.

 5   Q    Okay.  Are you familiar with a person by the name

 6   of Julio Cesar Resendez?

 7   A    I know him.

 8   Q    Okay.  And were you with him on March 31, 2006?

 9   A    Yes, sir.

10   Q    Okay.  Do you remember more or less what time it

11   was you were with him?

12   A    Twelve 12:30 in the night.

13   Q    At night?

14   A    Yes.

15   Q    Okay.  And what was it that you were doing?

16   A    We were just there talking.

17   Q    Who is we?

18   A    Me, my sister Marisol, and Julio.

19   Q    Okay.  And where was this conversation taking

20   place?

21   A    In the car outside Julio's house.

22   Q    Okay.  And where does Julio live?

23   A    By that time, he lived in Rio Bravo.

24   Q    Do you remember the name of the street or the

25   address?
```

```
1    A    No.

2    Q    Not even the name of the street?

3    A    Paseo Del Tebir.

4    Q    Okay.  And who was -- you said you were in a car.

5    What kind of a car were you in?

6    A    It was a Cougar, '99.

7    Q    Okay.  And who was driving?

8    A    I was in the driver's seat.

9    Q    Okay.  And where was your sister?

10   A    Passenger's seat.

11   Q    And where was Julio?

12   A    He was in the -- by the passenger's seat, outside.

13   Q    Okay.  And while you-all were talking, did

14   anything happen?

15   A    A black truck came.

16   Q    Okay.  A black truck.  Do you remember anything

17   else about the black truck?

18   A    There were several men inside.

19   Q    Okay.  Do you remember -- I don't know if you know

20   anything about cars.  Do you remember what kind of

21   truck was it?

22   A    It was a Silverado black truck, four-door.

23   Q    Chevrolet Silverado?

24   A    Yes.

25   Q    And four-door?
```

```
 1   A     Yes.

 2   Q     And we're talking about a pickup truck?

 3   A     Yes.

 4   Q     Okay.  And what did this pickup truck do?

 5   A     It started shooting at us.

 6   Q     Okay.  In relation to your car, where did the

 7   truck stop?

 8   A     Like in front right there, by the driver.

 9   Q     Okay.  And did you see -- were you able to see how

10   many people were in the truck?

11   A     It was like five.

12   Q     Okay.

13   A     Five men.

14   Q     What was it that you saw after it stopped?

15   A     A man, he stood out the truck and started shooting

16   at us.

17   Q     The man who got out of the truck, do you remember

18   what part of the truck he got down from?

19   A     The passenger.

20   Q     Okay.  Front or rear?

21   A     Front.

22   Q     Okay.  Front passenger.  Was he armed?

23   A     Yes.

24   Q     Do you remember how he was armed?

25   A     It was a gun.
```

1    Q    Okay.  But I mean like pistol, rifle?

2    A    Like a rifle.

3    Q    Do you remember what kind of a rifle?

4    A    Sort of like cuerno de chivo something.

5    Q    Could I get it translated?

6    A    Like a cuerno de chivo something.

7    Q    Is that something -- is that a name they use for

8    something like an AK-47?

9    A    Yes.

10   Q    And so this man got off.  Do you remember anything

11   about the man?  Was he young, old, tall, skinny?

12   A    He was skinny and young.

13   Q    Okay.  Do you remember anything else about him?

14   A    No.

15   Q    Okay.  So who did he start shooting at?

16   A    At the car.

17   Q    At the car.  The car that you and your sister were

18   in?

19   A    Yes.

20   Q    How many men did you see shooting?

21   A    It was only one.

22   Q    Okay.  He's the only one you saw?

23   A    Yes.

24   Q    What did you do when you saw him start shooting at

25   you?

```
1    A    I went down the car.

2    Q    Where down?

3    A    Like down.

4    Q    Like under the dash?

5    A    Yes.

6    Q    Okay.  And what about your sister?

7    A    She did too.

8    Q    Okay.  Do you remember approximately how many

9    shots you heard or felt or?

10   A    It was a lot.  It was a lot.

11   Q    It was a lot of shots?

12   A    Yes.

13   Q    And what did you do during the shooting or after

14   the shooting?

15   A    We stood out the car and went inside the house.

16   Q    Okay.

17   A    Yes.

18   Q    So you stayed in the car the whole time while this

19   shooting was happening?

20   A    Yes.

21   Q    Did you move the car at all?

22   A    Yes.

23   Q    What did do you?

24   A    I just turned on the car and moved the car

25   backwards.
```

```
 1    Q    Okay.  This is during the shoot?

 2    A    Yes, during the shooting.

 3    Q    Okay.  And what happened after you moved the car

 4    in reverse?

 5    A    The truck left.

 6    Q    The truck left?

 7    A    Yes.

 8    Q    How did it leave?

 9    A    Calm, yeah.

10    Q    They were like?

11    A    Slowly.

12    Q    Okay.  And then you said you came back to the

13    house?

14    A    Yes.

15    Q    Okay.  And what happened when you came back to the

16    house?

17    A    We were just there waiting for the police to

18    arrive.

19    Q    Okay.  Were you or your sister hurt?

20    A    No.

21    Q    Okay.  Was anybody hurt?

22    A    Julio.

23    Q    Julio.  What happened to Julio?

24    A    In the -- I think it was the right or left foot.

25    I don't remember.
```

1    Q    But he got shot in the foot?

2    A    Yes.

3    Q    And I apologize for the indiscretion, but how old

4    are you?

5    A    I'm 21.

6    Q    Okay.  How old were you then?

7    A    Seventeen.

8    Q    Okay.  How old was your sister then?

9    A    She was 16.

10    Q    Sixteen.  And Julio I take it is a lot older than

11    you?

12    A    Yes.

13    Q    Did you know his brother Jesus or Chuy Resendez?

14    A    Yes.

15    Q    Did you have a relationship with Chuy Resendez?

16    A    Yes.

17    Q    Okay.  You said you were waiting for the police or

18    someone to come.  Did someone come?

19    A    Yes.

20    Q    Do you remember who came?

21    A    Sheriff.

22    Q    The sheriff?

23    A    Yes.

24    Q    Do you happen to remember any of the officers that

25    came when you talked to them?

```
 1   A     No.
 2   Q     Okay.  But did you give a statement to one of the
 3   deputies?
 4   A     Yes.
 5   Q     Okay.  And did you do that that same night?
 6   A     Yes.
 7   Q     Okay.
 8             MR. MORENO:  If I may have just a moment,
 9   Your Honor.  That's all I have, Your Honor.  Pass the
10   witness.
11             THE COURT:  Mr. Balli or Mr. Vela.
12                 CROSS-EXAMINATION
13   BY MR. BALLI:
14   Q     Ms. Morales, were you outside, outside the
15   residence earlier when about 30 minutes before the
16   shooting happened?
17   A     Yes.
18   Q     And did another vehicle pass by the house riding
19   slowly about 30 minutes before the shooting occurred?
20   A     I don't remember.
21   Q     Do you remember hearing anybody on a radio outside
22   of that house at any time during the evening saying
23   that alli estan.  (They're there.)
24   A     Yes.
25   Q     So you heard that?
```

```
 1    A    Yes.
 2    Q    And when you heard that, did you take that to be
 3    some sort of a threat?
 4    A    No.  I didn't even imagine.
 5    Q    And could you describe that first vehicle in
 6    which -- when you heard those individuals, were they in
 7    a vehicle?
 8    A    It was a black truck.
 9    Q    It was a black truck?
10    A    Yes.
11    Q    And you said that black truck was there about 30
12    minutes before the shooting?
13    A    No, it was there when the shooting occurred, when
14    they said that.
15    Q    So there was two vehicles there?
16    A    No, it was just a black truck.  And the men that
17    were inside truck said that.
18    Q    Okay.  So the men who were inside the truck who
19    started shooting?
20    A    Yes.
21    Q    They're the ones that said -- what were their
22    exact words, if you can remember?
23    A    Alli estan -- there they are.  Shoot at them.
24    They're still there.
25    Q    Was the person talking on the radio or was the
```

1    person telling the others that were there to go ahead

2    and shoot?

3    A    No, he was talking to the person that stood out

4    the truck.

5    Q    Okay.  So it was the person inside the truck?

6    A    It was like -- yeah.  Yes.

7    Q    Telling the people outside the truck?

8    A    Yes.

9    Q    And how many people were inside and outside during

10   the shooting?

11   A    Outside the truck it was only one man.

12   Q    Outside the truck one man.  And inside the truck?

13   A    Inside like four.

14   Q    So it was four people inside the truck?

15   A    Yes -- no.  It was -- four and then the one that

16   stood up.

17   Q    Okay.  And the truck had dark windows; is that

18   correct?

19   A    Yes.

20   Q    Okay.  So when you say, "four," are you saying

21   that you know there was four or it appeared that there

22   could have been four?

23   A    Appeared.

24   Q    Appeared?

25   A    Yes.

```
 1    Q    Maybe it had been three or two?

 2    A    Yeah.

 3    Q    So possibly two or three, but you know that it

 4    was -- are you sure that it was more than one other

 5    person?

 6    A    Yes.

 7    Q    So at least two people in the truck?

 8    A    More than like three or four.

 9    Q    Okay.  And possibly three or four?

10    A    Yes.

11    Q    But as little as two?

12    A    Uh-hum.

13    Q    And one person, one shooter outside of the truck?

14    A    Yes.

15    Q    Did you realize that that shooter dropped

16    anything, or did you see that shooter drop anything?

17    A    No.

18    Q    Did you later find out that the shooter might have

19    dropped something?  Did you see anything that might

20    have been dropped by the shooter in that area where the

21    shooter was?

22    A    No.

23    Q    At any time?

24    A    (No audible response.)

25    Q    Did Mr. Resendez, Julio Cesar Resendez tell you
```

```
 1    that he found any objects?

 2                MR. MORENO:  I would object to hearsay.

 3                THE COURT:  Sustained.

 4    BY MR. BALLI:

 5    Q    Do you know about a cell phone that might have

 6    been left behind by the shooters?

 7    A    No, sir.

 8    Q    You never heard of that?

 9    A    No.

10    Q    How long did you stay at the residence after the

11    shooting?

12    A    Like 30, 25 minutes.  30 minutes.

13    Q    Did you stay at least until law enforcement

14    arrived?

15    A    Yes.

16    Q    And after law enforcement arrived, did you leave

17    immediately or?

18    A    I left when the police were there.

19    Q    Okay.  And, eventually, you did give a statement,

20    right?

21    A    Yes, sir.

22    Q    And you gave a statement that same evening,

23    correct?

24    A    Excuse me?

25    Q    You gave a statement that same night, correct?
```

```
 1    A    Yes, sir.

 2    Q    And when you gave the statement you -- did you

 3    give the statement there at the home where the shooting

 4    occurred or at some other place?

 5    A    No, there.

 6    Q    So you didn't leave immediately when the police

 7    arrived?

 8    A    Well, the police was still there when I left.

 9    Q    They were still there when you left?

10    A    Yes.

11    Q    But you waited for them an then you assisted them?

12    A    Yes.

13    Q    You waited for them as long as they needed you to

14    make your statement?

15    A    Yes.  Yes.

16    Q    And you gave them all the information that you

17    had?

18    A    Yes.

19    Q    When the shooting occurred, was Mr. Julio Resendez

20    agitated or excited about what had just occurred?

21    A    Like how?

22    Q    Well, did -- was he -- his -- was it his normal

23    demeanor or did he get a little bit excited because

24    there had been a little bit of an extraordinary event?

25    A    No, we were shocked, and we were scared.
```

```
 1   Q    You were shocked, and you were scared?

 2   A    Yes.

 3   Q    And Mr. Resendez, did he also seem I guess

 4   somewhat agitated or shocked or scared or nervous?

 5   A    Yes.  Nervous.

 6   Q    Different?

 7   A    Yes.

 8   Q    Because of the shooting?

 9   A    Yes.

10   Q    And did he tell you that he knew any of the

11   individuals that were involved in the shooting?

12                   MR. MORENO:  I would object to the

13   hearsay statement.

14                   THE COURT:  Sustained.

15                   MR. BALLI:  Your Honor, it's an excited

16   utterance, Your Honor.

17                   MR. MORENO:  And as such he could have

18   asked that of the witness who was there or of the

19   officer who received the statement.

20                   MR. BALLI:  Well, Your Honor, he made a

21   statement here in court, but many of his statements were

22   inconsistent with his own--.

23                   THE COURT:  You did have the opportunity

24   to ask him that.  Let me see you at the bench.

25                   (At sidebar.)
```

```
 1                   THE COURT:  Do you have reason to believe
 2    that he made that statement and just I mean didn't--.
 3                   MR. MORENO:  To her?
 4                   THE COURT:  I mean because you should
 5    never ask a question of a witness unless you have reason
 6    to believe that they have information in that regard.
 7    And if you didn't ask Mr. Resendez specifically that
 8    question but I--.
 9                   MR. BALLI:  I didn't ask if he told her,
10    but he did testify that he told that to law enforcement.
11                   THE COURT:  Okay.
12                   MR. BALLI:  And she was there.  And, you
13    know, obviously Mr. Resendez's credibility was -- is in
14    question especially based on his testimony with several
15    inconsistent statements.
16                   THE COURT:  I understand all that.  But
17    the issue is he just finished testifying.  You never
18    asked him whether he made that statement to the police
19    or whether he made the statement to anybody else.  You
20    know, the question is:  Do you have reason to believe
21    that he made that statement to her?
22                   MR. BALLI:  Only because he made to it
23    the police, Your Honor.
24                   THE COURT:  No other basis for it other
25    than that he made that statement to her?
```

1           MR. BALLI:  No, Your Honor.

2           THE COURT:  Okay.  The objection is?

3           MR. MORENO:  Is that it would be hearsay,

4    one.  And, two, there's nothing to indicate that she was

5    even present when he made the statement to the police.

6           THE COURT:  The objection is sustained.

7           MR. VELA:  Under Rule 803, hearsay

8    exceptions--.

9           THE COURT:  I understand excited

10   utterances are an exception.  There is no issue there.

11   But if he has no reason to believe that she -- that that

12   statement was made at all then he shouldn't--.

13          MR. BALLI:  But, Your Honor, we should be

14   entitled to ask whatever question we want to ask because

15   it's cross-examination.

16          THE COURT:  No.  There are limits on it.

17   The purpose of cross-examination is not to ask whatever

18   you want to ask.  But the cross examination is to

19   illicit testimony that's relevant to the issues at hand.

20          MR. BALLI:  I think--.

21          MR. VELA:  I think we're entitled to ask

22   her at least if she was told if she says, no, then

23   that's--.

24          THE COURT:  But you can't ask questions

25   unless -- one of the fundamentals of asking the question

1  is you should have a reasonable basis to believe that

2  the witness has knowledge about that.  You can't just go

3  through and ask them, you know, a whole line of

4  questions if you have no reason to believe that they may

5  have knowledge on that issue.

6              MR. VELA:  But, Your Honor, if we don't

7  ask them, how do we know that they have knowledge or

8  don't?

9              MR. MORENO:  Without even trying to

10  asking anything.  Just ask them the statement.

11              THE COURT:  Yeah, so the objection, is

12  sustained.

13          (End of sidebar.)

14  BY MR. BALLI:

15  Q    Did you hear of Mr. Julio Cesar Resendez talking

16  to -- did he make any statements between the time of

17  the shooting and the time that the police arrived?  Did

18  you talk to him?

19  A    Yes, but not much.

20  Q    And what is it that he told you or what is it that

21  you heard of him?

22              MR. MORENO:  Again, Your Honor, that

23  would be hearsay.

24              THE COURT:  Sustained.

25  BY MR. BALLI:

1   Q    Did he mention the identity of the shooters?

2   A    No.

3   Q    And were you able to get a good view of any of the

4   individuals that were inside of the pickup truck or

5   inside of the truck?

6   A    All I just remember was the one that got off the

7   truck.  It was a skinny man.  And in the backseat the

8   driver -- no, the passenger's side, it was a chunky

9   man.

10  Q    Okay.  And were you able to get a good view of

11  either of these individuals?

12  A    No.  No.

13  Q    So these two individuals that you saw, and the

14  only thing that you can describe is basically their

15  body type.  Heavy set and thin?

16  A    Yes.  Yes.

17  Q    Can you describe -- is there any other features

18  that you think you can describe?

19  A    No.

20  Q    And did you give all of that information to law

21  enforcement at the time?

22  A    No, well, I did told them, but not write.  I

23  didn't wrote it in the statement.

24  Q    But you were able to tell that to law enforcement?

25  A    Yes.  Yes.

1   Q    And did they -- and they never showed you any

2   photographs or ask you to identify any, any individuals

3   related to that shooting, did they?

4   A    Who?

5   Q    Anybody in law enforcement?

6   A    Oh, yes.

7   Q    They did or they didn't?

8   A    Yes, they did.

9   Q    And when that happened you were unable to

10  identify--

11  A    Yes, sir.

12  Q    -- anybody.  And who is it that showed you the

13  photographs?

14  A    Him.

15  Q    Him who?

16              MR. MORENO:  Me.

17  BY MR. BALLI:

18  Q    Okay.  So Mr. Moreno showed you the photograph

19  recently or way back then?

20  A    No, recently.

21  Q    Recently.  Like how recently?

22  A    Days ago.

23  Q    And back -- back in 2006, did you tell law

24  enforcement what you're telling me today that you only

25  saw a heavyset person and a thin person?

```
 1   A    Yes.

 2   Q    And that you didn't have any descriptions of the

 3   physical features?

 4   A    Yes.  Yes.

 5   Q    And did you tell that to Mr. Moreno?

 6   A    No, I didn't talk to him at all until now.

 7   Q    Until now and then he showed you?

 8   A    Yes.  Yes.

 9   Q    When he interviewed you, he showed you a

10   photograph?

11   A    Yes.  Yes.

12   Q    How many photographs did he show you?

13   A    There were a lot.

14   Q    Individual photos in a book?

15   A    Yes.

16   Q    He turned through the pages?

17   A    Yes.

18   Q    Okay.

19                 MR. BALLI:  Pass the witness.

20                 THE COURT:  Mr. Moreno.

21                 MR. MORENO:  Just one question.

22                    REDIRECT EXAMINATION

23   BY MR. MORENO:

24   Q    You said you could see a chunky man or somebody in

25   the backseat.  Were the dark windows I guess -- were
```

1    they down?

2    A    Yes, they were down.

3                    MR. MORENO:  That's all, Your Honor.

4                    THE COURT:  Thank you.  You may step

5    down.  The next witness, please.

6                    MR. MORENO:  Mr. Guillermo Trejo, Your

7    Honor.

8                    THE COURT:  Mr. Trejo, please.

9              (The witness enters the courtroom.)

10                    THE COURT:  Please come forward.  And

11    please stop and raise your right hand to be sworn in.

12              (Witness sworn.)

13                    THE WITNESS:  Yes.

14                    THE COURT:  Thank you.  You may be seated

15    right here in the witness box.

16                    MR. MORENO:  Your Honor, he wrote a

17    statement in Spanish.  I don't know if he's going to

18    need an interpreter or if he's okay.

19                    THE COURT:  The questions have to be

20    asked in English and your answers have to be done in

21    English.  But they can be done through a translation.

22    Do you understand that first of all?

23                    THE WITNESS:  Yes.

24                    THE COURT:  Do you want to go forward in

25    English, or do you want everything translated for you?

```
 1                THE WITNESS:  English.

 2                MR. MORENO:  Okay.  Thank you.

 3         GUILLERMO TREJO, GOVERNMENT WITNESS, SWORN

 4                   DIRECT EXAMINATION

 5   BY MR. MORENO:

 6   Q    Would you please tell us your full name?

 7   A    Guillermo Trejo.

 8   Q    Where do you work, Mr. Trejo?

 9   A    I work at Triple J Express Loop.

10   Q    And how long have you been there?

11   A    About five months.

12   Q    What kind of work do you do?

13   A    I'm a loop tech and a tire tech.

14   Q    And you said you have been there about five

15   months.  What did do before that?

16   A    I was working at some electronics on 909 Market

17   Street.

18   Q    What kind of work did you do there?

19   A    I was a video and audio installer.

20   Q    Back in April of 2006, were you working there?

21   A    Yes.

22   Q    Okay.  And on April 2nd of 2006, did you happen to

23   witness a shooting on Highway 83?

24   A    Yes.

25   Q    Okay.  And can you tell us if you remember
```

1    approximately what time was that?

2    A    What time?

3    Q    What time.

4    A    It was probably like 9:00, 9:30.  Close to 10:00

5    o'clock.  I believe so.

6    Q    And where were you -- were you on Highway 83?

7    A    Yes.

8    Q    And what direction were you traveling?

9    A    I was getting -- I was going to my brother's house

10   in Los Presidentes.  I was with my wife and about that

11   time my baby girl, she was like five or six months.

12   Q    Okay.  So were you going south were you going

13   north?

14   A    I was going north.

15   Q    And that would be coming into Laredo, right?

16   A    Going out of Laredo.

17   Q    North going?

18   A    South going north.

19   Q    Okay.  And you said you were with your wife and

20   daughter, and where was it that you saw a shooting?

21   A    It was in Sierra Vista in Santa Marta.  I was just

22   stopped right there on the car.  Next to me was another

23   truck.  And behind on the right side there was the

24   white truck, and behind me was a black truck that

25   approached.

1   Q    Hold on let me stop you.  So you were at the

2   corner of 83 and I guess it's Sierra Vista on one side?

3   A    On the right side and Santa Marta on the left

4   side.

5   Q    Do you remember if there's a traffic light right

6   there?

7   A    Yeah, it was on the red light.

8   Q    And so you said there was another car.  Were you

9   the first car at the light?

10  A    No.  Next to me was the truck.  We both made it to

11  the stop at the red light.  It just turned yellow, and

12  then we stopped there.

13  Q    Okay.  Tell you what, let me do this.

14               MR. MORENO:  If I can have just one

15  moment, Your Honor.

16  BY MR. MORENO:

17  Q    How many lanes are there on Highway 83?

18  A    Just two.

19  Q    Okay.  In each direction?

20  A    Yes.

21  Q    Okay.

22               MR. MORENO:  If I can just use the elmo?

23               THE COURT:  You may.

24  BY MR. MORENO:

25  Q    There's a monitor in front of you.

```
 1    A    Yes.

 2    Q    It's actually a touch screen.  If you touch it,

 3    you can actually write on it?

 4    A    Okay.

 5    Q    What I'm going to do right now is just so we'll

 6    have a point.  I'm going to say that's north on Highway

 7    83.  You said going right was which street?

 8    A    I was right here.

 9    Q    Okay.

10    A    And there was another truck here.

11    Q    So what street would this be?

12    A    That's Sierra Vista, and this is Santa Marta.

13    Q    Okay.  So you were on the inside lane?

14    A    Yes.

15    Q    And what were you driving?

16    A    I was driving a Tahoe.  '99 Tahoe, Chevy.

17    Q    And what kind of truck was next to you?

18    A    It was an F-250, four doors, color was gray with

19    light gray.  It was a two-toned truck.

20    Q    So were you the first truck at the light?

21    A    Yeah, those two.

22    Q    Okay.  Then you mentioned there was another

23    vehicle behind you?

24    A    Behind on this one, it was a white truck that

25    stopped right there.  And then behind me there was a
```

1    black truck.  That's the truck that started shooting at

2    these guys.

3    Q    Okay.  So let me start.  The white truck that is

4    on the outside lane?

5    A    Left side -- I mean right side.

6    Q    What kind of a truck was it?

7    A    It was F-150.

8    Q    Okay.  Pickup truck or?

9    A    Yeah, pickup truck, four-door.

10   Q    Okay.  Is that a Ford?

11   A    Four-doors.

12   Q    And that truck was also waiting at the light?

13   A    Yes, sir.

14   Q    Okay.  And then there was a black truck behind

15   you?

16   A    Yes.

17   Q    Do you remember what kind of truck that was?

18   A    It was a big truck also black, four-doors, and--.

19   Q    Do you remember the model or make?

20   A    It was probably like 2005, 2006 truck.

21   Q    But I mean Ford, Chevy?

22   A    It was a Chevy truck.

23   Q    Chevy truck.

24   A    And I am very familiar with trucks because I work

25   with cars.

1    Q    Okay.  And so it's the black truck that's behind

2    you it starts shooting at the white truck on the other

3    lane?

4    A    Yes.

5    Q    Tell me what you first saw or noticed.

6    A    Well, we were stopped at the light, and then I

7    started hearing the sound that I can describe it was

8    like there was a bunch of motorcycles.  The motorcycles

9    you can hear like fire crackers from the exhaust.  And

10   then I saw from the rearview mirror, I saw the big ball

11   of fire.  And then my wife started crying with my

12   little -- like she went in shock or something.  Started

13   crying.  And at that moment like everything stopped.

14   You hear no sound or nothing.  Nobody moved.  Like for

15   three to four minutes everything was stopped.

16   Q    When you say you saw a ball of fire, the ball of

17   fire was coming from where?

18   A    Behind the black truck.

19   Q    Could you tell if that was just in the bed of the

20   truck or also in the truck?

21   A    I could say probably it was like in the bed of the

22   truck.

23   Q    And you say things sort of stopped for like two or

24   three minutes.

25   A    Yes.

1    Q    What was the next thing that you remember?

2    A    Well they started shooting and everything and then

3    the truck that was next to me--.

4    Q    Okay.  Can you point to it again which one?

5    A    This one.  It took off immediately.  And then this

6    truck, the black truck, hit me from behind and pushed

7    me and this guy the one on this side to all the way --

8    and I went like halfway.  And I stopped there until the

9    police arrived.  I got out because my wife was crying

10   and everything and my truck was hit from behind.

11   Q    So the truck that did the shooting, they hit you?

12   Pushed you out of the way?

13   A    Yes, they hit me from behind.  Yes.

14   Q    And then it turned on Santa Marta?

15   A    Yes, sir.  And they went or disappeared over

16   there.

17   Q    Okay and so what do you remember next after that?

18   A    Nothing.  I moved and waited here for my wife --

19   and then the truck went slowly, slowly, slowly, and it

20   stopped right here on a pole that was here.

21   Q    Which truck?

22   A    The white truck.

23   Q    The one that was shot at?

24   A    Yes.

25   Q    It ended up where, I'm sorry?

1    A    Like a pole that was right here in the middle

2    between the highway.

3    Q    That's where it finally came to rest?

4    A    Yes, sir.

5    Q    Okay.  And then you said you waited there until

6    the police came?

7    A    Yes.

8    Q    And did you in fact talk to the police?

9    A    Yes, sir.

10   Q    Did give a statement to the police?

11   A    Yes, sir.

12                   MR. MORENO:  May I approach, Your Honor?

13                   THE COURT:  You may.

14                   MR. BALLI:  Your Honor, I'm going to

15   object at this time that counsel is showing a statement

16   to the witness.  Unless there's some reason for it, Your

17   Honor.

18                   THE COURT:  I imagine there is some

19   reason for it.

20                   MR. MORENO:  To refresh his recollection.

21                   MR. BALLI:  Your Honor, he hasn't

22   testified that he doesn't have recollection of the

23   event, Your Honor.

24   BY MR. MORENO:

25   Q    Do you remember if you told the police whether or

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

```
 1   not somebody was shooting also from inside the truck?

 2   A    No, sir.

 3   Q    Do you think if I showed you your statement that

 4   would help you remember?

 5   A    Yeah.

 6              MR. MORENO:  May I approach?

 7              THE COURT:  You may.

 8   BY MR. MORENO:

 9   Q    You can read your statement here and just read to

10   it yourself.  So were people shooting from inside and?

11   A    From the back.

12   Q    The bed?

13   A    Yes.

14   Q    I don't know if you have any idea.  But do you

15   have any idea how many shots were fired?  How many you

16   heard?

17   A    There were different sounds.  But I can't tell you

18   how many, how long it took.  It took probably like

19   probably two minutes or maybe less.  But you could hear

20   the sound.

21              MR. MORENO:  I'll pass the witness.

22              THE COURT:  Mr. Balli.

23              MR. BALLI:  Your Honor permission to

24   approach the elmo?

25              THE COURT:  You may.
```

```
 1                    CROSS-EXAMINATION

 2   BY MR. BALLI:

 3   Q     Sir, can you show the ladies and gentlemen -- are

 4   you familiar with this area?

 5   A     Yes.

 6   Q     And why are you familiar with this area?

 7   A     Because I live in South Laredo.

 8   Q     You live in South Laredo.  Okay.  And what aside

 9   from the streets, are there any businesses that in this

10   area?

11   A     Well, right here there's a gas station.

12   Q     Hold on just a second.  We don't want the lose

13   that.  When you say there's a gas station, will you

14   point again to where the?

15   A     Right here.

16   Q     And is that a Shell gas station?

17   A     No, it's a Stripes.

18   Q     It's a Stripes?

19   A     Yes.

20   Q     And it has like a Valero gas station?

21   A     Yes.

22   Q     Is there any other businesses in that area?

23   A     Well the Wal*Mart is on the other side on the

24   other light.

25   Q     And would you show the ladies and gentlemen of the
```

```
1   jury where the Wal*Mart is?

2   A    It's actually right here on the other light, right

3   side.  Right about here.  It doesn't--.

4   Q    Again, could you?

5   A    Right there.

6   Q    So there's a Wal*Mart a little further down?

7   A    Yes.

8   Q    And on the other side of the highway?

9   A    There's an entrance to the other subdivision.

10  There's -- there's a school.  I believe it was on this

11  side.  You can see the school.  There's an empty lot

12  here, and you go here to the other -- to the Santa Fe

13  subdivision.

14  Q    And what's in the other corner?

15  A    This one?  It's an empty lot.

16  Q    An empty lot.

17  A    Right there.

18  Q    That's the empty lot?

19  A    Yes.

20  Q    Okay.  And where the Wal*Mart is there's a gas

21  pumps, correct?

22  A    Yes.

23  Q    And there's a small shopping area like with a

24  Peter Piper and the Payless?

25  A    Yes.  And on the -- there's a Chevron across the
```

1    street.  There's a Jack-in-the-Box.

2    Q    Where is the Shell?

3    A    It's right here in front of the Wal*Mart on this

4    side.

5    Q    There's a Shell right there?

6    A    Yes.  This is Sierra Vista and Pita Mangana here,

7    and here is Jack-in-the-Box.

8    Q    There's a Jack-in-the-Box.  The Jack-in-the-Box is

9    there where you just drew the square and the Shell is

10   where?

11   A    On the other side.  Right there.

12   Q    Of Pita Mangana?

13   A    Yes.

14   Q    Were you able to see any of the individuals that

15   were involved in the--

16   A    No, sir.

17   Q    -- shooting?

18   A    It was dark, and it was a dark truck.

19   Q    And did you tell that to the police that you

20   didn't see anybody?

21   A    Yes, sir.

22   Q    Did they show you photographs of anybody?

23   A    At that time, no.

24   Q    Have they shown you photographs since?

25   A    No, sir.

1    Q    And to the best of what you can remember today,

2    the fire that you saw was coming out of the bed of the

3    truck?

4    A    Yes, sir.  Different sounds.

5    Q    You made your statement at about 11:30 at night;

6    would that be correct?

7    A    Well, up here it says 12:30.

8    Q    12:30.  When you mean "what you have here," what

9    are you talking about?

10   A    Excuse me?

11   Q    When you said what I have here says 12:30, what do

12   you mean by what I have here?

13   A    Right here the police officer put it at -- it says

14   here 4/3/06 at 12:30 a.m.

15   Q    12:30 a.m.?

16   A    We got out that night probably about 1:30 in the

17   morning.

18   Q    Okay.  And the shooting happened at about what

19   time?

20   A    Like around 9:30, close to ten.

21   Q    Okay.

22              MR. BALLI:  Pass the witness.

23              THE COURT:  Mr. Moreno, anything further?

24              MR. MORENO:  No, Your Honor, nothing

25   further.

```
 1                    THE COURT:  Thank you.  Thank you.  You
 2    may step down.  The next witness please.
 3                    MR. MORENO:  Ms. Blanca Lopez.
 4                    THE COURT:  Blanca Lopez, please.
 5              (The witness enters the courtroom.)
 6                    THE COURT:  Please come forward and stop
 7    for a minute so you can be sworn in.  Please raise your
 8    right hand to be sworn in.
 9                    (Witness sworn.)
10                    THE WITNESS:  Yes.
11                    THE COURT:  Thank you.  You may be seated
12    right here in the witness box.  You may proceed,
13    Mr. Moreno.
14                    MR. MORENO:  Thank you, Your Honor.
15        BLANCA ESTELLA LOPEZ, GOVERNMENT WITNESS, SWORN
16                      DIRECT EXAMINATION
17    BY MR. MORENO:
18    Q    Would you please tell us your full name?
19    A    Yes, Blanca Estella Lopez.
20    Q    Where do you work Ms. Lopez?
21    A    I work at LBJ High School.
22    Q    And you are a teacher?
23    A    I'm a math teacher, yes, sir.
24    Q    How long have you been a teacher?
25    A    I've been a teacher for 15 years.
```

```
 1   Q     So were you a teacher back on April 2, 2006?

 2   A     Yes, sir.

 3   Q     And do you remember being on Highway 83 on that

 4   evening and witnessing a shooting?

 5   A     Yes, sir.

 6   Q     Okay.  Can you tell us where you were at?

 7   A     Okay.  I was in Zapata Highway headed over south,

 8   parallel to the other vehicles, but in the opposite

 9   direction.

10   Q     Okay.  And when you say Zapata Highway, are we

11   talking about Highway 83?

12   A     Highway 83, yes, sir.

13   Q     You said you were going south?

14   A     Correct.

15   Q     So the vehicles that you're describing would be

16   going north?

17   A     Correct.

18   Q     Okay.  And do you remember if there's a cross

19   street from where you were at?

20   A     Yes, sir.

21   Q     Okay.  And what would that be?

22   A     Well, it changes names.

23   Q     Okay.

24   A     On this side it's -- I'm sorry, I forgot.

25   Q     Okay.  The other side?
```

```
 1    A     I forgot.  But it's taking you to a neighborhood

 2    called Los -- Santa Fe.

 3    Q     Okay the neighborhood is Santa Fe?

 4    A     Santa Fe.

 5    Q     And so were you stopped at a traffic light there?

 6    A     Yes, sir.

 7    Q     Okay.  How far from let's say the intersection

 8    itself were you at?

 9    A     How far, you mean from the light?

10    Q     Were you the first car at the intersection?

11    A     Yes, sir.

12    Q     Okay.  And what were you driving that day?

13    A     A Maxima.

14    Q     Okay.  And so no cars in front of you, between you

15    and the intersection?

16    A     No.

17    Q     Okay.  And were there any other cars around you?

18    A     Yes, sir.

19    Q     Okay.  And what was it that you first heard or saw

20    or noticed?

21    A     Everything became very silent, and the only thing

22    I could see was basically like fire during that time.

23    I couldn't hear anything.  But then I realized that it

24    was like firecrackers, and I saw the fire and that's

25    basically when--.
```

1    Q    Let me ask you, when you say, I saw the fire.

2    Where was the fire coming from?

3    A    From the vehicles.  The truck that they were

4    shooting.

5    Q    Okay.  Can you describe the truck that was doing

6    the shooting?

7    A    I cannot describe it, but the color was black.  It

8    was dark.

9    Q    Okay.  Are we talking like Blazer or are we

10   talking pickup truck?

11   A    Blazer.  Blazer.

12   Q    Okay.  And who were they shooting at or what were

13   they shooting at?

14   A    At another vehicle which was a white vehicle.

15   Q    Do you remember if that was a truck or a Blazer?

16   A    A truck.

17   Q    And so a black truck shooting at a white truck?

18   A    Correct.

19   Q    On the opposite side of the road from you?

20   A    Correct.

21   Q    And you said everything got very quiet and then

22   the next thing -- what happened after you noticed the

23   fire?

24   A    I did notice that nobody moved.  Everyone that was

25   around me, we all just stayed there for a couple of

1    minutes.  No noise.  Nothing at all.  Everything just

2    went blank.

3    Q    What's the next thing you remember?

4    A    I had my son down there because I was just worried

5    about him.  That's basically the only thing that have.

6    I was holding to him.  I was holding onto him, so that

7    he could stay down there.  Then I just -- we stayed --

8    I think that all of us, whoever was around there, we

9    just stayed there still because we didn't want to move

10   until that vehicle would take off.  And that's

11   basically what we did.  We waited for that vehicle to

12   take off.

13   Q    And did it in fact leave?

14   A    Yes.

15   Q    Okay.  Do you remember what direction it left?

16   A    Into that direction, the Santa Fe colonia.

17   Q    Okay.  And then what did you do next?

18   A    I was calling 911.

19   Q    Okay.  And did you have any luck?

20   A    No, I was very disappointed because we kept on

21   calling, me and my son, and no one was answering.

22   During the time that they did answer it, I remember

23   talking to the lady and asking her why.  How come it

24   took her too long to answer.

25   Q    What did you do then after that?

1    A    I went straight home.

2    Q    Okay.

3    A    And I locked the doors.  I thought like I don't

4    know.  Just went home, and I locked everything.

5    Q    Okay.  When was it that you spoke to the police?

6    A    The following day, I want to say it was the

7    following -- that happened -- that occurred on April

8    the 3rd on a Sunday night.  It must have been the

9    following date when they called me.

10   Q    Do you remember how many statements you gave to

11   the police?

12   A    I didn't remember, but I do know because you

13   showed those statements to me.  But they were two.

14   Q    And one was under the name of Blanca?

15   A    Correct.  And the other under Iselda because

16   that's my initial.

17   Q    For I?

18   A    Yes.

19             MR. MORENO:  Pass the witness, Your

20   Honor.

21             THE COURT:  Mr. Balli?

22                  CROSS-EXAMINATION

23   BY MR. BALLI:

24   Q    Ma'am, were you able to see any of the individuals

25   involved in the shooting?

```
 1   A      No, sir.

 2               MR. BALLI:  I'll pass the witness.

 3               THE COURT:  Nothing further?

 4               MR. MORENO:  Nothing further.

 5               THE COURT:  All right.  Thank you, ma'am.

 6   You may step down.  The next witness, please.

 7               MR. MORENO:  Your Honor, Corporal Ruben

 8   Garza.

 9               THE COURT:  Corporal Garza, please.

10          (The witness enters the courtroom.)

11               THE COURT:  Corporal Garza, please come

12   forward.  Please stop and raise your right hand to be

13   sworn in.

14          (Witness sworn.)

15               THE WITNESS:  Yes.

16               THE COURT:  Thank you.  You may be

17   seated.  You may proceed, Mr. Moreno.

18          RUBEN GARZA, GOVERNMENT WITNESS, SWORN.

19                   DIRECT EXAMINATION

20   BY MR. MORENO:

21   Q    Would you please state your name?

22   A    Deputy Sheriff Ruben Garza.

23   Q    Deputy Garza, you work for the Webb County

24   Sheriff's Office?

25   A    Yes, sir, I do.
```

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

```
 1    Q     How long have you worked for the Webb County

 2    Sheriff's Office?

 3    A     Approximately 26 years and three months.

 4    Q     Okay.  And are you still working with the

 5    Sheriff's Office?

 6    A     Yes, sir, I am.

 7    Q     Were you working with the Sheriff's Office back on

 8    April 2, 2006?

 9    A     Yes, sir.

10    Q     And were you working that night?

11    A     Yes, sir.

12    Q     Okay.  Did you have occasion to respond to the

13    scene of a shooting at the corner of Highway 83 and

14    Sierra Vista?

15    A     Yes, sir.

16    Q     Can you tell us about the call?  What was the call

17    that you received to respond to?

18    A     I received the call from a dispatcher that there

19    was a shooting and that there were no units close by,

20    and I responded.  And I was close by.  I arrived at

21    that time as soon as possible.  I was the first officer

22    at the scene.

23    Q     Do you remember approximately what time it was

24    that you arrived?

25    A     Pardon me?
```

1  Q    Do you remember approximately what time it was

2  that you arrived?

3  A    Before 10:00 o'clock, a little bit after.

4  Q    Okay.  And what was it you saw when you first

5  arrived at the scene?

6  A    I seen a white pickup truck, Ford, facing

7  northeast.  Northwest on the right -- right on the

8  intersection of Sierra Vista and Santa Marta on Highway

9  83.  It was riddled with bullet holes on both sides.

10  Q    Okay.  What was the first thing you did after you

11  noticed the truck?

12  A    The first thing I did was check for people inside

13  that were injured or anything.

14  Q    Okay.  And did you find any people who were

15  injured inside the truck?

16  A    Yes, sir.  Two individuals.

17  Q    Who did you -- what did you see or what did you

18  find?

19  A    The driver apparently was shot multiple times and

20  there was brain matter coming out of the back of his

21  head.

22  Q    There was what?

23  A    Brain matter.  Half his brain was hanging out of

24  the back.

25  Q    Okay.  That was the driver?

1    A    That was the driver.  Yes, sir.

2    Q    Okay.  And then you said there were two people?

3    A    Yes, sir.  The passenger, he had had half his neck

4    was blown away, and he had a bullet hole in the cheek.

5    No movement whatsoever.  They both appeared to be dead.

6    Q    And what did do you then?

7    A    The fire department arrived at the scene, and I

8    told them that we had two victims, and they looked like

9    they were deceased, and he wanted to verify.  I said,

10   sir, this is a crime scene.  I showed him the victims,

11   and he said apparently they are dead.  And after that I

12   secured the crime scene.

13   Q    Okay.  And just for the benefit of the jury, could

14   you explain what you mean by "I secured the crime

15   scene."

16   A    That nobody would enter or remove any articles or

17   anything, like contaminate the crime scene.  That's the

18   duty of a police officer.

19   Q    And what did you do after you secured the crime

20   scene?

21   A    I called for backup.

22   Q    Okay.  And who, if anyone, arrived?

23   A    Two more deputy units from the Sheriff's

24   Department.  I advised them to start directing traffic

25   both ways, not to let anybody stop.  There was a lot of

1    traffic at that time.

2    Q    Do you recall who the officers were, the deputies

3    that arrived?

4    A    Sylvia Morales and Peter Mosqueda.  And then

5    afterwards another deputy arrived at the scene.

6    Q    Okay.  And after the two deputies arrived to help

7    you out, what did you do after that?

8    A    Just secured the crime scene.  I was the night

9    supervisor at that time also.

10   Q    I'm sorry.  Repeat that again.

11   A    Secure the crime scene.  It was my job to do since

12   being the first officer, and also I was the night

13   supervisor for the Sheriff's Department at that time.

14   Q    Okay.  And you mentioned that you asked the other

15   officers to direct traffic on both directions?

16   A    Yes, sir.

17   Q    Okay.  If -- you said that the pickup truck had

18   come to rest at a pole?

19   A    Pardon me?

20   Q    Where was the pickup truck?

21   A    In between the highway north and southbound.

22   Q    Okay.

23                  MR. MORENO:  Your Honor, may I approach?

24                  THE COURT:  You may.

25

1    BY MR. MORENO:

2    Q    I'm going to show you what I've marked as

3    Government Exhibit Number 121 and 122 and ask you if

4    you recognize that scene?

5    A    Yes, sir.

6    Q    And is this the scene that -- the streets that you

7    were describing?

8    A    Yes, sir, it's the northbound lanes.

9    Q    Okay.  Both of them are the northbound lanes?

10   A    Yes, sir.

11                MR. MORENO:  We offer Government Exhibit

12   Number 121 and 122.

13                THE COURT:  Any objection?

14                MR. BALLI:  No objection, Your Honor.

15                THE COURT:  They're admitted.

16           (Government Exhibits 121 and 122 admitted.)

17   BY MR. MORENO:

18   Q    So this is the northbound lanes of Highway 83?

19   A    Yes, sir.

20   Q    Are you able to see?  I don't know if you can see

21   it on your monitor where the pickup was, the white

22   truck?

23   A    Yes, sir.  It's on the left-hand side.

24   Q    The screen that's in front of you.  It's a touch

25   screen.  If you will circle it, it will mark it.

```
 1   A    (The witness complied.)
 2   Q    And so that's where it came to rest in the middle
 3   of the street.  I guess it's the pole for the traffic
 4   light?
 5   A    Yes, sir.
 6   Q    You told us also that the truck was -- had a lot
 7   of bullet holes in it?
 8   A    Both sides, sir.
 9             MR. MORENO:  May I approach, Your Honor?
10             THE COURT:  You may.
11   BY MR. MORENO:
12   Q    Let me show you what I've marked as Government
13   Exhibit Number 124 and then Government Exhibit Number
14   125.
15   A    Yes, sir.
16   Q    Do you recognize those?
17   A    Yes, sir, that's the truck.
18             MR. MORENO:  Okay.  Your Honor, we'd
19   offer Government Exhibit Number 124 and 125.
20             THE COURT:  Mr. Balli, any objection?
21             MR. BALLI:  No objection, Your Honor.
22             THE COURT:  They're admitted.
23         (Government Exhibits 124 and 125 admitted.)
24   BY MR. MORENO:
25   Q    So that would be -- which side of the pickup truck
```

1    would this be?

2    A    That would be the driver's side which would be the

3    left side.

4    Q    I'm not sure how clear it is on the screen there,

5    but those little specks we see on the doors, what are

6    those?

7    A    Bullet holes.

8    Q    And the same thing for the window?

9    A    Yes, sir.

10   Q    Okay.  And then what side would this be?

11   A    Be the right side, the passenger's side.

12   Q    And the specks on the window and on the car?

13   A    Pardon me?

14   Q    The specks on the window and on the side?

15   A    They are bullet holes.

16                  MR. MORENO:  May I approach, Your Honor?

17                  THE COURT:  You may.

18   BY MR. MORENO:

19   Q    Let me show you what I've marked as Government

20   Exhibit Number 127.  Do you recognize that?

21   A    Yes, sir.

22   Q    And 128?

23   A    Yes, sir.

24   Q    I'm sorry, 129?

25   A    Yes, sir.

```
 1   Q    Okay.  Is that how they appeared when you saw them

 2   that evening?

 3   A    Yes, sir.

 4               MR. MORENO:  Your Honor, we'd offer

 5   Government Exhibit 127 and 129?

 6               MR. BALLI:  Without objection, Your

 7   Honor.

 8               THE COURT:  They're admitted.

 9          (Government Exhibits 127 and 129 admitted.)

10               MR. MORENO:  And I would warn, both the

11   court and the jury, that they're rather graphic.

12   BY MR. MORENO:

13   Q    Let me show you what we've introduced as

14   Government Exhibit Number 127.  And can you tell us

15   what we're looking at here?

16   A    At the driver of the vehicle.

17   Q    Okay.  And this is how you found them in the

18   pickup truck?

19   A    Yes, sir.

20   Q    And then you mentioned to us that the back part of

21   the driver's head was shot off?

22   A    Yes, sir.

23   Q    Is that what this is depicted on Government

24   Exhibit Number 129?

25   A    Yes, sir.
```

1    Q    Now after the other deputies arrived, did

2    anyone -- let me ask you this: Is that area of town,

3    Highway 83 with Sierra Vista, is that part of the

4    county or is that still part of the city?  Whose

5    jurisdiction would that be?

6    A    Laredo.  City of Laredo.

7    Q    And did anybody arrive from the Laredo Police

8    Department?

9    A    About 10, 15 minutes later.

10    Q    Okay.  And what happened after the police arrived?

11    A    I turned over the crime scene to their

12    investigator.

13    Q    What did you do next?

14    A    I offered assistance.  I made a supplemental

15    report of what I did when I first got there and my

16    officers did, and turned it over to -- a copy to the

17    police officer, to the investigator.

18    Q    Okay.  And was that the extent of your

19    participation in this?

20    A    Yes, sir.  Since I was the supervisor I had to go

21    and direct my other officers on the field.

22                    MR. MORENO:  Thank you.  I'll pass the

23    witness.

24                    THE COURT:  Mr. Balli.

25

                          CROSS-EXAMINATION

1
2    BY MR. BALLI:

3    Q    You didn't collect any evidence at this crime

4    scene, did you?

5    A    No, sir.

6    Q    You allowed the Laredo Police Department to do

7    that, correct?

8    A    Sir, once their investigator arrives at the scene,

9    we turn over the crime scene to the Laredo Police

10   Department, and they take it from there.

11   Q    And that's because this happened within the city

12   of Laredo and you knew that it was going to be their

13   investigation, correct?

14   A    Yes, sir.

15   Q    And so your purpose in stopping there is because

16   you're a peace officer and you have a duty to do

17   something, correct?

18   A    Yes, sir.

19   Q    And you wanted to make sure that you could help

20   not just with controlling traffic because there was a

21   traffic issue, but with securing the crime scene,

22   correct?

23   A    Or see if there was any victims alive or anything

24   to give or state whatever needs to be done for the life

25   of the civilians -- public.

```
 1   Q    And you were there for approximately what time in

 2   total?

 3   A    Myself, I was there for approximately 30 to 45

 4   minutes.

 5   Q    And during those 30 to 45 minutes, you didn't --

 6   you didn't take any witness statements, did you?

 7   A    No, sir.

 8   Q    You didn't determine who the shooters were?

 9   A    No, sir.

10   Q    And you didn't collect any evidence?

11   A    No, sir.

12                MR. BALLI:  Your Honor, permission to

13   approach the elmo?

14                THE COURT:  You may.

15   BY MR. BALLI:

16   Q    You're familiar with the Zapata Highway area, are

17   you not?

18   A    Yes, sir.

19   Q    And you're familiar specifically with this area

20   that you were patrolling on that day?

21   A    Yes, sir.

22   Q    How is your eyesight?  Is your eyesight pretty

23   good, deputy?

24   A    Excuse me, sir?

25   Q    Is that monitor that's in front of you, is it very
```

1    clear?

2    A    Yes, sir, it's very clear.

3    Q    Very clear.  Okay.  Give me just a minute.  And

4    I'm showing you Exhibit 122.

5    A    Yes, sir.

6    Q    Okay.  Can you see in Exhibit 122 some orange and

7    yellow lights right here where I'm pointing?

8    A    Yes, sir.

9    Q    Do you know what that is?

10   A    The yellow light there?

11   Q    Well, it's -- can you see some like a rectangular

12   orange and yellow light that are--?

13   A    It looks like a business.

14   Q    Is that a Shell gas station?

15   A    I'm not sure, but it looks like it, sir.

16   Q    You're familiar with the Shell gas station that's

17   about a block from that crime scene?

18   A    Well, see, sir, the reason why I was going through

19   there was to go to a district four which covers Rio

20   Bravo and the El Cenizo area, and there's no other way

21   to make it through those districts.

22   Q    That's right.  You have to go right through there?

23   A    Right.  Yes, sir.

24   Q    So you're not sure if there's a Shell gas station

25   right there in front of Wal*Mart?

1    A    There's is a station right there, but I'm not

2    quite sure if it's a Shell station.

3    Q    And those lights that are there, you're not sure

4    if it's the Shell gas station, correct?

5    A    No, sir.

6    Q    Okay.  But there is a Shell gas station in front

7    of the Wal*Mart, correct?

8    A    There's a gas station there.  Yes, sir, around

9    that area, so I don't through there every day.

10   Q    Are you saying you're not sure if it's a Shell?

11   A    Yes, sir.

12                   MR. BALLI:  I'll pass the witness.

13                   THE COURT:  Mr. Moreno, anything further?

14                   MR. MORENO:  No, Your Honor.

15                   THE COURT:  Thank you.  You may step

16   down.

17                   THE WITNESS:  Thank you.

18                   THE COURT:  The next witness, please.

19                   MR. MORENO:  We would recall Detective

20   Carlos Adan.

21                   THE COURT:  Detective Adan, please.

22           (Carlos Adan's testimony previously

23   transcribed.)

24                   THE COURT:  Nothing further?

25                   MR. MORENO:  No, Your Honor, not from

```
 1    this witness.

 2                    THE COURT:  Thank you.  You may step

 3    down.

 4                    MR. MORENO:  May we approach?

 5                    THE COURT:  You may.

 6              (At sidebar.)

 7                    MR. MORENO:  We've now gotten to Jasso.

 8                    THE COURT:  You've now gotten to Jasso.

 9    Okay.  I think what we'll do -- do we have him here?

10                    MR. MORENO:  He was here at lunch.

11                    THE COURT:  I think what I may do is just

12    let the jury go home a little early today.  They've been

13    very good, very patient all week long.  We'll address

14    this.  Hopefully, it won't take that long either.

15    You-all can have a little bit of a break as well, and

16    then we'll pick up tomorrow morning with him, so we'll

17    continue.  But I'll send them home.  Okay.

18                    MR. BALLI:  Your Honor, can we have a

19    short break before then?

20                    THE COURT:  Yes, I'll give you a break.

21              (End of sidebar.)

22                    THE COURT:  Ladies and gentlemen,

23    hopefully, it a nice surprise for you, but I'm going to

24    actually send you home a little bit early today.  We

25    have a matter that we need to take up.  It is something
```

```
1     that needs to be taken up outside your presence, so

2     rather than having you sitting there waiting for however

3     long this may take us, especially since it's 3:30 in the

4     afternoon, I'll just send you home early today.  We'll

5     come back tomorrow morning.  We will resume tomorrow

6     morning.

7              But for this afternoon, you'll be released

8     with the reminder of instructions previously given to

9     you by the court not to discuss the case, not to expose

10    yourself to any kind of coverage, not to receive or give

11    information about the case.  With those instructions

12    then, I will release you for the day.  Tomorrow morning

13    we are going to begin at 8:30 in the morning.  Until

14    tomorrow morning then.  Thank you.

15              THE CSO:  Please rise for the jury.

16         (The jury leaves the courtroom.)

17              THE COURT:  I will give you a break.  But

18    just before I send you off for a break, so just so that

19    you know we're going to deal with just the issue of the

20    identification to the extent that Jasso needs the

21    testify as to those particulars.  It's limited to those

22    particulars.  We're not going to go into everything that

23    he may have testified on the witness stand.  And to the

24    extent we need to have one of the officers -- whoever it

25    was -- one of the officers that was involved in the
```

1    lineup or photo presentations, however you want to call

2    it.  We'll have that as well.  But, again, I want to

3    keep it succinct to that issue only.  And you said that

4    we might have the same issue with Reta, or somebody

5    said.  And I don't know if we have Reta present after

6    all.

7                    MR. MORENO:  They brought him down.

8                    THE COURT:  Okay.  We'll deal with those

9    issues.  Again, I want to keep it succinct to those

10   issues.  All right.  We'll take a short recess.  And

11   it's not as I do for the jury -- for their convenience.

12   So they can take whatever much time they want, but done

13   for necessity's sake.  So we'll be short.

14                    MR. BALLI:  Yes, Your Honor.

15                    THE CSO:  All rise.

16              (Break.)

17                    THE CSO:  All rise.

18                    THE COURT:  Thank you.  You may be

19   seated.  Are we ready to proceed?

20                    MR. BALLI:  Yes, Your Honor.  The only

21   issue before we proceed is just that we didn't want --

22   we're going to request from the court that our client

23   not be present physically in the courtroom when

24   Mr. Jasso testifies, Your Honor, because he could taint

25   the identification.  But he, because the motion to

175

1    suppress is important that he know what's going on, Your

2    Honor, and we wanted to see if there was any possible

3    way that he could be placed in an adjacent room with a

4    monitor so that he can hear the translation of what's

5    going on in the courtroom, Your Honor.

6                    THE COURT:  Mr. Moreno.

7                    MR. MORENO:  I don't have any issue with

8    him being out of the courtroom.

9                    THE COURT:  I don't have any issue with

10   him being out of the courtroom either, but there's no

11   place that we can set up right now, so he can hear

12   what's going on.  And he needs to make sure he

13   understands that he has full legal right to be present.

14   If he wishes to excuse himself, the court will let him

15   be excused.  But I don't have any place that I can put

16   him where he can hear what's going on in the courtroom.

17                   MR. BALLI:  Your Honor, would it be

18   possible to put him in one of the conference rooms

19   that's just outside the courtroom?

20                   THE COURT:  And he would hear how?  I

21   understand that.  That's why I said, he would hear how?

22   I'm asking, Mr. Balli.  He's not sitting over here, I

23   mean.  No, he's not going to be sitting next to the

24   interpreters.

25                   MR. BALLI:  Your Honor, we'll discuss the

1    matter with him.

2                    THE COURT:  Let's do it quickly.  He

3    wants to cover his face?

4                    MR. BALLI:  Well, Your Honor, we've made

5    that suggestion and I think that that would be the best

6    option for us that his face be covered during the--.

7                    THE COURT:  He can cover his face if he

8    wants to.  I don't have any problem with that.  He

9    doesn't have to have his face exposed.  Okay.  Let's get

10   this issue decided so we can move forward.

11                   MR. BALLI:  We're ready, Your Honor.

12                   THE COURT:  Okay.  All right, that's

13   fine.  Marshal's, we're okay with that situation?  Okay.

14   All right.  Okay.  Then are we ready to proceed.

15                   MR. BALLI:  Yes, Your Honor.

16                   THE COURT:  Okay.  Let us proceed then.

17   I guess we need Mr. Jasso.

18                   MR. BALLI:  Your Honor, we'd like Robert

19   Garcia first.

20                   THE COURT:  Okay.  I'm sorry, we're going

21   to go with Robert Garcia first.  I don't believe we have

22   sworn you in previously.

23                   THE WITNESS:  No, ma'am.

24                   THE COURT:  Please raise your right hand

25   to be sworn in.

```
 1              (Witness sworn.)

 2                   THE WITNESS:  I do.

 3                   THE COURT:  Thank you.  You may be

 4    seated.

 5                   THE WITNESS:  Thank you, Your Honor.

 6                   THE COURT:  You may proceed.

 7          ROBERTO GARCIA, GOVERNMENT WITNESS, SWORN.

 8                        EXAMINATION

 9    BY MR. BALLI:

10    Q    What is your name?

11    A    Roberto Garcia.

12    Q    And what is your rank with the police department?

13    You're at the Laredo Police Department, right?

14    A    I'm an investigator with the Laredo Police

15    Department.  Yes, sir.

16    Q    Investigator Garcia, you were involved as the lead

17    investigator or an investigator in the shooting death

18    of Jose and Mario Resendez on April 2, 2002, correct?

19    A    I was assigned to assist as an investigator, yes.

20    Q    And you were assisting Carlos Adan, correct?

21    A    Yes, sir.

22    Q    Investigator Carlos Adan who testified earlier

23    today, correct?

24    A    Correct.

25    Q    And as part of your duties you interviewed
```

1   witnesses, correct?

2   A    Correct.

3   Q    Including Raul Jasso Jr.?

4   A    Correct.

5               THE COURT:  I'm sorry, remind me of your

6   full name please.

7               THE WITNESS:  Roberto Garcia.

8               MR. BALLI:  Excuse me, Your Honor, I have

9   a little bit of a sore throat.

10  BY MR. BALLI:

11  Q    And on April the 11th of 2006, you interviewed

12  Raul Jasso Jr., correct?

13  A    Yes.

14  Q    And that interview was recorded, correct?

15  A    Correct.

16  Q    And did you have any other interview with him

17  besides the recorded interview on April 11 -- any other

18  interview on April 11, aside from the recorded

19  interview?

20  A    No.

21  Q    So the entire scope of the interview with Raul

22  Jasso Jr., the entire interview is all recorded on

23  video, correct?

24  A    Yes.

25  Q    And he did not give you any written statement,

1  correct?

2  A    I don't know if -- I can't remember if he did give

3  us a written statement or not.  It should be on the

4  case file if it was, if he provided one.

5              THE COURT:  Let me interrupt here for a

6  second.  Is there any issue about there being any other

7  interview or any other communication as to the

8  identification other than what is recorded?

9              MR. BALLI:  Yes.  Well, there could be.

10  There could possibly have been another statement, and I

11  just want to make sure that we're limited to this one

12  statement.

13              THE COURT:  Okay.  You were trying to--.

14              MR. MORENO:  There are two separate

15  interviews.  The One on the day he got arrested on

16  April 11, and later on November 2nd that year he

17  interviews him in San Antonio.

18              MR. BALLI:  Yes, Your Honor.

19              THE COURT:  And is that--?

20              MR. MORENO:  Two interviews.  But that

21  day is just the video.

22              THE COURT:  Okay.  And is the

23  November 2nd interview at issue as far as the

24  identification?

25              MR. BALLI:  Yes.

```
 1                    THE COURT:  Or only the April 11th one?
 2                    MR. BALLI:  Well both of them are issues.
 3                    THE COURT:  Okay.  Because what I was
 4     going to say as to the November -- excuse me, the
 5     April 11th interview, as far as the manner of the
 6     presentation issue, it should all be their.  And I can
 7     view that videotape and make a determination on that.
 8                    MR. BALLI:  Well, you could, Your Honor.
 9     And it would take Your Honor about an hour and a half.
10     But if I ask him a few questions, I think we'll
11     establish that there was a -- that he did not give --
12     there was no identification, and that's really what I
13     want to establish that he because--.
14                    THE COURT:  Okay.  Well, let's just move
15     forward.
16                    MR. MORENO:  We can stipulate to that.
17                    THE COURT:  That there was no
18     identification?
19                    MR. MORENO:  On the video that was done
20     on the interview on November the 11th.
21                    THE COURT:  On April 11?
22                    MR. MORENO:  On April 11th of 2006.
23                    THE COURT:  Okay.  Okay.
24                    MR. MORENO:  This videotape at the Laredo
25     Police Department, my recollection is that he showed him
```

1    two photographs of Wenceslao Tovar who has not come up

2    here yet and Jose Pepe Martinez.  I think may be the

3    second one out of a folder that I can recall -- the only

4    photographs that he--.

5                    MR. BALLI:  If I may interrupt, that's

6    not the only issue with April the 11th.  The issue in

7    addition to him not IDing him with any photograph is

8    that nor did he give a description or a name, so if

9    they'll stipulate to that, then we're done with

10   April 11, 2006.  If they'll stipulate that there was no

11   identification, no name, and no description, then we're

12   done with April the 2nd, and we can move on to November

13   the 2, 2006.

14                    MR. MORENO:  The defendant is not

15   mentioned on November 11th.

16                    MR. BALLI:  Thank you.

17                    THE COURT:  On which one?  On which date

18   did you say?

19                    MR. MORENO:  November 11th.  I'm sorry,

20   April 11.

21                    THE COURT:  Okay.  On April 11th.

22                    MR. MORENO:  2006.  My recollection is

23   that they don't even talk about this defendant.

24                    THE COURT:  Okay.  So you're willing to

25   stipulate that there was no description given by Jasso

```
 1    and no identification of this defendant on April 11,

 2    2006?

 3                  MR. MORENO:  His interview is completely

 4    focused on somebody else.

 5                  THE COURT:  Okay.  Let's just move

 6    forward.  I thought we might shortcut.

 7                  MR. BALLI:  Because they stipulated to

 8    that.  You stipulated.  I just want to make sure it's

 9    stipulated.

10                  THE COURT:  I believe that's what Mr.

11    Moreno just did, yes.

12                  MR. MORENO:  Yes, he is not discussed in

13    that offense.

14                  THE COURT:  Okay.

15    BY MR. BALLI:

16    Q    All right.  So let's move on to November 2nd--

17    A    Yes, sir.

18    Q    -- 2006.  On November 2, 2006, you interviewed

19    Raul Jasso Jr. in San Antonio, Texas, correct?

20    A    Correct.

21    Q    And it was you and investigator Carlos Adan,

22    correct?

23    A    It was myself, Investigator Carlos Adan, and

24    Mr. Jasso's attorney, Andy Ramos.

25    Q    And that second interview, it is an oral interview
```

1    without any recordings or writings, correct?

2    A    Oral interview.  There is a recording.  Audio

3    recording.

4    Q    There is an audio recording?

5    A    Yes.

6              MR. BALLI:  Your Honor, at this time, we

7    would request that the audio recording be provided to

8    us.  That's the first we learned of an audio recording

9    of that interview.

10             MR. MORENO:  I have a report he wrote of

11   the interview.

12             MR. BALLI:  And that I've seen, Your

13   Honor.  But I would like to hear the audio recording.

14             THE COURT:  Is that an existing audio

15   recording?

16             THE WITNESS:  Yes.  It's mentioned on the

17   report that you just mentioned you read.

18             MR. BALLI:  Your Honor, we've never seen

19   that.

20             MR. MORENO:  I have a report of the

21   interview.

22             THE WITNESS:  If you allow me, excuse me.

23             THE COURT:  Do you know where the audio

24   recording is kept?

25             THE WITNESS:  It's in property -- if you

1    allow me, I can show you in the report you mentioned

2    that you have.  It says that it's recorded.

3    BY THE WITNESS:

4    Q    That's fine.  I'm not questioning.

5    A    Okay.

6    Q    That you're saying that if there's a recording,

7    we'd like to get that.

8                    THE COURT:  But, Mr. Moreno, you don't

9    have it right now.  You don't have it, and have not

10   had--.

11                   MR. MORENO:  I don't have it.  I can try

12   to get it from the police department.

13                   THE COURT:  That's all we can do right

14   now.

15                   MR. BALLI:  All right.

16   BY MR. BALLI:

17   Q    As far as November 2, 2006?

18   A    Yes, sir.

19   Q    Okay.  Do you think that if you testify to

20   November 2, 2006, you're going to be able to test --

21   testify to it accurately?

22                   THE COURT:  Ask your questions right now.

23   If he doesn't remember something and you think it is

24   necessary to find the recording, we'll deal with that,

25   but right now just ask the questions.

```
 1              MR. BALLI:  Okay.
 2              MR. MORENO:  I'm sorry, is there a
 3   cassette tape?
 4              THE WITNESS:  That's correct, yes.
 5              MR. MORENO:  I'm just noticing where it
 6   says the recording was stopped.  But I don't know if
 7   they checked the following.
 8   BY MR. BALLI:
 9   Q    On November 2, 2006, did you show Raul Jasso Jr.
10   any photographs?
11   A    I showed Jasso Jr. several photographs.
12   Q    Okay.  And in the report you said you showed him
13   two photographs; is that correct that you showed him
14   two photographs?
15   A    He identified two photographs out of what I showed
16   him.
17   Q    So you're saying that you showed him more
18   photographs than two?
19   A    Yes.
20   Q    But he identified two?
21   A    Yes.
22   Q    And of the two photographs that you showed him,
23   who were the other photographs of?
24   A    They were photographs of individuals that we have
25   identified throughout the whole investigation,
```

1    throughout the different murders.  They're Zeta

2    members, other Zeta members that we were trying to

3    identify.  He identified several subjects.  But the

4    ones that I noted were the ones that were related to

5    this particular case.  Those were the ones that were

6    actually identified and noted.

7    Q    And in those two photographs, one of the

8    photographs that you're saying that he identified was

9    the photograph of a person that you believe to be my

10   client?

11   A    Correct.

12   Q    And the allegation is that that is a photograph of

13   my client, correct?

14   A    Correct.

15   Q    And that photograph at the time, did you tell

16   Mr. Jasso who the photograph was of?

17   A    No.

18   Q    Did you ever advise -- did you tell him this is a

19   photograph of Armando Garcia?

20   A    No.

21   Q    Or the name that you had was Armando Garcia,

22   correct?

23   A    The name that we had -- that we had was -- we

24   believed his name was Armando Garcia.  Yes, that's the

25   name that we have.

```
 1    Q    I'm going to show you what has been marked as

 2    Defendant's Exhibit Number--.

 3                   MR. BALLI:  For the hearing, do we just

 4    mark it as one, Your Honor, for the hearing.

 5                   THE COURT:  Let's use letters for the

 6    hearing, so we don't get them confused.

 7                   MR. BALLI:  Okay.

 8    BY MR. BALLI:

 9    Q    Defendant's Exhibit A.

10    A    Okay.

11    Q    And I am going to ask you if Defendant's Exhibit A

12    shows the photograph that or is a copy of the

13    photograph that you showed Raul Jasso Jr.?

14    A    It's a copy of the photograph.

15    Q    And the person who is supposed to be my client is

16    one of six photographs there, correct?

17    A    Yes, on the lower left-hand side.

18    Q    Okay.  But when you showed it to him, it wasn't --

19    it wasn't.  What I'm showing you is not a six pack of

20    photographs, correct?

21    A    No, what I showed him was actually individual

22    photographs of these.

23    Q    And there are six photographs on that page that

24    you're looking at -- but you're showing him individual

25    photographs of at least some of those including my
```

1    client?

2    A    Correct.

3    Q    Like one photo on a page?

4    A    Correct.

5            MR. BALLI:  Okay.  And, Your Honor, at

6    this time I'm going to move to introduce Defense Exhibit

7    A.

8            MR. MORENO:  Can we can clarify one

9    thing?  Did the photos that you used to show the

10   defendant, did they have the names like that one?

11           THE WITNESS:  No.

12           MR. MORENO:  That would be my only

13   objection.  I have one that doesn't have the names, if

14   he wants to use that one.

15           THE COURT:  It's for the court's

16   determination, so I don't have a problem with it.  If

17   you want to substitute, Mr. Balli, the one without the

18   names, so long as it's clear that it was the photo not

19   in that format and without the name; is that correct?

20           THE WITNESS:  That is correct.

21           MR. BALLI:  That's fine.

22           THE COURT:  It will be admitted with that

23   understanding.

24           (Defense Exhibit A admitted.)

25

```
 1    BY MR. BALLI:

 2    Q    And when you showed Mr. Jasso this photograph, how

 3    did you show him?  What is the manner that you used to

 4    show him the photograph?

 5    A    During the process of the conversation, we started

 6    discussing people that he knew, if he knew certain

 7    individuals.  That's when I started showing him

 8    photographs, and started talking if he knew so and so.

 9    Q    Now during the process of conversation, did he say

10    he knew Armando Garcia Cachetes?

11    A    No.  He mentioned Cachetes as being part of the

12    homicide, but not by the name of Armando Garcia.

13    Q    He said that Cachetes was part of the homicide.

14    And in response to that you showed him this photograph?

15    A    During the process that we're talking we showed

16    him the photographs to see if he could identify

17    anybody.  Like I said, there were several photographs

18    that I showed him, not just those two particular

19    photographs that we are talking about.  There were

20    several -- a number of photographs that I showed him.

21    From them, he identified several people, not just

22    Cachetes.

23    Q    And prior to that, he had given you a name.  But

24    prior to that had he given you any description?

25    A    Prior to that interview that we had?
```

1  Q    No, prior to you showing you him the photograph

2  had he given you a description of Cachetes?

3  A    No, just Cachetes.  I mean I figured it was a

4  person with big cheeks.

5  Q    Okay.  And are you aware that Cachetes is a

6  nickname that not only one person has but that many

7  people have?

8  A    With big cheeks, yes.

9              THE COURT:  Let me just ask you in this

10  manner.

11              THE WITNESS:  Yes.

12              THE COURT:  When he mentioned this name

13  Cachetes, did he mention it, that this the name that

14  this person goes by or was he giving you a description

15  of the person with big cheeks?

16              THE WITNESS:  No, the name that he knew

17  this person went by -- no first name, no last name,

18  just that -- a nickname.

19  BY MR. BALLI:

20  Q    You didn't know why the person would have that

21  nickname?

22              THE COURT:  It doesn't matter for

23  purposes of this hearing.

24  BY MR. BALLI:

25  Q    Just -- because you know that it's common in

1    Laredo where somebody might have a nickname and the

2    nickname might actually refer to an opposite

3    characteristic sometime?

4    A    In some -- maybe in some nicknames, but that's the

5    only reason.  I wouldn't see why somebody would be

6    called Cachetes, if they don't have big cheeks.

7    Q    Well but could a person also I guess be called

8    Cachetes if they had a large rear end?

9              THE COURT:  It doesn't really matter,

10   Mr. Balli, for purposes of this hearing.

11             MR. BALLI:  Well, Your Honor, the reason

12   that it does matter for the hearing, at least for us, is

13   that it goes to the description that he gave.

14             THE COURT:  No.  He said he wasn't given

15   that description, he was given a name.  This is the name

16   that he knew this person by.  It wasn't that he was

17   describing somebody.

18             MR. BALLI:  And he said -- but he said he

19   assumed that the person would have big cheeks?

20             THE COURT:  It doesn't matter what this

21   witness assumed.

22   BY MR. BALLI:

23   Q    Okay.  After that, did you ever interview Raul

24   Jasso again?

25   A    The following interview after that, I want to say

```
 1   it might have occurred, what, maybe sometime last year.

 2   I'm sorry, yeah, in 2009, sometime in 2009.

 3   Q    How many times did you interview him in 2009?

 4   A    Maybe just once, that's about it.

 5   Q    Maybe just ones or--.

 6   A    No, I'm pretty sure it was only just once.

 7   Q    And at that time when you interviewed him, was it

 8   related to this case?

 9   A    You know, I don't want to lie to you.  I don't

10   know what exactly we talked about -- this case or

11   something else.

12   Q    Do you know?

13   A    I can check my notes, if you needed the exact

14   answer.  I can check on that.  But I don't know if it's

15   just on this case or related to something else.

16   Q    Did you show him a photograph again?  Did you show

17   him this photograph again?

18   A    No, I don't believe so.  No.

19   Q    Did you show him any other photographs?

20   A    I don't believe so.  It was actually here at the

21   marshal's building that I spoke with him.

22   Q    Are you sure that you didn't show him or the--?

23   A    During that time, no.  I'm positive that I didn't.

24   It was totally something else that I was speaking to

25   him about.
```

1    Q    And in 2010 have you interviewed Raul Jasso?

2    A    We talked not too long ago when we're talking

3    about this case.

4    Q    As this case was approaching -- and how many times

5    were you present when Raul Jasso was being interviewed?

6    A    Just once.

7    Q    One time.  And when was that?  In the last ten

8    days?

9    A    Yes, sir.

10   Q    And at that meeting, was Raul Jasso shown any

11   photographs of my client?

12   A    Yes, sir.

13   Q    Okay.  And which photographs was he shown?

14   A    The photograph in question here that we're talking

15   about.

16   Q    The same photograph.  Was he shown another

17   photograph?

18   A    I believe one other that was taken at the time of

19   his arrest.

20   Q    So he was shown this photograph, and he was shown

21   another photograph as well?

22   A    Yes.

23   Q    And when you say the time that he was arrested,

24   are you talking about when Mr. Castillo was arrested in

25   Houston?

1    A    Yes.

2    Q    And was he shown a mug shot or was he shown an

3    arrest photos that appeared to have been taken at the

4    crime scene?

5    A    I think it was taken outside somewhere outside.  I

6    wasn't there, so I'm just looking at the photo, so I

7    don't know where it was taken.

8    Q    And it looks like he was standing by a patrol car?

9    A    I don't think there was any vehicles behind his

10   back.  I wasn't there like I said.

11   Q    Do you have that photograph?

12   A    No, no, I don't.

13               MR. MORENO:  We have one, Your Honor.

14               THE COURT:  Mr. Moreno is indicating that

15   he has it, Mr. Balli, if you want to use that.

16   BY MR. BALLI:

17   Q    All right.  I'm showing you.  Are these the

18   pictures?

19   A    I don't remember this one.  The one that he's

20   standing I guess it's like a booking photo.  I remember

21   this one where he is standing here with the Santisima

22   Muerte in the front.  I don't know if that's what you

23   are referring to a patrol car in the back.  I don't

24   know if it is or not, but that's the one I remember

25   right there.

1              MR. MORENO:  Your Honor, I'm going to

2    mark this one as Defense Exhibit B.

3              THE COURT:  That was Mr. Moreno's

4    photograph.

5              MR. MORENO:  That's one of our exhibits.

6              THE COURT:  Why don't we--.

7              MR. MORENO:  I'd be happy to print it

8    out.

9              THE COURT:  No, if it's one that you

10   intend to use as an exhibit here?

11             MR. MORENO:  Yes.

12             THE COURT:  What is the number of that?

13   We can use that for this hearing as well as an exhibit.

14             MR. MORENO:  Okay.  Government Exhibit

15   Number 191.

16             THE COURT:  It is 191.  That number will

17   not be changed.  It is considered here for purposes of

18   this hearing.  And if it ultimately gets admitted, it

19   will be there.  And if it doesn't, then we'll have it in

20   this hearing only.

21             MR. BALLI:  Your Honor, I want to tender

22   these to Your Honor.

23             THE COURT:  To the court?  Yeah.  Let me

24   ask you a few questions.

25             THE WITNESS:  Yes, ma'am.

1           THE COURT:  In connection with the

2   November 2nd interview you said that you had shown Mr.

3   Jasso several photographs.

4           THE WITNESS:  Yes, ma'am?

5           THE COURT:  Were showing them to him in

6   response to a particular person that he had named or

7   were you just going through photographs.  Do you know

8   any of these people?  Do you know any of these people?

9           THE WITNESS:  That's what it was.  While

10  we're talking.  Do you know this person?  Do you know

11  this person?  Asking him information, mostly people that

12  were somehow related to these cases.

13          THE COURT:  Okay.  So in particular when

14  he mentions an individual by the name of Cachetes.

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  Did you then immediately show

17  him the photograph that we've identified here as an

18  Exhibit A or the one within Exhibit A or was that one of

19  those shown, do you happen to know this person.

20          THE WITNESS:  It's more of like if he

21  talks about do you happen to know who the person is and

22  he identifies him.  That's the individual who was

23  participating in this case.

24          THE COURT:  Okay.  But I guess what I'm

25  trying to find out is, for example, does he say one of

1    the other -- and I am not necessarily saying this so

2    Mr. Balli will understand, I'm not saying this what he

3    said.  But if he said something to the effect of one of

4    the other participants was Cachetes.  Did you say:  Is

5    this Cachetes or was it a matter of one of the other

6    persons was Cachetes and you're going along.  And at

7    some point in time you just show him a photograph?

8                    THE WITNESS:  That's more what it was to

9    my recollection.  That's what it was, when he was

10   talking about one of the persons was Cachetes.  At that

11   time, we were giving him several photographs to look at,

12   and he identified the person as being one.

13                   THE COURT:  So when he mentioned

14   Cachetes, you gave several photographs for him to

15   identify.  Several photographs?

16                   THE WITNESS:  Several photographs.  Yes,

17   ma'am.

18                   MR. BALLI:  Your Honor, permission to

19   approach again?

20                   THE COURT:  You may.

21   BY MR. BALLI:

22   Q    I'm going to show you what has been marked as

23   Government Exhibit 189?

24   A    Yes, sir.

25   Q    Is this the way the photograph that you showed --

1    that you showed Mr. Jasso looked like.  Is it on a

2    single page?

3    A    It's a single page.

4    Q    And did it look more like that?

5    A    Exactly like this.

6    Q    It was exactly like that one that you have in your

7    hand on?

8    A    The same one.

9    Q    As opposed to Defense Exhibit A?

10   A    Correct.

11              MR. BALLI:  Okay.  Your Honor, I'm going

12   to move the introduce government--.

13              THE COURT:  Can we can we just substitute

14   that?

15              MR. MORENO:  For the purpose--.

16              MR. BALLI:  Yes, Your Honor.

17              THE COURT:  Okay.  What number is that

18   then?

19              MR. BALLI:  It going to be Government

20   189.

21              THE COURT:  189.  Okay, so 189 becomes

22   Exhibit A.  Ms. Trevino, will make copies of those, and

23   I will return this one to--.  That will be Exhibit A for

24   this hearing, and you will get them back, Mr. Moreno.

25   We're going to substitute because this one is not

1    exactly what was shown.

2                    MR. MORENO:  I prefer to let the other

3    one in because I do have some questions to ask him about

4    the other photographs.

5                    THE COURT:  Oh, okay.  Okay.  Then that

6    one will remain as it is numbered Defendant's Exhibit

7    189.  Okay.  All right.  So that we are clear we then

8    have one photograph that is a letter and two that are

9    numbered.

10   BY MR. BALLI:

11   Q    Just to clarify, when you -- when he said that he

12   knew Cachetes, you showed him that photograph, correct?

13   A    What do you mean?  I'm Sorry.

14   Q    When Mr. Jasso said Cachetes that he knew

15   Cachetes, that is the photograph that you showed him?

16   A    That's one of several photographs we showed him.

17   Q    Do you have the other photographs?

18   A    They're -- I can get them.  I'm sure I got a whole

19   stack of photographs that I showed him at one time or

20   another.

21   Q    But if--.

22   A    I didn't keep track of which exact photos they

23   were.

24   Q    Okay.  So you wouldn't be able to tell us at this

25   time which exact photos you showed him?

1    A    No, sir, they were many.

2    Q    You showed him a series, and you don't remember

3    which?

4    A    That is correct.

5    Q    Okay.  And then in 2010, you showed him this last

6    photograph?

7    A    I didn't.

8    Q    Someone else showed him this last photograph?

9    A    Yes, sir.

10    Q    And what was told to Mr. Jasso about that

11    photograph?

12    A    Nothing was told to Mr. Jasso.

13    Q    Then what was the purpose of showing him the

14    photograph?

15    A    Just to see -- show him what the defendant is

16    right now, what he looked like right now.  I don't know

17    what the purpose was.

18    Q    All right.  Did Raul Jasso ever give you a

19    description of Cachetes prior to you showing him any

20    photographs?

21    A    No.

22                    MR. BALLI:  I'll pass the witness.

23                    THE COURT:  Mr. Moreno.

24

25

```
                          EXAMINATION
```

BY MR. MORENO:

Q    Detective Garcia?

A    Yes, sir.

Q    You mentioned earlier that he identified two

photographs.

A    Correct.

Q    In fact, your report said he positively identified

several other individuals in photographs?

A    Yes, sir.

Q    I think it's on Page 2 of your report where a --

I'm sorry, Page 3 of your report where you state that

he identified what you wrote down as Juan Jose, Juan

Arriaga AKA Pantera, and Armando Garcia AKA Cachetes?

A    Correct.

Q    But then on Page 6 Jasso positively identified

Jesus Gonzalez, Rosalio Reta, Pablo Gonzalez, David

Cerezo, Lucio Velez-Quintero AKA El Viejon?

A    That is correct.

Q    So did you have pictures of all those people also?

A    I had a lot of pictures that were shown to him.

And a lot of people -- they were several people that he

identified also there were a lot of people that he

didn't know.

Q    Would it be safe to -- could it be safe to say

1    that all the people that are mentioned in this report

2    you had pictures of to show him?

3    A    That is correct.

4    Q    Okay.  Were on this -- what was the exhibit?  On

5    Defense Exhibit Number A.

6    A    Yes, sir.

7    Q    You said these -- you had individual photographs

8    of these six pictures?

9    A    Yes.

10    Q    Was there anybody from these photos that he did

11    not identify?

12    A    He did not identify the person wearing the red

13    shirt on the bottom.

14    Q    Do you know who that is?

15    A    No, sir.  He did not identify the person in the

16    center wearing the white shirt and the moustache to the

17    left there.

18    Q    These two?

19    A    Yes.  He was not able to identify him.  He was

20    able to identify the person on top which is Rosalio

21    Reta.

22    Q    So from the pictures that you showed him that day,

23    there were a number of people that he could identify,

24    and there were some people that he could not?

25    A    That is correct.

1    Q    And could we say that the photograph that -- where

2    did we put it -- the photograph on Government Exhibit

3    Number 189 is not the best picture?

4    A    No, it's a surveillance photo.  It's not very good

5    quality.

6    Q    Could we say that the quality of Government

7    Exhibit Number 91 is much better?

8    A    A lot better.

9    Q    And you say it's a photo like Exhibit 191 that was

10   shown to the defendant during trial preparation to see

11   if he recognizes the defendant?

12   A    That's correct.

13   Q    And did he in fact identify the photo?

14   A    Yes, sir.

15   Q    But he didn't change his testimony.  He didn't

16   decide he didn't recognize him?

17   A    No.

18   Q    Was he also shown the other old photograph?

19   A    Yes, sir.

20             MR. MORENO:  That's all I have, Your

21   Honor.  Nothing further.

22             THE COURT:  Nothing further?

23             MR. MORENO:  One more question.

24             MR. BALLI:  Go ahead.

25

```
 1   BY MR. MORENO:

 2   Q    Did you have this set of photographs when you

 3   first talked to back in November?

 4   A    No.

 5                   MR. MORENO:  That's all I have.

 6                   THE COURT:  All right.  Mr. Balli.

 7                   MR. BALLI:  Yes, Your Honor.

 8                          EXAMINATION

 9   BY MR. BALLI:

10   Q    Of those individuals that Mr. Moreno just

11   mentioned to you -- mentioned a list of individuals

12   that Raul Jasso identified in November 2, 2006?

13   A    Yes.

14   Q    DO any of those individual -- could any of those

15   individuals be mistaken for my client?

16   A    No.

17   Q    They don't look like my client?

18   A    The ones that he mentioned are part from

19   identifying your client?

20   Q    The ones that Mr. Moreno just mentioned to you

21   that were identified by Raul Jasso Jr. on November 2,

22   2006?  The individuals that Raul Jasso Jr.--?

23   A    He mentioned that he identified Cachetes too.

24   Everybody apart from your client, they cannot be

25   mistake for--.
```

```
1    Q     For my client?

2    A     Correct.

3    Q     For Gerardo Castillo?

4    A     That is correct.

5               MR. BALLI:  Thank you.

6               THE COURT:  All right.  Thank you.  You

7    may step down.

8               THE WITNESS:  Thank you.

9               THE COURT:  I don't believe that that was

10   actually offered, correct?  You have another question?

11              MR. MORENO:  I'm sorry.  I believe he's

12   also the person who interviewed Reta, so I don't know if

13   you want me to go through the same thing with the new

14   officer.

15              THE COURT:  We might as well cover Reta

16   if you want to go through Reta.

17              MR. BALLI:  Yes, Your Honor.

18              THE COURT:  Okay.  I'm sorry, resume the

19   stand.  Okay.  You may proceed, Mr. Balli.

20   BY MR. BALLI:

21   Q     When is it that you interviewed Rosalio Reta?  How

22   many different times did you interview him?

23   A     I want to say at least about seven, eight times

24   more or less.

25   Q     Seven or eight times?
```

1    A    Yes, sir.

2    Q    And when was the first time that you interviewed

3    him?

4    A    June 28, 2006.  The day after his birthday.

5    July 28, I'm sorry.

6    Q    July 28, 2006.

7    A    Yes, sir.

8    Q    And July 28, 2006, where did you interview him?

9    A    At the Laredo Police Department.

10   Q    And did you record that interview?

11   A    Yes, sir.

12   Q    And on that July 28, 2006 interview at the Laredo

13   Police Department, did you discuss Gerardo Castillo or

14   Cachetes or Armando Garcia?  Was that discussed at all?

15   A    I don't believe we did.

16   Q    So he gave you no description or anything like

17   that related to Gerardo Castillo, Armando Garcia, or

18   Cachetes?

19   A    No, I don't think we spoke about Cachetes during

20   that interview.

21   Q    When was the next time that you interviewed him?

22   A    I got to go back and look at my notes, sir.  I've

23   been in on several cases, like I said, in or out.

24   Sometimes at his requests or his attorney's request.

25   Q    All right.  Was there any, any interview where he

1  mentioned the name of Cachetes, Gerardo Castillo, or

2  Armando Garcia?

3  A    There was one interview where he does mention

4  Cachetes and his involvement.

5  Q    Okay.  And that one interview, do you remember

6  what date that occurred on?

7  A    No, sir, I don't.

8  Q    What description did he give you of Cachetes?

9  A    Medium height, big cheeks.  To his knowledge or

10  his memory was mid to early twenties.  And he mentioned

11  that the individual was from the Rio Grande Valley area

12  from Miguel Aleman.

13  Q    But what physical description, not where he lived?

14  A    I'm sorry, that's about the physical description

15  that he provided.  That I remember that's what he

16  provided.

17  Q    Okay. So medium height, big cheeks, mid twenties?

18  A    Yes, sir.

19  Q    Dark skin?

20  A    I don't remember if he gave me a description of

21  his skin or his weight.

22  Q    And do you recall more or less what time period

23  that occurred, if you don't remember the day of this

24  second interview or this interview where he

25  identified--?

1    A    I don't know if it was the second, but I know it

2    was one of the interviews.  I don't want to lie to you,

3    sir.  I really don't know if it was towards the -- I

4    mean he was arrested in 2006.  I don't remember if it

5    was towards the end of the year or the beginning of the

6    following year.  Like I said, I had several interviews

7    with him.

8    Q    Is there a recording of it?

9    A    No.

10   Q    Okay.  So are you thinking late 2006, early 2007?

11   A    It's got to be somewhere around there, sir.

12   Q    Okay.  And when he gave you that description, did

13   you show him any, any photographs?

14   A    The one that -- the one that we've been talking

15   about.

16   Q    The blurry surveillance video?

17   A    The surveillance where Reta is depicted too.

18              THE COURT:  And let me ask you this:  And

19   in that regard, did you do the same thing as you had

20   done with Jasso as far as giving him several photographs

21   to see if he could identify this individual or did you

22   give him just one?

23              THE WITNESS:  No.  During that process,

24   we were actually talking.  I remember we were talking

25   about the incident that had occurred in Monterrey where

1    that photo was taken from, and he was explaining when

2    that photograph was taken from and how come that photo

3    was taken of him there.

4                    THE COURT:  Who was explaining that?

5                    THE WITNESS:  Reta.

6                    THE COURT:  So Reta was telling you about

7    the Monterrey incident?

8                    THE WITNESS:  Yes.

9                    THE COURT:  And about his own photo--.

10                    THE WITNESS:  Being part -- that's a

11    surveillance photo from a convenience store.

12                    THE COURT:  What I'm trying to determine

13    from you is if Reta was explaining the incident and

14    identifying the photo of this defendant and what his

15    part was in that incident?

16                    THE WITNESS:  Correct.  And the name is

17    Cachetes.  Just Cachetes.  No other name.

18                    THE COURT:  Okay.

19    BY MR. BALLI:

20    Q    And by the time that you showed him that photo,

21    did you now have the surveillance video photos aside

22    from just -- previously we've marked an Exhibit A.  And

23    Exhibit A had I guess a tiny shot of faces or tiny

24    shots of faces, correct?

25    A    I'm sorry.  The sheet of six people there.  I have

```
 1    never seen a surveillance, actual surveillance video.

 2    The only thing I've seen was that photograph that you

 3    showed me.

 4    Q    Did you see any surveillance photos taken from a

 5    distance or only those tight shots like the ones that I

 6    showed you in Exhibit A?

 7    A    The only shots that I ever seen that I used were

 8    the ones the tight ones I just.  Mr. Angel Moreno just

 9    showed me another one that -- that one you're talking

10    about expanded.  That I never had.

11    Q    Okay.

12              MR. BALLI:  May I approach, the witness

13    Your Honor?

14              THE COURT:  You may.

15    BY MR. BALLI:

16    Q    I'm going to have you look at Defense Exhibit B.

17    A    Yes, sir.

18    Q    And this one you say you did not show.

19    A    Not those, no.

20    Q    And you didn't have access to those?

21    A    No, sir, I never had access to those.

22    Q    And so on that occasion he identified -- you're

23    saying he identified Cachetes as being in that

24    particular photograph, the ones depicted in Defense A,

25    correct?
```

1    A    Correct.

2    Q    Did you in any of these other interviews that you

3    conducted with Rosalio Reta, did were photographs shown

4    to him again?

5    A    Throughout the interviews, we showed him several

6    photographs of other people.

7    Q    Did you ever show him photographs of who you

8    believed to be Cachetes or that same photograph?  Did

9    you ever show that same photograph to him again?

10   A    I don't believe I did again.  I might have, but I

11   don't think I did.

12   Q    Did you ever show him the other photograph that

13   has been described as the arrest photograph which is

14   Government Exhibit Number 189 -- 191 which was the

15   arrest photograph from Houston?

16   A    During interviews that I conducted no, I never

17   showed him that photograph.

18   Q    Were you ever with anyone else in law enforcement

19   or with the U.S. Attorney's Office when at any time

20   when any photographs are shown by someone other than

21   yourself?

22   A    Yes, sir.

23   Q    And on how many occasions did that occur?

24   A    Just once.

25   Q    An when was that?

```
 1   A    About ten days ago, more or less.

 2   Q    And which photograph was shown to Mr. Reta?

 3   A    The same photos that you showed me before with the

 4   one on the surveillance photograph by himself.  And I

 5   believe the one that you showed me which has the

 6   Santisima Muerte, and maybe this one was shown.  I

 7   really don't know about this one.  I don't remember

 8   this one being shown.

 9   Q    So at least those two and possibly?

10   A    At least those two, yes.

11   Q    And possibly a third?

12   A    Possibly.

13              MR. BALLI:  Permission to approach, Your

14   Honor?

15              THE COURT:  You may.

16              MR. BALLI:  I'm going to move to

17   introduce Government's Exhibit Number 190.

18              MR. MORENO:  Since he says he doesn't

19   even know if they used it, I'm not sure for what

20   purpose.  But I don't have any objection.

21              THE COURT:  I don't understand the

22   purpose either, but if he has no objection.  It is

23   Number 180.  Again, it will be admitted under the

24   same--.

25              MR. BALLI:  190, Your Honor.
```

1    THE COURT:  190.  Again, it will be

2    admitted under the same circumstances as the others.  We

3    need to make sure we keep them separate from what has

4    been admitted for the trial itself right now.

5    MR. MORENO:  What I can do, Your Honor --

6    I was going to say I can just put another one -- is put

7    them separate.

8    THE COURT:  And I just want to keep them

9    separate because they haven't been admitted for purposes

10   of the trial yet, and I don't want it inadvertently

11   winding up in there without going through the proper

12   procedure.  All right.

13   BY MR. BALLI:

14   Q    As of these occasions that you described where

15   Rosalio Reta was shown photos of Cachetes or Gerardo

16   Castillo or Armando Garcia whatever name we choose to

17   call him.

18   A    Uh-hum.

19   Q    These are the only two occasions in which you saw

20   photographs or when you were involved in photographs

21   being shown to Rosalio Reta?

22   A    That I remember, yes.  I showed him at least once

23   myself.

24   Q    At least once or?

25   A    Myself.

```
 1                THE COURT:  He did it at least once, and

 2    then it was done about ten days ago with others.

 3                THE WITNESS:  Correct.

 4    BY MR. BALLI:

 5    Q    But you say at least once or only once?

 6    A    I guess only once.

 7    Q    Only once.

 8                MR. BALLI:  I'll pass the witness.

 9                THE COURT:  Nothing further?

10                      EXAMINATION

11    BY MR. MORENO:

12    Q    Mr. Garcia.

13    A    Yes, sir.

14    Q    You went to see Reta last Friday in Encinal, is

15    that the one you're referring to?

16    A    Friday, yes.

17    Q    Okay.  And aside from showing him those

18    photographs, we had that whole sleeve of photographs of

19    all the defendants?

20    A    That's correct.

21    Q    Did it also include the photographs of his brother

22    and the other two individuals that were arrested with

23    him in Houston; is that correct?

24    A    That's correct.

25    Q    So it was not just that one photo of him after his
```

1    arrest?

2    A    No.

3                    MR. MORENO:  Okay.  That's all I have.

4                    THE COURT:  And the court has another

5    question just to clarify something you said earlier.  In

6    connection with the one interview where does identify

7    the photograph of the individual he knows by Cachetes,

8    were you already discussing the Monterrey incident with

9    him?

10                   THE WITNESS:  We were talking about the

11   Monterrey incident as to why it had happened, yes.

12                   THE COURT:  And it's been mentioned here

13   several times, but I don't know if it's necessarily been

14   put on the record.  But it's that surveillance

15   photograph that we have shown is of that Monterrey

16   incident taken at the scene, correct?

17                   MR. MORENO:  I forgot to ask that.  We

18   also showed him that photograph.

19                   THE COURT:  Let me get an answer to this

20   question first.  For the record that is correct, right?

21   The photo that is number--.

22                   MR. MORENO:  189.

23                   THE COURT:  Okay.  Number 189 that is a

24   photo taken from the Monterrey incident surveillance

25   cameras, correct?

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1              MR. MORENO:  I assume, Your Honor.  What
2    I get are these two.  So I'm assuming that bottom photo
3    came at the same time as these photos that appear to be
4    from surveillance.

5              THE COURT:  Maybe for purposes of making
6    that.

7              MR. MORENO:  I'll mark that and introduce
8    it.  They look to be photos from the same video from the
9    store.

10             THE COURT:  It appears to the court that
11   way as well.  189 is a little blurry.  It does appear to
12   be the same shirt I guess.  Do you dispute that
13   strenuously, Mr. Balli?

14             MR. BALLI:  It does, Your Honor.  But the
15   only thing is it appears to be I guess from a different
16   moment, probably the same place.

17             THE COURT:  It does appear to be the same
18   location.  Okay.

19             MR. BALLI:  Same location, but a
20   different moment because there's a different angle on
21   the weight of the faces.

22             THE COURT:  Correct.  Correct.  I agree.

23             MR. BALLI:  The face is facing--.

24             MR. MORENO:  Let me make that Government
25   Exhibit Number 208, Your Honor, so we have a point of

```
 1    reference.
 2                    THE COURT:  This one.  And, Ms. Trevino,
 3    if you can hand -- okay.  Anything further from this
 4    witness?
 5                    MR. MORENO:  Not from the government,
 6    Your Honor.
 7                    THE COURT:  All right.  Nothing.  All
 8    right.  Thank you.  You may step down.
 9                    THE WITNESS:  Thank you.
10                    THE COURT:  The report for purposes of
11    the reference made earlier.  208 has been offered for
12    purposes of the reference made earlier.  Any objection,
13    Mr. Balli?
14                    MR. BALLI:  I'm sorry.
15                    THE COURT:  208 has been offered.
16                    MR. BALLI:  No, objection.
17                    THE COURT:  It will be admitted for this
18    hearing.
19              (Government Exhibit 208 admitted.)
20                    THE COURT:  All right.  Okay.  Mr. Balli.
21                    MR. BALLI:  Yes, Your Honor.  We would
22    call Mr. Jasso.
23                    THE COURT:  Mr. Jasso, please.  Mr.
24    Jasso, please come forward.  Let me have you raise your
25    right hand to be sworn in.
```

```
 1                    (Witness sworn.)

 2                    (Raul Jasso's testimony previously

 3      transcribed.)

 4                    THE COURT:  All right.  Thank you.  You

 5      may step down.  You may step down.  Incidentally, do we

 6      expect to start with Mr. Jasso tomorrow morning?

 7                    MR. MORENO:  Yes.

 8                    THE COURT:  Okay.  So.  Okay.  Mr. Balli.

 9                    MR. BALLI:  Your Honor, I just wanted to

10      ask the court to allow us to supplement the record with

11      the recording of November 2, 2006, that Robert Garcia

12      described prior to making a ruling, Your Honor.

13                    THE COURT:  But he's going to be

14      testifying tomorrow morning, and I haven't heard -- I

15      mean anything that would raise a concern, raise

16      concerns.  I mean there was no issue as far as not

17      remembering.  I realize you may say, well, the record

18      may be different.  But at this point in time, we have

19      all this testimony before, and the court is prepared to

20      make a ruling on it.

21                    MR. MORENO:  Your Honor--.  Were they not

22      going to call Reta?

23                    MR. BALLI:  Oh, is he here?  Reta is

24      here.

25                    MR. MORENO:  Yes.
```

```
 1               THE COURT:  Reta is here.

 2               MR. BALLI:  The only reason, Your Honor,

 3    is that we would hate to hear that tape later and find

 4    out that there's something in there that we didn't know

 5    about, and he has already testified.  So we would just

 6    like to supplement the record with that, Your Honor.

 7               THE COURT:  Well, okay.  Here is the

 8    issue:  I don't know where that record is, and I don't

 9    know.

10               MR. MORENO:  I can go back to the office

11    and see if we have it according to the courtroom.  I'd

12    have to go look.

13               THE COURT:  To look for it.  First of

14    all, he's expected to be here tomorrow morning.  At this

15    time, the request is denied.  You should look for that.

16    You should make it available to counsel.  If you feel it

17    is necessary for you to supplement the record for

18    purposes of appeal, you may do so.  Okay.  Do you want

19    Mr. Reta?

20               MR. BALLI:  Yes, Your Honor.

21               THE COURT:  Okay.  Let's bring Mr. Reta

22    in.  Mr. Reta, please come forward.  Mr. Reta, let me

23    have you first of all raise your right hand to be sworn

24    in.

25               (Witness sworn.)
```

```
 1                    THE WITNESS:  Yes, ma'am.

 2                    THE COURT:  Okay.  Mr. Reta, go ahead and

 3       have a seat right here, and let me explain a few things

 4       for you.  You may put your hand down.  Right here,

 5       please.  Sit down.  It is my understanding that you will

 6       be giving some testimony in the trial of this case.

 7       We're not in the actual trial at this moment.  There has

 8       been an issue that has come up about identification of

 9       the defendant in this case.

10                    And so right now the purpose of this hearing,

11       is just for the purposes of asking you some questions

12       about that identification.  First of all, do you

13       understand that?

14                    THE WITNESS:  Yes, ma'am.

15                    THE COURT:  Okay.  You do have an

16       attorney that -- who is the attorney?

17                    MR. MORENO:  Mr. Eduardo Pena.

18                    THE COURT:  And Mr. Pena had been

19       planning to be here for your testimony in the trial

20       itself.  Now did you say you had contact with him?

21                    MR. USTYNOSKI:  Your Honor, I spoke to

22       Mr. Pena, and he said that he had no objections to going

23       on without him.  But if Mr. Rosalio doesn't want him to.

24                    THE COURT:  Mr. Pena has been contacted,

25       and it was explained to him what the purpose of this
```

1  hearing is.  On his part, he said he was probably going

2  forward without him being present.  However, you have

3  the right to have him present if you want him to be

4  present.  And so at this point in time, it's up to you

5  whether you want to go forward.  The questions here

6  would be limited to identification issue, not the actual

7  events that are on trial here today.  Do you understand

8  that?

9                    THE WITNESS:  Yes, ma'am.

10                    THE COURT:  Do you want to go forward

11  today without your attorney, or do you want to have your

12  attorney present?

13                    THE WITNESS:  No, I'll go forward today.

14                    THE COURT:  Okay.  Thank you.  Mr. Balli,

15  is going to begin with asking you questions and then

16  Mr. Moreno will ask questions.  Mr. Balli.

17            (Rosalio Reta's testimony previously

18  transcribed.)

19                    THE COURT:  Nothing further, Mr. Balli?

20                    MR. BALLI:  No, Your Honor.

21                    THE COURT:  All right.  Thank you.  You

22  may step down.

23                    THE WITNESS:  Yes, ma'am.

24                    THE COURT:  Okay.  Based upon the

25  testimony presented, the court is ready to make a ruling

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040

1    on this issue as to both Jasso and Reta.  Let us begin

2    with I think initially -- and I understand, Mr. Balli,

3    that having not examined these witnesses before you

4    might not have known exactly what they would testify in

5    this regard.  But we begin with the I guess the basic

6    the fact that neither one of them was presented with a

7    single photograph.  The testimony has been that they

8    were presented with multiple photographs when they did

9    identify this defendant.

10             So we don't have one of those highly

11    suspicious situations where only one photograph is

12    shown.  You know, the factors that the court is required

13    to consider are laid out in the government's motion and

14    the court probably had another case on the issue.

15    Nonetheless--.

16             MR. MORENO:  The defense motion.

17             THE COURT:  I'm sorry, the defense

18    motion.  Correct.  What the court has to determine in

19    this case obviously we begin with the issue as far as

20    whether the presentation of the photo was impermissibly

21    suggestive.  Based on what the court has heard here

22    today, the court does not believe that that was the

23    case.  But I'll touch on some of the other, so we really

24    don't get beyond that anyway, but, nonetheless, I'll

25    touch on them anyway.

1           And that is that as far as the actual

2    identification, both of these witnesses testified that

3    they had ample opportunity to view the defendant,

4    Mr. Reta for a month and a half when they worked

5    together.  Mr. Jasso for a period of at least four to

6    five hours excluding even the time that they were

7    together and he said he wasn't in a situation to view

8    him either face-to-face or even in the same room, so at

9    the very least we have a period of four to five hours

10   during which he did have the opportunity to view him.

11          The issue of description doesn't necessarily

12   come into play because this is a situation a little bit

13   different from others that we have when you are

14   identifying an individual that you don't know.  Although

15   the knowledge here in particular to Mr. Jasso may have

16   been more limited, they did have a relationship before

17   he is called to identify the defendant.  And he is

18   identified by name, although I recognize it is a

19   nickname, and especially in the Spanish culture many of

20   those are used to describe an individual.  This is the

21   name that he is known by, so it would be no different

22   than him saying I was with Bobby all day long, and a

23   photo being shown.  Is this Bobby?  So the description

24   is not as critical here.

25          In all of the testimony that was presented,

1    the witnesses were very positive that this was in fact

2    the defendant that they know by the name of -- the

3    individual that they know by the name Cachetes.  There

4    was no uncertainty on their part.  There was nothing

5    suggestive from the detectives in presenting the

6    photographs whatsoever.  I recognize that there was a

7    length of time between the time that they knew the

8    defendant to the time that they actually identified the

9    defendant.

10          But all the circumstances considered, the

11   court believes that it does not taint the

12   identification.  So the motion is denied to suppress

13   that identification.  Anything else at this time?

14              MR. MORENO:  Not from the government.

15              MR. BALLI:  No, Your Honor.

16              THE COURT:  Okay.  All right.  Thank you.

17   I thought I was going to let you out early today.

18              MR. MORENO:  The court will be keeping

19   the photos?

20              THE COURT:  Ms. Trevino will make copies

21   but if you're hesitant.  Okay.  She'll make copies, and

22   you'll have them back tomorrow morning.

23              MR. MORENO:  Thank you.

24              THE COURT:  Anything else at this time?

25              MR. MORENO:  No, Your Honor.  We have two

1   defendants left, and we may get to both of them

2   tomorrow.

3               THE COURT:  When you say "two witnesses"

4   two defendants or--.

5               MR. MORENO:  That I think are the last

6   two in custody.

7               THE COURT:  The last two witnesses that

8   are defendants in custody.  Okay.  Anything else then?

9               MR. BALLI:  Nothing further, Your Honor.

10              THE COURT:  Okay.  Tomorrow morning 8:30.

11          (Recess to January 29, 2010 at 8:30 a.m.)

12                      CERTIFICATE

13          I, Leticia O. Gomez, Official Court Reporter,

14   certify that the foregoing is a correct transcript from the

15   record of the proceedings in the above-entitled matter.

16          WITNESS MY OFFICIAL HAND, this 6th day of

17   April, 2010.

18

19                              /S/LETICIA GOMEZ
                                Leticia O. Gomez
20                              CSR: 4767

21

22

23

24

25

LETICIA O. GOMEZ, CSR
1300 VICTORIA #3245
LAREDO, TEXAS 78040